# EXHIBIT D

1

```
          IN THE UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF VIRGINIA
                  Harrisonburg Division

------------------------------------

ATLANTIC COAST PIPELINE, LLC,

                      Plaintiff,

   v.

11.18 ACRES, MORE OR LESS, IN AUGUSTA
COUNTY, VIRGINIA, LOCATED ON PARCEL
IDENTIFICATION NO. 40-11, IDENTIFIED
AS TRACE ONE (TAX MAP NO. 40-11) IN
INSTRUMENT #180002522; LOCATED ON
PARCEL IDENTIFICATION NO. 40-13,
IDENTIFIED AS TRACT TWO (TAX MAP NO.
40-13), IN INSTRUMENT #180002522;

and                                    Civil Action No:

BONNIE V. RALSTON, TRUSTEE OF THE          5:18cv60
BONNIE V. RALSTON TRUST AGREEMENT
DATED JUNE 13, 2009,

and

CARSON R. RALSTON, TRUSTEE OF THE
BONNIE V. RALSTON TRUST AGREEMENT
DATED JUNE 13, 2009,

                      Defendants.

------------------------------------

              DEPOSITION of WILLIAM C. HARVEY, II,
         CCIM, MAI, in the above-entitled matter held
         at the law offices of McGuireWoods LLP,
         1750 Tysons Boulevard, Suite 1800, Tysons,
         Virginia on January 29, 2020, before
         Jacqueline Hagen, Court Reporter and Notary
         Public in and for the Commonwealth of
         Virginia.
```



**2**

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:

    MCGUIREWOODS LLP
        1750 Tysons Boulevard
        Suite 1800
    Tysons, Virginia 22102
    BY:  KEITH J. MINSON, Esq.
        kminson@mcguirewoods.com
        (703) 712-5363

ON BEHALF OF DEFENDANTS:

    WALDO & LYLE, P.C.
        301 West Freemason Street
        Norfolk, Virginia 23510
    BY:  STEPHEN J. CLARKE, Esq.
        sjc@waldoandlyle.com
        (757) 622-5812

**3**

I N D E X

THE DEPOSITION OF WILLIAM C. HARVEY, II, CCIM, MAI

E X A M I N A T I O N S

WITNESS                                      PAGE
William C. Harvey, II, CCIM, MAI
  Examination by Mr. Clarke                    4

E X H I B I T S

No.   Description                 MARKED
 1    Report, William C. Harvey         24
 2    Third Amended Complaint and Condemnation    82
 3    Disclosure, Expert Report        128
 4    Expert Rebuttal Report           175
 5    Disclosure, Expert Report        181

**4**

P R O C E E D I N G S

W I L L I A M   H A R V E Y, II, having been duly called and sworn, testified as follows:

    (Whereupon the proceedings began at 9:59 a.m.)

EXAMINATION BY MR. CLARKE:

Q   Good morning, Mr. Harvey. We've met, but I will introduce myself for the record. I'm Steve Clarke, and I represent the trustees of the Bonnie V. Ralston trust in this matter, and we're here today to take your deposition because you've been identified by Atlantic Coast Pipeline, LLC, as an expert witness that it expects to call to testify at trial in this matter. And my clients just want to make sure we understand your testimony and the opinions you intend to give so that we're not surprised. Would you just please state your name for the record?

A   William Charles Harvey, II.

Q   And I think I know the answer, but, Mr. Harvey, have you had your deposition taken before?

A   Yes.

Q   All right. So this is going to be familiar. I like to kind of go over what I call my ground rules for the deposition to make sure we're all on the same page. First, I'm going to be asking you a series of

**5**

questions about your opinions and the underlying basis for these opinions. I would ask that you listen to my question and not begin your answer before I finish my question, and I'll do my best to not begin asking a new question until you finished your previous answer, and, that way, we're not talking over each other.

    Please don't give any nonverbal answers like nodding or shaking your head or uh-uh or uhm-hmm. If it's a yes, answer yes. If it's a no, answer no. If you don't understand a question, please just ask me to clarify. If you need to take break for any reason, excuse me, please let me know. If there's a question that's been pending, we may just want to finish the answer to that question. Does that make sense to you?

A   Yes, it does.

Q   All right. Now, do you understand you've been identified by Atlantic Coast Pipeline, LLC, as an expert witness in this matter?

A   Yes.

Q   And do you, in fact, expect to testify as an expert witness in this case?

A   If it goes to trial, yes.

Q   All right. What is your occupation?

A   Real estate practitioner.

Q   And is that the capacity in which you expect



**6**

1 to testify as an expert witness in this case?
2    A    Well, I would expect to be qualified as a
3 real estate appraiser in this particular matter.
4    Q    Okay.  Any other capacities that you would
5 expect to be qualified as an expert in?
6    A    Appraisal, the field of appraisal review.
7    Q    Okay.  Is that a specialty within the field
8 of real estate appraisal?
9    A    It's a field, you know, within all of the
10 specialty of real estate appraisal.
11    Q    All right.
12    A    Subset.
13    Q    So you have real -- real estate appraiser and
14 then appraisal review, real estate appraisal review.
15 Are there any other capacities in which you expect to be
16 qualified as an expert in this case?
17    A    No.
18    Q    How are you employed?
19    A    I'm employed by William C. Harvey
20 Associates, Inc.
21    Q    All right.  And is that -- is that a firm
22 that you own?
23    A    Yes.
24    Q    Are you the sole owner of that firm?
25    A    My wife and I are equal owners.

**7**

1    Q    All right.  An for how long have you been
2 with that firm?
3    A    May 1986.
4    Q    How many -- does that firm employ anyone
5 else?
6    A    It has affiliations but no other employees
7 other than myself.
8    Q    All right.  And for how long have you been a
9 real estate professionally?
10    A    Since 1976, 43 years.
11    Q    If you will, could you walk me through your
12 educational background, beginning with high school?
13    A    Calvert Hall in Baltimore, Calvert Hall
14 College Preparatory School.  It's a high school in
15 Baltimore, Maryland.  Wesley Junior College, 1976.
16 University of Maryland, '77 -- I'm sorry.  '72 for
17 Wesley and then '73 to '75 for Maryland.
18    Q    Okay.  And then shortly after college is when
19 you began your field -- your practice as a real estate
20 appraiser?
21    A    Yes.
22    Q    All right.  And has that been chiefly your
23 profession since that point?
24    A    Well, I had some sidelines along the way.  I
25 worked at a savings and loan right here in Tysons for

**8**

1 three years.  I was also a stockbroker at Blake Mason
2 (phonetic) for three years, again, and I opened the
3 Tysons office.  But the my specialty in both of those
4 locations was still performing appraisal work.
5    Q    All right.  And since you founded William --
6 is it called William C. Harvey and Associates?
7    A    Yes.
8    Q    Have you been continuously employed by that
9 firm?
10    A    Yes.
11    Q    And in your employment with William C. Harvey
12 and Associates, has that been in the field of real
13 estate appraising, real estate appraisal, or appraisal
14 review?  Or have you been done other things with that
15 firm?
16    A    Well, under that -- in that location for --
17 the headquarters at 1166 H Walker Road in Great
18 Falls, Virginia.  There's a satellite office in -- at
19 605 South Talbot Street, Unit 5, St. Michael's,
20 Maryland.  But at one point, I also owned an
21 auctioneering firm and a separate real estate brokerage
22 firm.
23    Chesapeake Auctions, LLC, was the auction firm.
24 Harvey Real Estate Group, LLC, was the brokerage.  A few
25 years ago, I just -- I let the auction company expire,

**9**

1 and then I folded the brokerage into William C. Harvey
2 and Associates.  So right now, William C. Harvey
3 Associates is licensed, duly licensed, as both a real
4 estate appraisal firm as well as a real estate
5 brokerage.
6    Q    Okay.
7    A    Does that answer your question?
8    Q    Yeah, it does.  Thank you.  I appreciate
9 that.  Do you, yourself, practice as a real estate
10 broker?
11    A    Not a broker.  My wife is a broker of record
12 but I am -- I assist her on her sales team, and we do
13 leasing and property management stuff.
14    Q    Okay.  So do you have some sort of real
15 estate salesman's license or something?
16    A    Yes.
17    Q    But not a brokerage's license?
18    A    No.
19    Q    And of your appraisal practice, I guess
20 thinking in maybe the past five years, how much of that
21 involves litigation or the potential of litigation?
22    A    Good question.  More so in the last three
23 years, ever since I started this mega project, the AS
24 ACP --
25    Q    Okay.



10

1     A    -- as titled to your deposition, but it's
2  variable.  We do -- the appraisal firm does a fair
3  amount of non-litigation work.  So as a dollar sum,
4  litigation is not the majority of revenue stream from my
5  person activity.  As I said, the last these years, it's
6  been more litigation.
7     Q    You mentioned the ACP project.  That's the
8  Atlantic Coast Pipeline project; is that right?
9     A    That's correct.
10    Q    And of your work in litigation, you're
11 thinking of you personally, your appraisal work, in
12 litigation, how much of that, again, in the past five
13 years or so, has been in eminent domain cases?
14    A    I can't give you an exact dollar amount or a
15 percentage.  Litigation takes many forms in real estate.
16 Breach of contract cases, I would -- maybe half would be
17 my guess.
18    Q    All right.  And then thinking about that,
19 maybe half of the -- of your litigation practice, in
20 eminent domain cases, how much of that in eminent domain
21 cases has been on behalf of condemning authorities or on
22 behalf of landowners, property owners?
23    A    Up until the last two years, it was almost
24 equally divided.  Uncannily so.  Went and looked at it
25 one time and broke it all down, and it was about 50/50.

11

1  But for the last -- since April 2017, which is when I
2  was engaged on the ACP project, it's been more
3  condemning authority.
4     Q    Okay.
5     A    But not exclusively so.
6     Q    And who was it that you hired to work on this
7  particular case?
8     A    This case, VanFossen?
9     Q    Yes.
10    A    Ralston?
11    Q    Ralston.
12    A    Well, it was part of my engagement with the
13 ACP project, and that would have been John Wilburn.
14    Q    Okay.  So John Wilburn with McGuireWoods
15 actually hired you to work on the overall ACP project;
16 is that correct?
17    A    Correct.
18    Q    And when was -- I think you said April 2017,
19 is that when you were first hired to be involved with
20 regard to the ACP project?
21    A    Yes.
22    Q    Okay.  How many appraisals have you prepared
23 with regard to the ACP project?
24    A    I would say it's between 90 and 95, probably
25 closer to 95.  I don't have the exact number.

12

1     Q    And has that been exclusively in Virginia?
2  Or has that been in other jurisdictions, as well?
3     A    Other jurisdictions.
4     Q    Which others?
5     A    West Virginia, North Carolina, and Virginia.
6     Q    Okay.  And that's 95 or so since April of
7  2017; is that correct?
8     A    Correct.
9     Q    And has anyone else from your firm prepared
10 an appraisal for Atlantic Coast Pipeline which you,
11 yourself, did not personally prepare or sign?
12    A    No.
13    Q    So with regard to the Atlantic Coast Pipeline
14 matter, how did you or how did your firm come to hire to
15 handle that much appraisal work?
16    A    John Wilburn called me.
17    Q    Okay.  Had you worked with him previously?
18    A    Yes, I've worked with him, and then he's
19 been representing opposing clients in the past.
20    Q    Okay.  And are you being paid for your work
21 on this matter?
22    A    This matter, being Ralston VanFossen?
23    Q    Yes, sir.
24    A    So for the rest of the day, when you say
25 "this," should I just assume it's Ralston?

13

1     Q    Sure.  If you need to clarify, please ask me.
2  Because I don't want any confusion.
3     A    I think that clarified it, yes.
4     Q    All right.
5     A    Yes.
6     Q    All right.  And what is that compensation?
7     A    525 an hour for my time.
8     Q    Just straight hourly?
9     A    Straight hourly.
10    Q    Is there a cap on that?
11    A    No cap.
12    Q    How many hours so far have you spent on work
13 relating to this matter, the Ralston VanFossen case?
14    A    I'd say the overall billings are just under
15 30,000.
16    Q    Okay.  And is that -- are there -- do you
17 have unbilled time, as well, in it?
18    A    Well, I bill monthly.  So January would be
19 unbilled.
20    Q    Okay.  Have you been paid for your time
21 through your -- the last bill you sent?
22    A    Yes.
23    Q    And was that paid by McGuireWoods?
24    A    Yes.
25    Q    Now, I know you said you've given a



14

1  deposition before.  Do you know approximately how many
2  times?
3      A    Of all depositions?
4      Q    Yes, sir.
5      A    Couple hundred.
6      Q    And have you testified in court as an expert
7  witness in the field of real estate appraisal before?
8      A    Yes.
9      Q    How many times?
10     A    I think I've qualified as an expert and
11 provided court testimony about 140 or 150 cases.
12     Q    All right.  And have that been -- well, in
13 what courts, if you can recall?  I'm not asking you to
14 have a comprehensive one, but if there's a --
15     A    Yeah, well, 21 different venues.  I think
16 you have a copy of one of my reports.  My CV, the last
17 page of CV, lists all the venues that I've qualified and
18 testified, and that would include serving as
19 court-appointed expert as well as testimony before the
20 U.S. Congress.
21     Q    Have you testified in a deposition with
22 regard to Atlantic Coast Pipeline matter before today?
23     A    Yes, two.
24     Q    And do you recall which properties or
25 property owners they were?

15

1      A    SMJB was the first.  Fenton Family Holdings,
2  LLC, is the second.
3      Q    All right.  And were those both in Virginia?
4      A    Yes.
5      Q    Did you do anything to prepare for today's
6  deposition?
7      A    I reviewed my reports, yes.
8      Q    Okay.  Did you meet with anyone?
9      A    I had a telephone conversation, but I didn't
10 -- it was not a personal meeting but over the phone.
11     Q    Gotcha.  I'm not asking about the substance
12 of that conversation, but who was that conversation
13 with?
14     A    James Holt.
15     Q    Did you review any other documentation other
16 than your reports?
17     A    No.
18     Q    Have you ever had your expert opinion
19 excluded or found by a court to be unreliable or not
20 credible?
21     A    Well, let me take the compound question.
22 Yes to the first part.  No to the second part.
23     Q    Okay.  Tell me about when you've had your
24 expert opinion excluded.
25     A    The only time I recall is a matter of Lord &

16

1  Taylor versus White Flint Mall.  It was a case in
2  Maryland and --
3            MR. MINSON:  Just for the record, I'd
4       like to object to the form of the question.
5      A    Federal case in Maryland, and in that
6  particular matter, the judge ruled, as a matter of law,
7  that the damages had to flow from the going concern and
8  not the real estate held by the going concern.  So he
9  said it wasn't helpful, my work would not have been
10 helpful, for the jury in that case.
11     Q    Okay.
12     A    He granted a motion to strike.
13     Q    Is that the only time that you're aware of?
14     A    It's the only one that comes to mind.
15     Q    Right.
16     A    I'm not aware of any others.
17     Q    Do you have any licenses?  I know we talked
18 about you have a salesman's license, but do you have any
19 other professional licenses?
20     A    Yes, I have -- hold a certified general
21 property appraiser license in DC, Maryland, Virginia,
22 North Carolina, and West Virginia, Pennsylvania.
23 Wholesalesman license in Virginia.
24     Q    Anything -- anything beyond that?
25     A    Not that pertains to why I'm here today.

17

1      Q    Okay.  Do you have any designations or
2  certifications in your profession?
3      A    Yes.
4      Q    What are those?
5      A    For appraisal, I have an MAI designation.
6  For brokerage as well as consulting and evaluation, I
7  also hold a CCIM designation, and I am an AQB certified
8  USPAP instructor with the Appraisal Foundation.
9      Q    All right.  For how long have you been a
10 licensed certified general real estate appraiser in
11 Virginia?
12     A    Since licensing went into effect.  It first
13 went into effect in 2000.  Then Governor Wilder
14 suspended it for two years, and then ever since it was
15 reenacted, I've been licensed.
16     Q    All right.  Do you have to do anything to
17 maintain that license?
18     A    You have to have continuing education, yes.
19     Q    And have you continued to keep up that
20 requirement since you had your license?  Or had it
21 reinstated, I guess?
22     A    Yes, all of my licenses are not coterminous.
23 So it's a continual renewal process.  I'm currently
24 renewed in Virginia through the end of '22.
25     Q    All right.



18

1     A     Same would hold true for the designations.
2 They require a little more robust continuing education.
3 I -- I'm currently certified to teach the current
4 version of the USPAP 2021 edition, and I've also renewed
5 my CCIM.
6     Q     Now, have you ever had a complaint filed
7 against you with any licensing agency in any
8 jurisdiction in which you're professionally licensed?
9     A     Yes.
10    Q     And tell me about those, if you will.
11    A     The only -- the only one I really recall was
12 an attorney in a matter that I wasn't actually involved
13 with.  One of my associates was.  After the fact, one of
14 my -- two of my associates bought a property.  The
15 attorney complained.
16       The attorney was not aware that the client who had
17 hired my associates gave them permission.  So it was
18 screened, and went no -- I mean, it was -- the case was
19 closed.
20    Q     I gotcha.  And was that -- what jurisdiction
21 was that in?
22    A     Virginia.
23    Q     Was that with the Real Estate Appraiser Board
24 in Virginia?
25    A     Yes, I think it was DPOR, Department of

19

1 Professional --
2     Q     Okay.
3     A     As the custodian of the files and as the
4 president of the firm, I received the complaint.
5     Q     I gotcha.
6     A     Like I said, it was dismissed shortly
7 thereafter.  There was one matter referred for the
8 Appraisal Institute of issuance to MAI.  There was an
9 anonymous complaint.  I submitted my work.  It was
10 screened and the file was closed.  No further action.
11    Q     Okay.  Was that with regard to an appraisal
12 you had prepared?
13    A     Yes.
14    Q     In what jurisdiction?
15    A     Maryland.
16    Q     And what was the substance of the complaint
17 made with the appraisal?  Was it the Appraisal
18 Institute, you said?
19    A     Yeah.  You don't know because it's all
20 anonymous.  You just get a letter saying a complaint has
21 been lodged, please submit your --
22    Q     Okay.
23    A     -- your appraisal for screening.  I had just
24 completed my term as the regional ethics member in
25 charge of region 6.  So it was -- familiar with all the

20

1 parties.  I submitted my work.
2       It was reviewed by the director of screening with
3 the Appraisal Institute, and then I received a letter
4 saying the matter had been closed with no further
5 action.
6     Q     Okay.
7     A     And that -- you just don't know who did it,
8 why they did it.  It's just -- that's the way it works.
9     Q     Have you ever, yourself, filed a complaint
10 against another appraiser with a licensing agency?
11    A     In my capacity with the Appraisal Institute,
12 in one of my national roles, I did -- I was required to
13 file it one time.  And then that was -- as the
14 experience coordinator for the DC Metro area, when a
15 member -- when a candidate or, now called associate,
16 seeks membership through designation, they have to meet
17 certain criteria, one of which is their work that they
18 contribute on.
19       And when that work comes in, if there is -- if the
20 candidate or associate is denied the experience credits,
21 and there are -- the basis for a denial rises to an
22 ethical rule level, then, as the head of that committee,
23 I'm required to submit it.  So in 20 some years in that
24 capacity, I submitted one report.
25    Q     Okay.  And what was that -- was that with

21

1     Q     regard to a candidate in Virginia?
2     A     I believe it was Maryland.  It was so long
3 ago.  I don't really remember.  And it may have been
4 multiple jurisdictions, you know.  Generally, candidates
5 in the Washington area work in more than one state.
6     Q     Right.  Other than that, though, have you
7 ever submitted or filed a complaint against another
8 appraiser with the Appraisal Institute?
9     A     No.  That was the only one.  I've never
10 filed any complaint with a state agency, and the only
11 one, as I said, was a matter of, you know, I would have
12 been derelict in my responsibilities, had I not done it.
13    Q     I understand.
14    A     And that candidate and member --
15 subsequently, the candidate resigned.  I think the
16 member gave up his membership.  Wasn't the best work.
17    Q     Now, you're familiar, I take it, with the
18 property that's the subject of this case today and
19 located in Augusta County; is that correct?
20    A     Yes.  I represent the county board of
21 supervisors of Augusta County.  I'm very familiar with
22 the subject property.
23    Q     And have you appraised property in Augusta
24 County, Virginia, prior to your work in this case?
25    A     Well, when you say "this case," you're



---

**22**

1 referring to the project or just the Ralston VanFossen
2 matter?
3    Q    Well, let's start with just the Ralston
4 VanFossen matter.
5    A    Yes, I've appraised many properties in
6 Augusta County.  As I said, I represent the board of
7 supervisors.
8    Q    Okay.  And the appraisals that you had
9 prepared for properties in Augusta County prior to your
10 involvement in this case, were those involving the
11 Atlantic Coast Pipeline?  Or were there other appraisals
12 that you had prepared separate and apart from the ACP
13 project?
14    A    A combination of ACP-related work and non
15 ACP-related work.
16    Q    When was the first time that you appraised a
17 property in Augusta County, Virginia?
18    A    In my representation of the board of
19 supervisors I think was the first time, and I think it
20 goes back to either 2012 or 2013.
21    Q    When you say you represent the board of
22 supervisors, in what capacity is that?
23    A    They're my client.
24    Q    But what work are you doing for them?
25    A    I handle their ad valorem property tax

---

**23**

1 appeals once it goes to -- beyond an administrative
2 review.
3    Q    So if an owner decides to challenge his or
4 her tax assessment and it goes beyond the administrative
5 review, then the -- the board of supervisors would get
6 you involved to defend its assessment?
7    A    They could.  It's not -- it's not an
8 automatic hire.  It depends upon the board's discretion
9 as to, you know, whether they bring it to me or somebody
10 else, but -- what's been represented to me is I
11 represent the board in their largest tax base,
12 properties.
13    Q    Okay.  Now, in your capacity representing the
14 Augusta County Board of Supervisors, have you been
15 involved in litigation or testified in litigation?
16    A    I have.
17    Q    I guess that was a compound question.  Have
18 you actually testified in litigation cases in your
19 capacity representing the board of supervisors?
20    A    I have.
21    Q    All right.  What -- multiple -- multiple
22 times?
23    A    Yes.
24    Q    And what were those cases?
25    A    One was McKey Foods, and the other one was

---

**24**

1 Hershey Chocolate.
2        MR. MINSON:  Objection for this line of
3     questioning.  I don't see how it's relevant,
4     but continue.
5    A    And the other one was Hershey Chocolate of
6 Virginia, Inc.
7    Q    All right.
8        MR. CLARKE:  If I could get this marked
9     as Harvey 1?
10        (Whereupon Harvey Exhibit No. 1 marked
11     for identification.)
12    Q    All right.  Mr. Harvey, I've given you a
13 document that's been marked for identification purposes
14 as Harvey Exhibit 1, and I'll just ask -- if you need to
15 take a little review of it, that's fine, but I'm going
16 to ask you some questions about it.
17    A    Go ahead.
18    Q    All right.  So actually if you're looking at
19 the first page here -- I know you're kind of looking
20 further back.  Is -- it's your report; is that correct?
21 Or they -- one of your reports; is that right?
22    A    Yes, it's -- it's one of my reports.  Why
23 I'm staying on page 34 is I signed these reports
24 electronically, and my stamp does not appear on page 34.
25 If you read the paragraph in italics below that, it's

---

**25**

1 possible to unlock it, if one were to save it in some
2 other capacity, but I submit them in electronic format.
3    Q    Okay.
4    A    So just to be clear, what I submitted had a
5 digital stamp indicating, you know, my digital ID, and
6 the file was locked.
7    Q    Okay.  Well, I'm going to -- I'm going to
8 represent to you that this is what I received from
9 McGuire Woods.  So I don't know anything about that.
10 I'm not trying to suggest that something was altered
11 here, but I appreciate your bringing that to my
12 attention.
13    A    Yeah, let me just -- so that's -- there's
14 not an elevated level of concern.  This is fairly
15 common.  I'm required to submit it to client and other
16 intended users with the file lock.
17    Q    I gotcha.
18    A    Lots of times, IT departments in
19 transmitting documents and legal will save it in another
20 capacity or whatever, or the other possibility is the
21 copy did not elevate the stamp but --
22    Q    I gotcha.  Okay.  Well, I appreciate that.
23    A    It appears to be my work.
24    Q    Sure.
25    A    And I will note anything to the degree it



26

1  differs from what I recall.
2      Q    I appreciate that.
3      A    Sure.
4      Q    If you will, look at the very beginning of
5  it. Before you get to your -- the substance of your
6  report itself, and, actually, there's a -- the second
7  page of the document, Harvey Exhibit 1 --
8      A    Could I read this, please?
9      Q    Sure.
10     A    Okay.  Thanks.
11     Q    All right. So, Mr. Harvey, looking at the
12  second page of this -- of this exhibit, there's sort of
13  a block about a third of the way down the page that has
14  your name and your business contact information. Do you
15  see that?
16     A    I do.
17     Q    All right. And then underneath that to the
18  end of the document at the top of page 3, there's three
19  paragraphs of text.  Do you see those?
20     A    I do.
21     Q    Did you write that text?
22     A    No.
23     Q    All right.  Do you know who wrote it?
24     A    The signature is James Holt.  So I can only
25  assume that he authored it.

27

1      Q    Okay.  Have you seen this text that we're
2  just looking at here, these three paragraphs, before
3  today?
4      A    I haven't seen this -- this is typical of a
5  transmittal of an expert report under the rules.  I've
6  seen very similar transmittal letters in many
7  capacities.  I didn't see this particular one.  That's
8  why I asked to read it.
9      Q    I appreciate that.  If you look just briefly
10  at the second paragraph underneath your name and contact
11  information there, sort of the bottom of page 2, the --
12  the last sentence of that says, "Mr. Harvey is expected
13  to testify consistent with the appraisal report to a
14  reasonable degree of his professional certainty." Do
15  you see that?
16     A    I do.
17     Q    What does that phrase mean, to a reasonable
18  degree of his professional certainty?
19     A    Well, it's legal language that I've heard in
20  many capacities, and I'm often asked at live testimony
21  if I hold my opinions to a degree of professional
22  certainty.
23     Q    Okay.  That's not -- that's not a phrase that
24  you asked to be included in this disclosure, I take it;
25  is that correct?

28

1      A    No.  My document starts after the separated
2  page of Exhibit A.  This is, I believe, the attorney's
3  transmittal to the filing of my exhibit.
4      Q    Okay.
5      A    And his language.
6      Q    I appreciate that.  Now, continuing on to the
7  next paragraph there at the bottom of page 2, Mr.
8  Harvey, it says, "In reaching his opinions, Mr. Harvey
9  reviewed the documents, facts, and data described and
10  supplemented in the attached expert report and appraisal
11  report attached to the expert report." Do you see that?
12     A    I do.
13     Q    So just so I understand, the attached expert
14  report is what you were saying starts after the
15  separation page that says Exhibit A? And then there's a
16  document that's midway down the page that says expert
17  report?  Is that -- that's what's referenced there on
18  page 2?
19     A    Correct.
20     Q    All right.  And what is the -- the reference
21  on page 2 to the appraisal report attached to the expert
22  report.  What is that?
23     A    If you turn to the table of contents, second
24  page.
25     Q    Yes, sir.

29

1      A    And I believe in this particular case, it's
2  referring to Exhibits 4 and 8, which are exhibits to
3  Harvey Depo Exhibit 1, and in those two exhibits are
4  actual appraisal reports.  So that's why it refers to an
5  expert report and appraisal reports.
6      Q    Okay.
7      A    The expert report is in accordance with
8  Rule 2682, and the two appraisal reports meet the
9  criteria of USPAP standard 2A.
10     Q    Okay.
11     A    1- -- 2-2A.  I'm sorry.
12     Q    Is the expert report also an appraisal report
13  under USPAP?
14     A    Yeah, I wouldn't distinguish between the
15  two, but I could see one doing so.  The Rule 26 report
16  doesn't hold the same criteria as does the requirements
17  for USPAP for a written appraisal report.
18         In my particular case, they are -- those criteria
19  could be synonymously employed, meaning my expert report
20  does meet all the criteria of a stand alone appraisal
21  report under 2-2A, but it also has two additional
22  appraisal reports as exhibits there too.
23     Q    Okay.  So just so I -- so I'm clear.
24     A    Sure.
25     Q    I don't want to be misunderstanding.  Your



30

1  expert report would constitute an appraisal report under
2  the USPAP standards, but it, itself, also has two other
3  USPAP-compliant appraisal reports attached to it?
4     A   That's correct.
5     Q   All right.  Now, in reaching your opinions
6  with regard to this case, did you review any documents,
7  facts, or data that's not described or supplemented in
8  this expert report that's attached?
9     A   I don't understand your question.  I mean, I
10 reviewed lots of data.  I didn't rely, you know, on any
11 additional data that's not described and referenced in
12 Exhibit 1.
13    Q   All right.  It's really a reference -- again,
14 if you're looking back at page 2 of this initial cover
15 document at the bottom, it mentioned that you reviewed
16 the documents, facts, and data described and
17 supplemented in the attached expert report.  I'm
18 wondering if you reviewed any documents, facts or data
19 that is not described or supplemented in the attached
20 expert report?
21    A   Where's that language?
22    Q   It's at the very bottom of page 2.
23    A   So in accordance with the language of the
24 bottom 2, yes, all of the documents, facts, and data are
25 referenced in Exhibit 1, and I -- I probably did review

31

1  some other data, but I found it to be extraneous and not
2  valid for purposes of developing the appraisal and,
3  therefore, didn't consider it further.
4     Q   Okay.  So turn with me, if you will, to your
5  expert report, which is attached as Exhibit A to Harvey
6  Deposition 1.
7     A   Okay.
8     Q   And it -- just want to confirm this is your
9  report with regard to this case; is that correct?
10    A   It's one of the reports.
11    Q   Okay.  And just so I understand, who are the
12 owners of the property that you were appraising in this
13 report?
14    A   Bonnie V. Ralston and Carson R. Ralston, the
15 trustees of the Bonnie V. Ralston trust agreement, dated
16 June 13th, 2009.
17    Q   Okay.  When did you prepare this report?
18    A   This Exhibit 1 was prepared, if you go back
19 to the title page, on November 27th, 2019.
20    Q   Okay.  And it's indicated on that page that
21 this is what's called a third supplement; is that
22 correct?
23    A   Yes.
24    Q   And there are three other reports referenced
25 of different dates prior to that; is that right?

32

1     A   Correct.
2     Q   When did you accept this appraisal assignment
3  to prepare this expert report, the third supplement?
4     A   When the underlying plats were revised, they
5  were brought to my attention, and it was at that time
6  that I was asked to supplement my work.  I don't
7  remember the exact date, but I could --
8     Q   All right.
9     A   -- reference the plat dates.  Normally,
10 they're transmitted to me shortly thereafter.  So for
11 PIN -- for property identification nos. 40-11, that plat
12 was amended October 21, 2019.  I would say it was that
13 week that I was communicating with and asked to
14 supplement based upon the revised plat.
15    Q   Who was it that asked you to do that?
16    A   Most likely, James Holt.  But I don't recall
17 the specific telephone call or e-mail or transmittal by
18 which I received it.  As you know, there's multiple
19 attorneys on this project working under the McGuireWoods
20 firm.
21    Q   And were you asked to prepare a new appraisal
22 or to provide something or just to set -- told, "Hey,
23 these plats have been updated.  Will you update your
24 opinions?"
25    A   It was more the latter of what you

33

1  referenced.  There have been other amended plats in the
2  past in other cases.  So this -- I couldn't call it
3  routine, but it's not the first time this type of
4  occurrence has occurred.  And given my familiarity with
5  the rules, you know, I always find it beneficial to just
6  submit a new, entirely self-contained expert report.
7     Q   Okay.  Now, does this expert report, the
8  third supplement that's dated November 27th, 2019, does
9  that contain a complete statement of all of the opinions
10 you will express and the basis and reasons for them?
11    A   If -- when this matter goes to trial, is
12 that what you're asking?  If it goes to trial?  Because
13 there's another report.  That's why I'm confused by your
14 question.
15    Q   Sure.
16    A   The answer is no, as you've asked.  The
17 answer is no.
18    Q   Because there's another report that's a
19 review appraisal?  Is that the --
20    A   Rebuttal, yes.
21    Q   Okay.  So other than that rebuttal report, is
22 there any -- any other statements or opinions you will
23 express or the basis and reasons for them that you
24 intend to testify if we go to trial on this matter?
25    A   None that I would intend to, although I



34

1   don't control what questions are asked.  So to the
2   degree somebody asks a question that's outside of the
3   four corners of this report or the rebuttal report, and
4   the judge would not object to that, or the judge would
5   not overrule such an objection, then I would answer
6   those questions.
7       Q    So other than what's contained in this third
8   supplement expert report and the rebuttal report which
9   we'll look at later, are there any other opinions you
10  will express in this case that are not contained in
11  either of those?
12      A    Not that I intend to.
13      Q    And does this report, the third supplement
14  and the rebuttal report we talked about, do those
15  contain all of the facts or data which you considered in
16  forming your opinions?
17      A    Yes.
18      Q    Is there any facts or data which you
19  considered in forming your opinions which is not
20  contained in either this third supplement report or the
21  rebuttal report?
22      A    No.
23      Q    And does your expert report, the third
24  supplement, and the rebuttal report we talked about, do
25  those contain all of exhibits which will be used to

35

1   summarize or support your opinions?
2       A    I don't intend to have any other exhibits,
3   but it's been my experience that a demonstrative exhibit
4   may be included, not for purposes of submitting it to
5   the jury, but for helping the jury understand any
6   testimony.  It's possible there would be other
7   demonstrative exhibits.
8       Q    Okay.  Did any of the attorneys with the law
9   firm of McGuireWoods provide you with facts or data
10  which you considered in forming your opinions?
11      A    Other than the plats and the complaint, no.
12      Q    And did any of the attorneys with the law
13  firm of McGuireWoods provide you with any assumptions
14  upon which you relied in forming your opinions?
15      A    No.
16           MR. MINSON:  Objection to the form of
17           that.
18      A    No.
19      Q    What -- what was your assignment?  What were
20  you appraising in this report?
21      A    I was appraising the two property
22  identification numbers listed in the complaint under the
23  federal rule before and after for purposes of a fifth
24  amendment taking.
25      Q    Okay.  Were you considering the rights that

36

1   were being acquired by Atlantic Coast Pipeline across
2   those properties?
3       A    In part, yes.
4       Q    How did you know what rights were being
5   acquired?
6       A    Well, the rights were set forth in the
7   complaint that was transmitted to me by the McGuireWoods
8   attorneys.
9       Q    Okay.  And how many times have you appraised
10  this property or these properties on behalf of Atlantic
11  Coast Pipeline?
12      A    Well, this is the fourth supplement or
13  fourth appraisal.
14      Q    So each -- each of the prior appraisals or
15  reports that are listed on your cover page of the expert
16  report, those are themselves appraisal reports; is that
17  correct?
18      A    They're all expert reports that contain as
19  exhibits additional appraisal reports.  And going back
20  to my prior answer, I believe the expert report is also
21  an appraisal report, and each one would be a different
22  assignment because assignment conditions changed
23  vis-à-vis a change in the plats, a change in the taking,
24  and so forth, change in the date.  So four appraisals,
25  four different assignment results.

37

1       Q    Okay.  Now, you talked a little bit before
2   and we talked somewhat about USPAP, and you're familiar
3   with USPAP, the Uniform Standards of Professional
4   Appraisal Practice, correct?
5       A    I am.
6       Q    Is there a provision in USPAP that relates to
7   this idea of supplement reports?
8       A    Well, there are many provisions in USPAP.  I
9   don't believe they use the word "supplement."  I think
10  the more common nomenclature would be "update" or
11  "recertification," and, in that capacity, a supplement
12  report, you know, would be a form of an updated report,
13  sure.
14      Q    Okay.
15      A    New assignment and new assignment results as
16  a result.
17      Q    Is there anything -- thinking about your
18  expert report, the third supplement that we're looking
19  at now, is there anything in this report that you would
20  need to look at any of your prior reports to understand
21  that's not self contained in this document?
22      A    No.
23      Q    If you'll turn with me to page 7 of your
24  expert report, Mr. Harvey.
25      A    Okay.


ZAHN
COURT REPORTING
www.zahncourtreporting.com

**38**

1    Q    And there's a section near the top of page
2  that is indicated "general assumptions and limiting
3  conditions." Do you see that?
4    A    I do.
5    Q    What is the difference between a general
6  assumption and limiting condition and an extraordinary
7  assumption?
8    A    An extraordinary assumption is an assumption
9  made for specific assignment. A general assumption and
10  limiting condition would be applicable to virtually all
11  assignments.
12    Q    Now, looking at those general assumptions and
13  limiting conditions on page 7 of your report, the first
14  item states, "No. 1, no responsibility is assumed for
15  the legal description provided or for matters including
16  legal or title considerations." Do you see that?
17    A    I do.
18    Q    What was the legal description provided?
19    A    It was set forth in the complaint, and it's
20  referenced on the report on page 11.
21    Q    All right. So page 11 and then on to the top
22  of page 12 has a legal description of the properties
23  that you were appraising; is that correct?
24    A    Well, so my answer is clear to your prior
25  question, the first paragraph under identification of

**39**

1  real estate appraised is that which is referenced in the
2  complaint. Because there were two subject PINs, but I,
3  in my determination of the solution to the appraisal
4  problem, I determined there was a larger parcel at
5  issue.
6    These are the legal descriptions that I obtained
7  through my own resources. They're not part of the
8  complaint, and that's what continues on the bottom of
9  page 11 and top of page 12.
10    Q    All right. And that -- that legal
11  description of -- I think it was four additional tracts
12  that you determined comprised with the two subject --
13  comprise what you call the "subject larger parcel." Is
14  that correct?
15    A    Correct.
16    Q    And the legal description that you have of
17  those four additional tracts that's on the bottom of
18  page 11 and the top of page 12, there's a footnote,
19  no. 15 on page 12, that's indicated that that is from
20  the deed of gift recorded March 4th, 2010; is that
21  correct?
22    A    Yes.
23    Q    And that's what you were describing? You
24  obtained -- you found that deed or you got a copy of
25  that deed, and you pulled the legal description of those

**40**

1  four additional parcels from that deed?
2    A    Correct.
3    Q    All right. Did -- did you include this same
4  general assumption and limiting condition back on
5  page 7, item no. 1 in each of your three previous
6  reports that you prepared regarding these properties?
7    A    Yeah, I mean, it's a matter of course that
8  all appraisals, all written appraisals, would generally
9  include general assumptions and limiting conditions.
10  Maybe some word changes, given the years at issue but --
11  yeah.
12    Q    Did the legal description provided to you
13  change between any of those reports?
14    A    In the complaints, in the amended
15  complaints, I don't believe so.
16    Q    Okay. Now, if you'll turn with me to page 9
17  of your expert report, Mr. Harvey.
18    A    Yes.
19    Q    You indicate there sort of towards the top
20  that April 4th, 2018, is the effective date of the
21  appraisal; is that correct?
22    A    Yes.
23    Q    How did you determine that date?
24    A    That's the date of the original complaint.
25    Q    And we talked about it, but again, page 9

**41**

1  indicates the date of this report, the third supplement,
2  is November 27th, 2019; is that right?
3    A    Correct.
4    Q    Now, looking at the top of page 9, you have a
5  statement that says "A retrospective appraisal is
6  complicated by the fact that the appraiser already knows
7  what occurred in the market after the effective date of
8  the appraisal." Do you see that?
9    A    I do.
10    Q    What is it that occurred in the market after
11  the effective date of this appraisal?
12    A    Passage of time and subsequent activity.
13    Q    Okay. Is there any specific market activity
14  that you're considering or thinking about when you made
15  that statement?
16    A    No, this is model language out of USPAP with
17  regard to -- if you look at the footnote advisory
18  opinion 34, it's recommended that intended users of the
19  appraisal report be made aware of the appraiser's
20  perspective.
21    It's normally three perspectives of a valuation:
22  current, retrospective, or prospective. It's just model
23  language to orient any intended user as to what the
24  context of the appraisal is.
25    Q    Okay. So -- and I appreciate that, but



42

1 thinking specifically about this report or -- in your --
2 this appraisal, is there something other than passage of
3 time that occurred in the -- in the market or on these
4 properties after your effective date of the appraisal
5 that has -- has complicated your preparation of this
6 appraisal?
7   A   No, the classic example would be 9-11.  On
8 the day after 9-11 -- if my appraisal was dated 9-9 and
9 then an event like 9-11 occurred, that's the type of
10 notice you're giving to people that, hey, it doesn't
11 consider that subsequent act or actions.
12   Q   Okay.  Now, that paragraph at the top of
13 page 9 goes on to say, "Data subsequent to the effective
14 date may be considered in developing a retrospective
15 value as a confirmation of trends that would reasonably
16 be considered by a buyer or seller as of that date."  Do
17 you see that?
18   A   I do.
19   Q   And then it goes on, "The appraiser should
20 determine a logical cutoff because at some point distant
21 from the effective date, the subsequent data will not
22 reflect the relevant market."  Is that right?
23   A   Correct.
24   Q   And you determined that the cutoff date would
25 be the date of valuation, April 4th, 2018; is that

43

1 right?
2   A   Yes.
3   Q   How did you determine to use that date as
4 your cutoff date?
5   A   That's a default date.  It has to go beyond
6 the effective date.  Case law that I'm aware of --
7 Denison is the case in Virginia where I think the
8 Virginia Supreme Court said just like appraisers use
9 data before an effective date, they can use data after
10 the effective date, but it has to be adjusted back to
11 the effective date.
12   So the effective date is what controls the
13 valuation, whether it's data that occurred pre- or
14 post-valuation.
15   Q   Okay.  So once you determined that April 4th,
16 2018, was your cutoff date, did you disregard data that
17 might have been available in the market after that date?
18   A   I didn't disregard it, but I didn't consider
19 it, either.  In other words, in the course of doing my
20 work, I'll look for land transactions and so forth.  If
21 I was aware of one, I would investigate it.
22   If I was aware of one that, let's say, closed
23 post-valuation, I would look at that data and say,
24 "Well, was it listed or was it under contract prior to
25 the effective date?"  And that's really what the

44

1 confirmation speaks to.  You could use a listing, for
2 instance, that hadn't settled yet.  And you could
3 confirm the data by saying "And it subsequently
4 settled."
5   If the meeting of minds occurred before the
6 effective date, then it would be maybe a good arbiter of
7 value.  If the meeting of the minds occurred after the
8 effective date and there was a change to the list price
9 versus the settle price, that would have to be
10 considered, but that's -- that's really the extent of
11 what this language is speaking to.  It doesn't mean you
12 can go 10 years after the fact and say, "Well, it
13 represents the same market."  It's possible.  Highly
14 unlikely.
15   Q   All right.  Looking further down on page 9 of
16 your report, there's a section that's titled "scope of
17 work," and the first item under there indicates that you
18 made a personal inspection of the subject larger parcel
19 that involved an inspection of the land and exterior and
20 interior of the existing building improvements on a
21 "walk-through basis."  Do you see that?
22   A   That's correct.
23   Q   When did you make that personal inspection?
24   A   July 23rd, 2018.
25   Q   And what was your purpose in doing that?

45

1   A   To familiar myself -- familiarize myself
2 with the physical characteristics of the property.
3   Q   All right.  So just so I'm clear, you made
4 that inspection with regard to your first appraisal
5 assignment, your first appraisal report that you
6 prepared for this property for this case; is that
7 correct?
8   A   Yes.
9   Q   Since you were asked to prepare this
10 supplemental report, I think you said maybe in October
11 or November of 2019, you didn't make a subsequent visit
12 to the property; is that correct?
13   A   Not on the property.
14   Q   Okay.  Did you make -- you made a subsequent
15 visit by the property?
16   A   I've driven by this property multiple times.
17   Q   But my question is --
18   A   Not for the purpose of inspecting but in my
19 travels in Augusta County.
20   Q   I understand.  My question, though, is since
21 you were asked -- I think you said it was by James Holt,
22 but one of the attorneys at McGuireWoods -- and given
23 the updated plats and asked to supplement or update your
24 opinion, did you -- did you go to or by this property?
25   A   No, I didn't see the need --



**46**

1          MR. MINSON:  Objection.
2     A    I didn't see the need to since the effective
3  date remains the same for all four reports.
4     Q    I appreciate that.  Now, you mentioned the
5  that personal inspection you made.  Was someone with you
6  at that point?
7     A    Yes, both Mr. and Mrs. Ralston accompanied
8  me on the inspection.
9     Q    Okay.
10    A    More so Mr. Ralston, given that we did -- we
11  did walk the entirety of the property.
12    Q    Okay.  You walked all the way up the hill?
13    A    I -- I did.  They didn't.
14    Q    Okay.
15    A    But I walked beyond the cottage where the
16  niece lived, and we walked in all the buildings, and it
17  was a robust inspection.
18    Q    How long were you there on the property when
19  you made that inspection?
20    A    A couple hours.
21    Q    And you indicated Mr. and Mrs. Ralston were
22  with you.  Did you talk with them?
23    A    Yes.
24    Q    What was the substance of your conversation?
25    A    Cordial, cordial interaction.  Appreciated

**47**

1  their time, that type of thing.  They answered certain
2  questions about when I went to the cottage.  There was
3  no cooking -- there's no kitchen and so forth, which is
4  typical because this -- you know, it's not zoned for
5  multi-family development, and they indicated that, well,
6  it was not really intended for use.
7       It's more of a cottage, and their niece was
8  attending college, and that's why she lived there, but
9  she ate with them.  So they just gave real world
10  examples to some of the questions about, you know,
11  observations that I made.  They may have answered some
12  other questions about when the last renovation occurred
13  of a particular appliance or element and, you know, what
14  particular buildings -- what uses they served, and so
15  forth.  There were a lot of little outhouse buildings
16  and sheds.
17    Q    Okay.  You indicated you went in all of the
18  buildings on the property; is that correct?
19    A    Went in all -- there may have been one or
20  two sheds that were very small that were self-evident,
21  but, yeah, I went to both sides of the street, walked
22  the flood plain areas, which are to the south.  And then
23  to the north is ultimately where the ACP line is
24  proposed above the tree line where the cottage is.
25    Q    Was the proposed ACP route marked or staked

**48**

1  or somehow indicated on the property during that visit?
2     A    No, I saw no markings on the property.
3     Q    Okay.  Would -- did that make it difficult
4  for you to understand the -- the route of the pipeline
5  as it crossed the property?  Were you still able to do
6  that?
7     A    No, I was still able to do that.  I carry --
8          MR. MINSON:  Objection to the form for
9     that question.
10    A    I carry with me electronic devices, one of
11  which is a phone and iPad, and they're both equipped
12  with GIS.  So I have the real time and I have the
13  shapefiles for the center line.  So I know exactly where
14  the pipe is.
15    Q    Okay.  And was anyone else with you?  You
16  indicated Mr. and Mrs. Ralston.  Anyone else with you
17  during the inspection?
18    A    My associate, William O'Donnell, was with
19  me, and Mr. and Mrs. Ralston were the fourth parties in
20  attendance during the inspection.
21    Q    And now you indicated, in response to a
22  previous question, that you had been by that property,
23  not necessarily on that property, but by it.  How many
24  other times have you been by that property?
25    A    I haven't recorded the times, but, you know,

**49**

1  it's a route that there were other properties,
2  obviously, along the pipeline route that I appraised and
3  that's the frequency by which I drove by the property.
4     Q    On any of those other times when you drove by
5  the property, did you ever stop and get out of your car
6  or take notice, take particular notice, of a property?
7     A    I certainly stop and got out of my car from
8  time to time, but it wasn't for the purpose of doing
9  anything with this property.
10    Q    Okay.  Looking back at page 9, item no. 2,
11  Mr. Harvey, under your scope of work, it indicates that
12  you relied upon public records for information regarding
13  the subject larger parcels' legal and physical
14  characteristics.  Do you see that?
15    A    Yes, I do.
16    Q    What are the public records that you're
17  referring to?
18    A    They would consist of land records recorded
19  with Augusta County as well as GIS and assessment
20  records available through the county website.
21    Q    And how did you obtain those records?
22    A    Electronically.
23    Q    What -- what is it that you learned from
24  those public records that you relied upon?
25    A    Well, assessment records carry with them



50

1  specific data with regard to property descriptions as
2  well as references to transactional data.  I have a
3  remote access license with the Augusta County Circuit
4  Court for land records.  So plats, deeds, and so forth,
5  I obtained as well as deeds of trust and other important
6  information relative to transactional data.
7      Q    And are the public records that you relied
8  upon, are they identified or included in your report?
9  Or are they just in your work file?
10     A    They are identified.  For instance, the
11  instrument number and the footnote you read previously,
12  the deed of gift, that would be the form of
13  identification, and then the work file would contain the
14  actual document that was referenced in the report.
15     Q    Okay.  Are there any public records that you
16  relied upon that are not identified in your report?
17     A    I don't believe so.
18     Q    Now, you mentioned GIS information.  If I
19  could ask you to turn to -- I think it's Exhibit 1 to
20  your report.
21     A    Yes.
22     Q    And there's a number of maps with parcels
23  outlined?
24     A    Correct.
25     Q    Would you explain to me what those are?

51

1      A    Yeah, these are the county provided GIS
2  shapefiles for the four PINs that are referenced at the
3  top.
4      Q    Okay.  And so these are the -- there's
5  actually six?
6      A    I'm --
7      Q    PIN numbers; is that right?
8      A    Six, yes.
9      Q    Okay.  So these are the six tax parcels that
10  you determined were part of what you would call the
11  subject larger parcel; is that right?
12     A    The -- Augusta refers to them as property
13  identification parcels.  They are used by the assessor,
14  but they're not really referenced as tax parcels.
15     Q    Okay.
16     A    It can get confusing.  If you say tax
17  parcels, and I'm saying PIN or property identification,
18  but they're, many times, synonymous.
19     Q    I appreciate that clarification, and where
20  did you obtain these documents that you've included as
21  Exhibit 1 to your report?
22     A    From the Augusta County website.
23     Q    How is that you relied upon these documents
24  as Exhibit 1?
25     A    Well, they just provide the intended users

52

1  as to a visible orientation as well as a numeric
2  reference to the six parcels at issue, but I don't rely
3  upon them further than just to identify property.
4      Q    Do these documents that you've included as
5  Exhibit 1, do they show the boundaries of the properties
6  that you wind up appraising?
7      A    They show the boundaries as identified
8  within the GIS database, but that's not the boundaries
9  that I rely upon.  I rely upon the actual deeds, the --
10  you know, that are referenced with the land records for
11  that purpose.
12     Q    Okay.  And which deeds in particular are you
13  talking about?
14     A    The ones that we've previously referenced,
15  the deed of gift that references all of the property
16  that was gifted to Bonnie Ralston.
17     Q    Okay.  So the deed of gift that's indicated
18  in footnote 15 on the bottom of page 12; is that
19  correct?
20     A    Yes, right.
21     Q    Any other deeds that you're relying upon as
22  far as the boundaries of the parcels you're appraising?
23     A    Well, that deeds reference the prior
24  conveyance and so forth.  So there's a chain of title,
25  and then to a degree, I normally will look for the prior

53

1  deed to see if it's consistent with its legal
2  description.
3      Q    Okay.  And are those prior conveyances
4  referenced themselves in your report?
5      A    No, they're referenced in the deed
6  themselves that's referenced in my report.
7          THE WITNESS:  Can I get another cup
8      before you ask your next question?
9          MR. CLARKE:  Sure.
10         THE WITNESS:  Is this a good time for a
11     quick break just down the hall?
12         MR. CLARKE:  That's fine.  Sure.
13         (Whereupon there was a brief recess in
14     the proceedings.)
15  BY MR. CLARKE:
16     Q    All right, Mr. Harvey.  If you will, turn
17  back with me to the GIS documents we were looking at as
18  part of Exhibit 1 to your report.
19     A    Yes.
20     Q    And I'll ask you to turn to the third of
21  those documents that indicates at the top property
22  identification no. 040-11.
23     A    Yes.
24     Q    Do you see that?  Sometimes we call that the
25  4011 property; is that right?



**54**

1    A   Okay.  Yeah.
2    Q   If you would, hold your finger there, and
3    then turn with me to what you've indicated as Exhibit 3
4    to your report.
5    A   Yes.
6    Q   And so there's actually two documents that
7    are -- that comprise Exhibit 3; is that right?
8    A   Yes.
9    Q   And these are -- would you call these the
10   plats, the ACP plats?
11   A   Yes.
12   Q   Now, looking at the first of those documents,
13   this appears to indicate -- or excuse me.  This appears
14   to depict the property, the 40-11 property; is that
15   correct?
16   A   Correct, yes.
17   Q   The -- the boundary lines of the 40-11
18   property as shown on this plat in Exhibit; 3, are they
19   the same as what's shown on the GIS document that's part
20   of Exhibit 1?
21   A   No, the GIS document shows shapefiles.  The
22   plat shows actual boundary lines.  Those are not
23   synonymous terms, and, in fact, the grids are not
24   aligned.
25   Q   Okay.  So explain that to me in -- in

**55**

1    layman's terms.
2    A   GIS uses two forms of architecture, and
3    unless you align your architecture that was used to
4    calibrate the plats with the GIS architecture, they
5    don't -- they don't match up.
6        The purpose of Exhibit 1 and the six property
7    identification plats is just to orient the reader to the
8    property identification number, approximate location,
9    approximate size, approximate shape.  I didn't rely upon
10   those six beyond that point.  I do rely upon the deed of
11   gift and the plats when specific boundary issues are at
12   issue.
13   Q   Okay.  Now looking back at plats that are
14   part of the Exhibit 3, are those plats, to your
15   knowledge, surveys?
16   A   I don't understand your question because I'm
17   not a land surveyor licensed by the Department of
18   Professional Occupation.  I mean, these constitute plats.
19   Whether they reach the level of surveys or not under the
20   Virginia requirements, I don't know.
21   Q   Okay.  Well, I'll direct your attention to
22   the -- note no. 2 on both of those plats --
23   A   Yes.
24   Q   -- it says it's not a boundary survey,
25   correct?

**56**

1    A   Right.  I just call them plats.  I don't
2    call them boundary survey.
3    Q   I understand, but do you distinguish between
4    a plat and a boundary survey?  Is that something you
5    distinguish?
6    A   Yeah, the boundary survey would normally
7    have the surveyor's stamp and license and be dated by
8    the party certifying that survey.  These are terms of
9    art that people in the real estate industry will use,
10   plats, surveys, GIS.  They all have a specific purpose.
11   Q   Okay.  And so you agree with me that these
12   are, on their face, not boundary surveys, these plats,
13   correct?
14   A   They're not surveys in the standpoint from
15   what -- if you were to ask me to provide you with a
16   survey, I would provide you back a document with a
17   surveyor's certificate on it.
18   Q   Okay.
19   A   If -- if the question were posed in
20   Virginia.
21   Q   Do you have in your work file -- have you
22   reviewed any boundary of surveys of -- let's talk about
23   the 40-11 tract?
24   A   Well, the deed of gift would represent --
25   would reference the prior transaction, and in the course

**57**

1    of my due diligence, I would normally go on the land
2    records to find -- a lot of times, they're very dated
3    surveys that go way back.  But normally, I will chain
4    back until I find something, but I just don't recall.
5    Q   So you're not -- sitting here today, you're
6    not sure whether you have something like that in your
7    work file?
8    A   I probably do.  I mean, electronically, when
9    I go on -- on my SRA license to the land records, I'm
10   looking for everything to the point where I'm satisfied
11   that I, one, have the right property and, two, that I'm
12   referencing it as accurately as possible.
13       So I would have looked at the deed of gift, the
14   prior transaction, anything referenced in there which
15   would normally say a plat, and then go to find that
16   plat.  But that plat would most likely have had changes
17   to it subsequent to its original recording, but that's
18   the due diligence that I typically do.
19   Q   So if you had come across a survey in your
20   review of the title with regard to the 40-11 tract, say,
21   is that something you would ordinarily typically include
22   in your report?
23   A   No, it's for my own personal satisfaction.
24   Q   And just so I understand it, are you relying
25   upon either of the documents, the GIS documents in

58

1   **Exhibit 1 or the plats in Exhibit 3, with regard to the**
2   **boundaries of either parcel 40-11 or 4013?**
3       A    Neither.
4       **Q    Okay.**
5       A    I'm relying upon the Exhibit 1 to Exhibit 1
6   -- sorry for the multiple exhibit reference.  Just for
7   identification purposes.  Orient the intended user.  So
8   I'm relying upon the two plats in Exhibit 3 primarily
9   for the area of the take only and its approximate
10  location, where it sits on the property.
11      **Q    Now, are you relying upon any document with**
12  **regard to the boundaries of parcel 40-11 or 40-13?**
13      A    Those that I've previously referenced, the
14  deed of gift.  The land record to me would be the best
15  source of the property, its legal characteristics and so
16  forth.
17      **Q    Okay.  And did the deed of gift contain**
18  **what's called a metes and bounds description; is that**
19  **correct?**
20      A    Sometimes it does.  Sometimes it only
21  references lot and block or prior conveyance, less and
22  except.
23      **Q    Okay.**
24      A    It doesn't always have a metes and bounds.
25      **Q    Does this deed of gift contain metes and**

59

1   **bounds description?**
2       A    Well, I mean, we read the language.  So I
3   think it's self evident because I took this right off
4   the deed of gift, but I'll orient you to it.
5       **Q    Okay.  Thank you.**
6       A    So if you go back to page 11, the first
7   paragraph, the identification is from the complaint
8   under identification.  The second paragraph in that,
9   which appears on the top, as I said, are not -- they
10  reference prior plats and tracts, not a -- it's a
11  combination of referencing prior -- prior plats,
12  surveys, less and except pieces, that have been sold or
13  otherwise taken away.
14      And in some respects, those are not your metes and
15  bounds, but they are some type of quantitative measure
16  such as rods and poles and so forth and acreage.
17      **Q    Okay.  So -- and where they're specific in**
18  **that language that you've quoted from the 2010 -- hold**
19  **on --**
20      A    Top of page 12.
21      **Q    Yes, sir.**
22      A    Where it says "map of a portion of Sylvia B.
23  Hamilton's property," that's an illustration where then
24  you go look for that property.
25      **Q    Right.**

60

1       A    But the -- they get reconfigured over time.
2       **Q    And you do that?  Is that what you're saying?**
3       A    I did.
4       **Q    Okay.  Now, in the description, the first**
5   **paragraph under -- on page 11 of identification of real**
6   **estate appraised, there's a reference to -- a couple of**
7   **times to a deed of gift dated April 2nd, 2018.  Do you**
8   **see that?**
9       A    I do.
10      **Q    Do you have a copy of that deed of gift?**
11      A    I would have -- yes, I believe I have all of
12  the deeds of gift.
13      **Q    Okay.  So I'm wondering why, then, the**
14  **reference that you hold in the next two paragraphs that**
15  **is from a deed of gift recorded March 4th, 2010?**
16      A    Because I was distinguishing between what
17  was given to Mrs. Ralston versus what went into the
18  trust.  I think they occurred under different
19  recordations.
20      **Q    Okay.  So your testimony is that March 4th,**
21  **2010, deed was the conveyance to Ms. Ralston,**
22  **personally?**
23      A    I'm just referencing the activity that I
24  undertook as to -- there were multiple deeds that I had
25  reviewed that went into my file.

61

1       **Q    Okay.**
2       A    I can't tell you specifically what was --
3   what was conveyed without looking at those particular
4   deeds --
5       **Q    All right.  You don't have those --**
6       A    -- satisfied my curiosity when I was doing
7   this research.
8       **Q    I appreciate that.  You don't have those**
9   **deeds with you here today, I take it?**
10      A    I do not.
11      **Q    Okay.  And, again, is there a reason that the**
12  **language you reference on pages 11 and 12 is from the**
13  **March 4th, 2010, deed of gift?**
14      A    Right.
15      **Q    As opposed to the April 2nd, 2018, deed of**
16  **gift?**
17      A    What was the question?  I'm sorry.
18      **Q    Is there a reason why you referenced and**
19  **pulled language specifically from that March 4th, 2010,**
20  **deed instead of the April 2nd, 2018, deed?**
21      A    My only recollection is that when the trust
22  was formed on June 13th, that there may have been
23  something in the trust, and then the prior gift included
24  other properties in the trust.  I just don't recall, but
25  there were multiple transactions, some which appeared to


ZAHN
COURT REPORTING
www.zahncourtreporting.com

62

1  be an estate planning.
2      Others appeared to be the inheritance that was
3  triggered by the death of Ms. Ralston's aunt or mother
4  or whoever it was.  I just don't recall the family
5  relations.
6      Q    All right.  Now, looking back at page 9 of
7  your report under the scope of work, item no. 3
8  indicates that you referred to the generally accepted
9  appraisal practices, procedures, rules and standards set
10  forth in the Uniform Standards of Professional Appraisal
11  Practice, 2018 to 2019 edition.  Do you see that?
12      A    I do.
13      Q    And why is that you're referring there to
14  USPAP?
15      A    Well, because at the time of development of
16  your work, that's the USPAP edition that controls one's
17  activity.
18      Q    Does this expert report, third supplemental
19  report that we're looking at, does this comply with
20  USPAP?
21      A    Yes.
22      Q    Does a report have to comply with USPAP?
23      A    Depends on the nature of the report.  You
24  need to qualify what it was.
25      Q    Does this report have to comply with USPAP?

63

1      A    Yes.
2      Q    Okay.  Does this report have to comply with
3  any other reporting or appraising standards?
4      A    The Code of Professional Ethics and the
5  Supplemental Standards of Practice to the Appraisal
6  Institute.
7      Q    Okay.  Does the report have to comply with
8  the Uniform Appraisal Standards for Federal Land
9  Acquisitions, sometimes called the Yellow Book?
10      A    Does this one?  No.
11      Q    Okay.  Does this report comply with the
12  Yellow Book?
13      A    I would say not because, for instance, the
14  Yellow Book -- one of the distinguishing characteristics
15  is the history of property has to go back ten years
16  versus USPAP, it's three years.  So there are nuances
17  between the two that would apply to the Yellow Book
18  certification that I have not done for purposes of this.
19      Q    All right.  Now, looking at item no. 4 on the
20  bottom of page 9 and on to the top of page 10, there's a
21  reference to several textbooks and treatises.  Do you
22  see those?
23      A    I do.
24      Q    Do you consider those texts and treatises
25  that you've referenced there to be authoritative?

64

1      A    Yes.
2      Q    And in your development of this report, did
3  you refer to specific pages of those texts or treatises?
4      A    Yes.
5      Q    And are those pages specified within the
6  report itself?
7      A    Yes.
8      Q    Now, looking at the top of page 10, item
9  no. 5 indicates that you referred to peer reviewed
10  appraisals, treatises published by national professional
11  appraisal organizations on specialized topics relevant
12  to this assignment.  Do you see that?
13      A    I do.
14      Q    What treatises are those?
15      A    Easement Valuation is one, and then the
16  other one -- I'll have to go find it and reference it
17  for you.  The INGAA Foundation Report, Pipeline Impact
18  to Property Value and Property Insurability -- the INGAA
19  Foundation Report by David Dominy, D-O-M-I-N-Y.
20      Q    And just for the record, are you looking at a
21  specific page of your report?
22      A    For that reference, it was page 29.  I
23  haven't finished the answer.  So I was going to add
24  more.
25      Q    Great.

65

1      A    And then on -- The Analysis of Environmental
2  Case Studies by Thomas Jackson as published in the
3  Appraisal Journal.
4      Q    Okay.
5      A    And the prior one that I mentioned was
6  Easement Valuation in the Right of Way by Donald
7  Sherwood.  Those are the three treatises in response to
8  your answer.
9      Q    And your testimony is that those are peer
10  reviewed treatises?
11      A    Well the first two are, the INGAA, report is
12  an industry report.
13      Q    Okay.
14      A    It has been republished, though, in a number
15  of peer-reviewed publications.
16      Q    And just so I understand it, when you use
17  that term, peer-reviewed, what do you mean by that?
18      A    Peer-reviewed is a publication that is not
19  published until your colleagues, your peers in the
20  industry, have reviewed it and believe it to be
21  representative of valid techniques and opinions.
22      I served as -- on the editorial review board for
23  the Appraisal Journal for a number of years, and in that
24  capacity, I was a peer reviewer.
25      Q    Okay.  And so that article by Sherwood



66

1 entitled Easement Valuation, that was in the Right of
2 Way periodical, right?
3     A   Yes, correct.
4     Q   That -- that is a peer-reviewed article?
5     A   Yes, and it's also been republished in a
6 number of peer reviews such as the Appraisal Journal and
7 other things.
8     Q   Okay.  Now, in your opinion, is it acceptable
9 appraisal methodology to rely upon treatises prepared by
10 other appraisers?
11     A   Depends upon what type of reliance is placed
12 upon those treatises.
13     Q   How so?
14     A   There's no substitute for market data, and
15 that's the primary data that an appraiser will rely
16 upon.  In -- in looking for a broader context of what
17 your peers do in a similar appraisal assignment, then
18 supporting literature such as that can be reasonably
19 relied upon.
20     Q   Okay.
21     A   Doesn't take the substitute of field work.
22     Q   Okay.  And is that in the context in which
23 you relied upon these three appraisal treatises that
24 you've testified about?
25     A   Yes.

67

1     Q   Now, looking pack at page no. 10 of your
2 report, Mr. Harvey, item no. 6 under your scope of work
3 indicates that you gather specific data on the subject
4 larger -- excuse me, subject larger parcel and market
5 area, and then it lists a number of sources.  Do you see
6 that?
7     A   I do.
8     Q   I just want to kind of go quickly through
9 them so I understand what information, what data you
10 gathered, from each of the sources you've indicated.
11     A   Okay.
12     Q   But before we -- before I ask that question,
13 is the information from those sources specifically
14 identified and referenced or included in your report?
15     A   Yes.
16     Q   All right.  So the first item indicated is
17 electronically transmitted and printed data services.
18 What -- what is that?  And what information did you get
19 from those sources?
20     A   Well, that is a broad category referring to
21 what follows.
22     Q   Okay.  So what follows, then -- the next item
23 is Augusta County's website, correct?
24     A   Yes.
25     Q   And what information or data did you obtain

68

1 from that source?
2     A   Well, the website would provide, among other
3 things, GIS data, community data, population, budgetary
4 data for the county, assessment data, zoning data.  I
5 think that would be the -- the broader extent of what I
6 obtained from the website.
7     Q   Then the next item listed is Augusta County
8 Circuit Court's remote access system.  What is the data
9 or information you received from that source?
10     A   Those would be the recorded instruments in
11 the land records that I reference.
12     Q   And we talked about the deed of gift or deeds
13 of gift, and then I think you mentioned that some of the
14 instruments that are referenced in those deeds you also
15 obtained from the land records; is that correct?
16     A   Correct.
17     Q   How far back did you go?
18     A   As far back as necessary, as far back as the
19 records go.  They -- they go back pretty far.  They've
20 digitized almost everything, and if you have to go back
21 to the early 1900s, it will reference a different source
22 for you to have to go back to.
23     Q   Okay.
24     A   So that website will take you to another
25 website, but all under your subscriber license.

69

1     Q   All right.  And did you wind up following
2 that all the way back?
3     A   Yeah, from time to time, I will go back
4 looking for some esoteric document that was handwritten
5 back in the 1800s or 1900s.
6     Q   I'm asking, though, specifically with regard
7 to this report?
8     A   Well, I just don't recall, you know, whether
9 I did or didn't do that, but it's par for the course.
10     Q   Okay.  Looking again at paragraph 6, the next
11 item listed is the Charlottesville Area Association of
12 Realtors Multiple Listing Service?
13     A   Yes.
14     Q   What data or information did you obtain from
15 that source?
16     A   That's transactional data, listings and
17 sales that realtors input records in the multiple
18 listing system which is used as a marketing tool.  The
19 Charlottesville Area Multiple Listing Service is the
20 predominant MLS -- it's not the only one, but it's the
21 predominant one used in Augusta County.
22     Q   And is there specific information that you
23 obtained from that service with regard to this report?
24     A   Yes, the listing records that are referenced
25 by MLS number are those, and then within each MLS



**70**

1  number, if -- if a realtor is offering a property for
2  sale, there's -- many times, there's documents for that
3  particular property that are part of the listing.
4      So you can look at the underlying plat disclaimers
5  that disclose whether the property, the transactional
6  property, had any type of deficiencies that were
7  being -- things of that sort, plats, surveys.
8      Q    Looking again at paragraph 6, the next item
9  listed is vamanet.com?
10     A    Right.
11     Q    What information did you receive from that
12  source?
13     A    Vamanet.com is a listing of assessment
14  public records for other -- for instance, one of the
15  comps I had was from Rockbridge County, not Augusta
16  County. So I had to go back to vamanet to get data for
17  that particular one because it wasn't in Augusta, but
18  that's what vamanet -- it's very similar to an MLS or a
19  county website, but it has a broad number of
20  jurisdictions under its umbrella.
21     Q    Okay. So other that one comp that you
22  referenced, did you receive or rely upon any other
23  information you got from vamanet?
24     A    No.
25     Q    And then the end of that sentence in

**71**

1  paragraph 6 references other sources that are referenced
2  in this report. What are those?
3      A    Well, those that are referenced in the
4  report. If we go through the report, I will bring any
5  to your attention.
6      Q    Okay. Then the next sentence begins,
7  "Geographic information system, GIS data, for the
8  subject larger parcel was obtained from ACP, ArcGIS,
9  Augusta County, and Google Earth." Is that correct?
10     A    That's correct.
11     Q    All right. So let's go through those
12  sources. What GIS data did you obtain from ACP with
13  regard to the subject larger parcel?
14     A    The shape and data files an the center line
15  for the pipeline.
16     Q    All right. So that was specific to the
17  pipeline route? Or did it include the parcels
18  themselves?
19     A    Both.
20     Q    Parcel 40-11 and 40-13?
21     A    Both.
22     Q    And I take it you didn't receive GIS data
23  from ACP with regard to the four other parcels that you
24  included as part of your subject larger parcel but which
25  were not directly part of the taking; is that correct?

**72**

1      A    That's correct. The only -- the only shape
2  and data files that -- from the ACP GIS database were
3  properties that were actually on the route.
4      Q    Okay. And the next item in that sentence,
5  ArcGIS. What GIS data did you did you get from source?
6      A    I own an ArcGIS license. So multiple
7  layers, topography, street, world maps, climate,
8  hydrology, soils, all of that's under the ArcGIS license
9  that I hold.
10     Q    Okay. And you obtained all -- you pulled all
11  of that information with regard to this subject larger
12  parcel in this report?
13     A    Yeah, I mean, I -- I mapped the entire
14  Augusta County route, and that mapping exercise includes
15  all of those layers. So you can take the layers on or
16  off, and as you look at the property, it's helpful to
17  orient yourself to that type of data.
18     You can learn an awful lot about a property from
19  your desk without ever going on it. So you can go on it
20  to confirm what you learned from all these sources.
21     Q    Right. The next item in that sentence is
22  Augusta County. What GIS information for the subject
23  larger parcel did you obtain --
24     A    Well, for instance, the six property
25  identification depictions that appear in Exhibit 1 to

**73**

1  Exhibit 1.
2      Q    Okay. And then Google Earth. What --
3      A    Aerial mapping, primarily, measurements,
4  distances, and so forth. It's a very effective tool.
5      Q    All right. Now, item no. 7 on page 10
6  indicates that you reviewed ACP's right-of-way exhibits
7  for the subject larger parcel --
8      A    Yes.
9      Q    -- dated May 2nd, 2019, and October 21st,
10  2019, correct?
11     A    Correct.
12     Q    And we looked at those earlier. Those were
13  Exhibit --
14     A    3.
15     Q    -- 3 to your report, correct?
16     A    Yes.
17     Q    And you're aware, I take it, that those
18  right-of-way exhibits have changed over the past year or
19  two; is that correct?
20     A    Yes.
21     Q    Have you reviewed previous versions of those
22  right-of-way exhibits?
23     A    Yes.
24     Q    And do you know what the changes were?
25     A    A combination of size and deletion of the

**74**

1  access route.
2  **Q    So talking about the size change, do you --**
3  **do you know -- are you aware of what prompted that size**
4  **change on one of those right-of-way exhibits?**
5      A    No.  I mean, I -- typically, it's either an
6  engineering function or a request by a landowner for
7  some type of sensitivity issue, but that -- I didn't
8  investigate specifically.  I take it as a given.  This
9  is the -- the new parcel taking.
10      **Q    Okay.  Did you do anything to confirm the**
11  **accuracy of those right-of-way exhibits?**
12      A    No, I'm not a surveyor.  I mean, I'm taking
13  them for -- as they are presented.
14      **Q    And now, item 7 there references the**
15  **right-of-way exhibits for that -- it's a defined term**
16  **that you have in your report, "subject larger parcel."**
17  **Do you see that?**
18      A    I do.
19      **Q    Is it correct to say that the right-of-way**
20  **exhibits pertain only to two of those parcels, two of**
21  **the six parcels that make up the subject larger parcel?**
22      A    You know, that could be interpreted many
23  ways.  The subject larger parcel is an appraisal
24  determination I made, and those plats affect the subject
25  larger parcel.  Now, of the components of the subject

**75**

1  larger parcel, only two have the ACP on them.
2      **Q    Okay.  My question really is did you --**
3      A    I don't understand your question.
4      **Q    Sure.  My question is did you review or did**
5  **you receive right-of-way exhibits from ACP that relate**
6  **to -- specifically to any of those four of the non-take**
7  **parcels that you determined were part of the subject**
8  **larger parcel?**
9          MR. MINSON:  Objection to the question.
10      A    No, I only received the two right-of-way
11  exhibits referenced on paragraph 7.
12      **Q    All right.  Item no. 8 on page 10 of your**
13  **report indicated -- excuse me -- indicates that you**
14  **completed a survey of the subject market noting supply**
15  **and demand factors and development trends in the subject**
16  **matter area.**
17      A    That's correct.
18      **Q    Do you see that?**
19      A    Uhm-hmm.
20      **Q    Is that survey included in the report?**
21      A    Yeah, summarized on the two form reports
22  that I reference as appraisal reports 4 and 8.
23      **Q    Okay.  What did that survey consist of?**
24      A    It's a qualitative analysis of population,
25  market trends, whether values are increasing, stable, or

**76**

1  decreasing, and the marketability of the property in the
2  area, market area, as defined.
3      **Q    All right.  So just so I'm clear, when you**
4  **use that term "survey," we're not talking about a --**
5  **something where you talk to a bunch of people and ask a**
6  **bunch of people the same type of questions?**
7      A    No.
8      **Q    You're talking about a survey in sort of a**
9  **review of available information?**
10      A    It's more of an analysis in that case.
11      **Q    Okay.**
12      A    The survey is analytical, not quantitative,
13  with regard to property depiction.
14      **Q    All right.  And item no. 9 on page 10**
15  **indicates that you analyzed the subject larger parcel's**
16  **highest and best use; is that right?**
17      A    Correct.
18      **Q    What does that phrase mean, "highest and best**
19  **use"?**
20      A    It's the maximally productive use that is
21  legally permissible, physically possible, financially
22  feasible, and that which creates the latest, greatest,
23  long term value for the property.  And it's done both on
24  a before and after basis for this type of appraisal.
25      **Q    Then item 10 indicates you collect verified**

**77**

1  **and analyzed comparable land sales, correct?**
2      A    Yes.
3      **Q    What were your sources for collecting those**
4  **comparable land sales?**
5      A    Everything referenced in paragraph 6 on
6  page 10.
7      **Q    Including the GIS information?  Or are you**
8  **talking about the -- the sentence before that in**
9  **paragraph 6?**
10      A    No, I mean, once I collect data, I have to
11  verify it.  So verification in some respects takes the
12  form of a GIS -- GIS analysis.
13      **Q    I understand.  My question, though, is,**
14  **really, what were your sources for collecting?  How did**
15  **you come about and collect the sales?**
16      A    It was primarily MLS and deeds.
17      **Q    All right.  And did you collect any**
18  **comparable improved sales?**
19      A    If I did, I didn't rely upon them given the
20  nature of the subject property, which was -- which was
21  much greater land-to-building ratio than some of those
22  other sales would have warranted.
23      **Q    And how did you verify the comparable land**
24  **sales that you're referencing there?**
25      A    First and foremost, from the source, the MLS



**78**

1 or whatever, and then I would confirm that there was a
2 deed backing up the transactional data comparing the two
3 together. Oftentimes, there is an interview with the
4 agent to get any specific information that wasn't self
5 evident.
6    Q    Okay. Now, Item 11 indicates you collected
7 and analyzed cost and depreciation data for the subject
8 larger parcel's existing improvements and capitalization
9 and investment rates for short term investments; is that
10 correct?
11    A    Yes.
12    Q    What -- what were the sources for the data
13 that you collected and analyzed as referenced in that --
14    A    If you turn to page 24, middle of the page,
15 it references CoreLogic Swift Residential Estimator,
16 formally known as the Marshall Valuation Service or
17 Marshall and Swift -- was the basis for the direct cost
18 as well as depreciation.
19    Q    Okay. Was there any other data or any other
20 source for the data with regard to the cost analysis?
21    A    That was the primary source, yeah. To a
22 degree there's a gravel driveway or a fence or a
23 culvert, I may go on prior experience as to what those
24 costs factors were, but I don't recall anything like
25 that in this case.

**79**

1    Q    Okay, Now looking back at page 10, if you
2 will, Mr. Harvey.
3    A    Okay.
4    Q    Item no. 12 indicates that you base this
5 appraisal, in part, upon an extraordinary assumption
6 that assumes the duration of the temporary easements for
7 the subject larger parcel is five years. Do you see
8 that?
9    A    Yes, yes.
10    Q    Now, we spoke a little bit earlier about
11 extraordinary assumption, but how did you determine to
12 make this extraordinary assumption?
13    A    To the complaint.
14    Q    The complaint indicates that this is an
15 extraordinary assumption?
16    A    No, the complaint indicates the duration of
17 the temporary construction easement is five years from
18 the date of ACP's acquisition of same.
19    Q    Okay. So when you -- you say you assume the
20 duration of the temporary easement is five years. Is
21 that five years beginning on the effective date of the
22 appraisal?
23    A    Yes.
24    Q    And at this point, do you have any evidence
25 which would indicate whether that extraordinary

**80**

1 assumption may be false?
2    A    No, I mean, it's five years from the
3 effective date. The litigation will determine when and
4 if that five year begins. But for purposes of
5 reasonable analysis for a jury to relate to what the
6 appraiser intends, there has to be an effective date.
7 So it's all appropriate.
8    Q    I understand that, but you're aware -- well,
9 let me back up. Are you aware of the status of the
10 construction of the ACP project on the Ralston property
11 as of today?
12    A    Well, it's on hold, I believe.
13    Q    Okay. Has any construction occurred on the
14 property?
15    A    I don't know. I know there was a prior
16 inverse suit brought by the Ralstons against ACP, which
17 I believe was for trespass. I don't know if the
18 trespass resulted in actual construction activity or if
19 it was just surveying, but I know there's been some
20 activity.
21    Q    Okay.
22    A    So I can't speak to whether there was loss
23 of trees or any construction. I just know the history.
24    Q    Right. And I appreciate that, and I'm not
25 asking you to testify to any sort of specific detail

**81**

1 about the construction process, but my question really
2 relates to the fact that there is this extraordinary
3 assumption that you've testified about a five-year
4 construction period. And I'm wondering if you've
5 encountered any evidence as of today whether that --
6 whether construction will actually be completed within
7 that five-year period, or not?
8    A    Well, the terminology --
9         MR. MINSON: Objection. You may answer.
10    A    The terminology in the complaint I think is
11 relevant because it says five years from ACP's
12 acquisition of the easement. To my knowledge, that --
13 there's been no summary judgment award of the actual
14 easement, and, therefore, it's helpful for a jury to
15 understand from the point in time when this matter is
16 heard. That would be a reasonable basis for them to
17 consider any award for that element of the taking.
18    Q    Okay. So you're saying -- and maybe I
19 misunderstood your prior testimony. Forgive me if I
20 did, but you're saying the five years starts from some
21 future date when the easements are -- when the
22 acquisition of the easement occurs?
23    A    My interpretation of the language in the
24 complaint is the five years starts when ACP is vested
25 with the easement.



82

1    Q    Okay.  When you say "vested," what do you
2  mean by that term?
3    A    The court awards the easement rights to ACP.
4    Q    Okay.
5        MR. CLARKE:  I can have this marked as
6    Harvey 2.
7        (Whereupon Harvey Exhibit No. 2 was
8    marked for identification.)
9  BY MR. CLARKE:
10    Q    Mr. Harvey, I'm giving you a document that's
11  been marked for identification purposes as Harvey
12  Exhibit 2, and I will reference to you this states on
13  its cover, the first page, this is the third amended
14  complaint and condemnation.  Do you see that?
15    A    I do.
16    Q    Have you seen this document before?
17    A    I believe so.
18    Q    And it -- just for the purposes of the
19  record, this does not include any of the exhibits?
20    A    I was going to say this is a lot shorter
21  document than the one I looked at.
22    Q    It's very light.  Right.  Right.  And I want
23  to reference -- I want to ask you to turn, if you will,
24  with me to page 5 of this document, Harvey No. 2, and
25  paragraph no. 19.  Do you see that?

83

1    A    Yes.
2    Q    And is that the indication that you're
3  relying upon from the complaint?
4    A    I'm going to have to read this document.
5    Q    Okay.  That's fine.
6    A    Yeah, yes.
7    Q    All right.  So paragraph 19 includes the
8  language that you're relying upon, which talks about the
9  temporary easements being effective and condemned for a
10  period not to exceed five years following Atlantic's
11  possession of the easements; is that correct?
12    A    Correct.
13    Q    And so to your knowledge, has Atlantic taken
14  possession of the easements on the Ralston property?
15    A    Not to my knowledge.
16    Q    And just so I'm understanding your -- your
17  appraisal methodology, you -- you determined or you made
18  this extraordinary assumption about the duration of the
19  temporary easement being five years, correct?
20    A    Correct.
21    Q    And based on that summation, then, you -- and
22  we'll talk about this later -- you valued that temporary
23  easement for that five-year duration; is that correct?
24    A    That's correct.
25    Q    But you valued that temporary easement as of

84

1  April 4th, 2018; is that right?
2    A    Correct.
3    Q    However, the five-year time period when that
4  temporary -- temporary easement will be actually used
5  and effective did not begin on April 4th, 2018; is that
6  your testimony?
7    A    Can you restate that, please?
8    Q    Sure.  The five-year time period when that
9  temporary easement is effective did not begin on
10  April 4th, 2018; Is that your testimony?
11    A    That's my understanding, yes.
12    Q    Did you do any sort of calculation or
13  manipulation of your valuation to account for the fact
14  that you were valuing the temporary easement as of
15  April 4th, 2018, but the time in which it would be
16  effective and in use was some uncertain time in the
17  future?
18    A    No.
19    Q    All right.  If you will, look back with me at
20  Harvey Exhibit 1.
21    A    Okay.
22    Q    And if -- turn with me to page 11 of your
23  report.
24    A    Yes.
25    Q    And item no. 15 at the top of the page

85

1  indicates that you developed the cost and sales
2  comparison approach using the before and after method to
3  value the permanent easements to be taken on the subject
4  larger parcel.  Do you see that?
5    A    Yes.
6    Q    Can you explain to me how you valued the
7  permanent easement using the cost approach?
8    A    Yes, the cost approach is a summation of
9  land and improvements to determine property valuation.
10  In this case, two cost approaches were performed, one
11  before the easement and one after the start of the
12  easement.  The differential, therefore, is the value of
13  the permanent easement.
14    Q    Okay.  All right.  I just want to make sure
15  because you didn't value improvements acquired within
16  that permanent easement area using the cost approach; is
17  that -- is that correct?
18    A    Can you restate that, please?
19    Q    Sure.  You didn't use the cost approach to
20  value certain improvements that, themselves, were being
21  acquired in the permanent easement?
22    A    I'm not aware of any improvement in the
23  easement areas that are being acquired.
24    Q    That's what I wanted to clarify.  Thank you.
25  Now, item no. 17 at the top of -- little further down on

86

1  the top of page 11 indicates that you relied upon Joseph
2  C. Harvey and William D. O'Donnell, associates with
3  William C. Harvey, Inc., who assisted you in collecting,
4  verifying, and analyzing the data and valuing the
5  subject larger parcel. Is that correct?
6      A  That's correct.
7      Q  Who are they?
8      A  Joseph C. Harvey is my son. He's a licensed
9  Virginia appraiser trainee. He collects data. When I
10  say "collects," I mean he'll pull the assessment cards
11  and so forth.
12     Mr. O'Donnell is a licensed certified residential
13  appraiser in Virginia. He accompanied me, as I
14  previously testified, on the inspection, assist me with
15  measurements and collecting information, and then we
16  just collaborate on evaluation.
17     Q  Okay. But, ultimately, you prepared this
18  report; is that correct?
19     A  Yes.
20     Q  And they did not sign the report; is that
21  right?
22     A  That's correct.
23     Q  Okay. And is there a reason that you
24  reference them specifically in your reliance upon them?
25     A  It's a requirement.

87

1      Q  Under what?
2      A  Scope of work rule in the certification rule
3  and standard rule 2-3.
4      Q  It's a requirement that you do what?
5      A  That I acknowledge their professional
6  assistance.
7      Q  Okay. And is it specific -- does it have to
8  rise to a certain level of assistance for you to
9  acknowledge that?
10     A  Any assistance I'm going to acknowledge and
11  certify because I think it's appropriate. As far as a
12  trigger, no. I mean, it has to reference some type of
13  collection verification or analysis.
14     Q  Okay. Does USPAP itself require that you
15  acknowledge anyone who's assisted you in any capacity in
16  your preparation of the appraisal report?
17     A  USPAP uses the word significant as an
18  element to indicate when it should be disclosed. USPAP
19  also talks about administrative assistants, secretarial
20  or administrative work, it doesn't rise to that level.
21     Q  Okay. And looking at item no. 18, still on
22  page 11, Mr. Harvey, it indicates that you reconcile the
23  value indications into final estimates of value for the
24  subject larger parcel. Do you see that?
25     A  I do.

88

1      Q  Were there multiple estimates of value that
2  you concluded for that defined term, subject larger
3  parcel?
4      A  Well, there's land component and total
5  property components. So the answer is yes, but in this
6  case, reconciliation was straight forward, what the
7  improved value determination was through one approach
8  versus the other.
9      Q  Okay. Now, the -- the next section we've
10  looked at before on page 11, but -- under identification
11  of the real estate appraised, the first sentence there
12  starts with a reference to the property with a capital
13  "P." Do you see that?
14     A  I do.
15     Q  Is that a defined term in your report?
16     A  No, it's a term of art to recognize that the
17  property consists of the two PINs, 40-11, 40-13, and I
18  want to just differentiate that between my determination
19  of the subject larger parcel, which is all six PINs
20  referenced in the report. So I use it just for intended
21  users so they understand the difference.
22     Q  Okay. So -- so when you use that term,
23  capital "P" Property, that's a specific reference to
24  40-11 and 40-13; is that right?
25     A  That's correct. That's correct.

89

1      Q  And then the defined term, again, with
2  capital Subject Larger Parcel, that includes those two
3  plus four additional PINs; is that right?
4      A  All six, yes.
5      Q  Okay. Looking at page 12 of your report, Mr.
6  Harvey, in the middle of the page, there's a chart
7  that's under the section "property description," and you
8  set forth the six parcels that you determined were part
9  of the subject larger parcel; is that correct?
10     A  That's correct.
11     Q  And your source for that is the Augusta
12  County Commissioner of the Revenue and GIS; is that
13  right?
14     A  That's correct.
15     Q  Are you aware that in a prior report for this
16  matter, you credited that to the City of Suffolk?
17     A  If I did, that was a typo.
18     Q  Okay. I just wanted to make sure there
19  wasn't anything involving the City of Suffolk.
20     A  No.
21     Q  All right. Now, looking at the bottom of
22  page 12 and continuing on to the top of page 13, you
23  indicate that there have been no other transfers of the
24  subject larger parcel during the past three years from
25  the effective date of appraisal, and then you have



90

1  parentheses, ie, and then on the next page April 26th,
2  2015, through April 26th, 2018.  Do you see that?
3      A    I do.
4      Q    What's the purpose of your reference to
5  April 26th, 2018?
6      A    April 26th?
7      Q    Yes, sir.
8      A    Oh, if you go back to -- it should be
9  April 4th.
10     Q    Okay.
11     A    Typo.
12     Q    That's a typo?
13     A    Yes.
14     Q    So it should be April 4th, 2015?
15     A    That's correct.
16     Q    Instead of April --
17     A    In both references, April 26th.  April 26th.
18  See, I don't think this is the actual report I signed.
19  That would have been a correction.
20     Q    Okay.  Well, I mean, I can only tell you that
21  this is the report I received from your client.
22     A    I understand.  I understand.  I don't think
23  it's substantively different.
24     Q    Right.
25     A    Little knits like that.

91

1      Q    Right.
2      A    We take a little time to get rid of them.
3      Q    Okay.
4      A    Which is the significance of the stamp.
5      Q    Sure.  And I can understand your frustration.
6      A    It's quite possible that the stamped version
7  has the same typo.  I will acknowledge that it's a typo.
8  It should be April 4th.
9      Q    I just want to make sure.
10     A    It should be April 4th.
11     Q    Okay.
12     A    And then to a degree that there is a stamped
13  version that has that correction in it, you should be
14  made aware of that version.
15     Q    Okay.  I appreciate that.
16     A    It's page 13.  First sentence.  If you want
17  to take a minute, I can probably reference this stamped
18  version on my phone.
19     Q    No.
20     A    Okay.
21     Q    That's fine.
22     A    Okay.
23     Q    That's a not a big deal.  I appreciate that.
24     A    Yeah, I just want to make sure you have a
25  full understanding --

92

1      Q    Right.
2      A    -- of the actual documents.
3      Q    Okay.  Thank you.  All right.  Now, looking
4  at the bottom of page 13 and continuing on, there's a
5  chart on the top of page 14 about the assessed values
6  about the assessed values and the taxes for the -- the
7  parcels that you've considered as part of the subject
8  larger parcel for 2018; is that right?
9      A    That's correct.
10     Q    Did you rely upon the assessed values in
11  forming your opinions in this case?
12     A    No.
13     Q    All right.  There's a statement underneath
14  that chart on page 14 that says, "Based on my analysis,
15  the total 2018 assessed value provides a meaningful
16  occasion of the subject larger parcel's fair market
17  value"?
18     A    Yes.
19     Q    So your opinion is that they are a meaningful
20  indication of fair market value but you did not rely
21  upon them?
22     A    Let me put it in context.  Meaningful if you
23  use the land to assess -- assessment to sales price
24  ratio.  In other words, if a property sells for 2
25  million and it's assessed for 1 million, the ratio would

93

1  be 50 percent.
2      So it's then if you were looking at other
3  properties, they would be assessed for 1 million but
4  potentially sell for 2 million, those ratios would be
5  meaningful.
6      Q    Okay.
7      A    And the overall data would be meaningful,
8  but only in that context.
9      Q    All right.  And is there -- what's the ratio
10  for Augusta County?
11     A    It's variable.
12     Q    Okay.  Does the county indicate that they are
13  assessing property at something less than fair market
14  value, though?
15     A    Well, by state law, all counties have to use
16  100 percent of fair market value, but the coefficient of
17  variation and coefficient of deviation that is
18  calculated by the Department of Taxation never rises to
19  100 percent.  I've never seen any county do that.
20     Q    All right.  So you're -- you're saying that
21  that coefficient or that variable, the ratio I guess, is
22  a function of actual sales of property versus
23  assessments?
24     A    That's correct.  That's how quality of
25  assessment are determined.



94

1    Q    Okay.
2    A    How -- how closely they parallel the COV and
3  COD.
4    Q    Now, at the bottom of page 14, there's a
5  paragraph that references the partial taking of a
6  subject larger parcel, and it says it consists of a
7  permanent easement and a temporary easement in
8  connection with the ACP's Atlantic Coast Pipeline
9  project, correct?
10    A    Correct.
11    Q    And I think we talked about this before, but
12  was your determination of the rights being taken, was
13  that a function of what's in the complaint? Or, in this
14  case, the third amended complaint that you have?
15    A    Yes.
16    Q    And that paragraph goes on to describe the
17  ACP project as involving the construction and laying of
18  an approximately 600-mile underground pipeline and
19  related facilities; is that right?
20    A    That's correct.
21    Q    Now, I understand the pipeline itself, but
22  what are the other related facilities that you're
23  referencing there?
24    A    Appurtenances, valve stems, any PIG
25  launcher, or anything of that sort -- PIG launches, two

95

1  words, pipe and ground -- any appurtenances that would
2  be affixed to the pipe.
3    Q    And are any of those appurtenances or related
4  facilities, are any of those proposed to be or going to
5  be constructed on the Ralston tract?
6    A    I didn't see any indication of such. This
7  is a generic statement for the entirety of the pipeline,
8  which would include compressor stations, which are
9  clearly above grade, and any other valves.
10    Q    Is it your understanding that ACP is
11  acquiring the right to construct not only the pipeline
12  underground but also certain above ground appurtenances
13  on the Ralston property?
14    A    As defined on pages 15 and 16 are the rights
15  that I understand, yes.
16    Q    All right. So looking at page 15, then,
17  there's an indication under the tax assessment chart
18  that -- about a description of the rights to be granted
19  to ACP in connection with the permanent easement to be
20  taken on the subject larger parcel; is that right?
21    A    That's correct.
22    Q    And there are three numbered paragraphs
23  there, correct?
24    A    Correct.
25    Q    All right. And are those -- the information

96

1  in those paragraphs taken from the third amended
2  complaint that we were looking at earlier that's Harvey
3  Exhibit No. 2?
4    A    Yes.
5    Q    All right. In particular, looking at item
6  no. 3, there on page 15 of your report --
7    A    Yes.
8    Q    -- and that says, "Of ingress and egress to
9  and from and through the easements, the right to
10  transport pipe, vehicles, machinery, persons, equipment,
11  or other materials to and from and through the
12  easements." Is that correct?
13    A    Correct.
14    Q    If you'll look with me at Harvey Exhibit 2,
15  the third amended complaint.
16    A    Page 5, paragraph 19.
17    Q    Right. Paragraph 19.
18    A    And 20.
19    Q    In particular, paragraph 20, right, and I
20  want to compare paragraph 20 to your item no. 3 on
21  page 15 of your report. In particular, item 15 --
22  excuse me. Item 3 on page 15 of your report indicates
23  that ACP is acquiring the right of ingress and egress to
24  and from and through the easements, correct?
25    A    Yes.

97

1    Q    And that language is actually not in
2  paragraph 20 of the third amended complaint. Do you
3  agree with me?
4    A    No. Paragraph 20 reads "right of ingress
5  and egress through the easement." Paragraph 18 provides
6  rights to the property and through the easement. So
7  it's, you know -- it's -- I'm paraphrasing but not
8  quoting verbatim, but I'm paraphrasing the culmination
9  of rights that I determine from these various numbered
10  paragraphs in the complaint.
11    Q    Then my question is your -- your opinion and
12  one -- one of the things you appraised was ACP's
13  acquisition of the right of ingress and egress to and
14  from the easements?
15    A    Through the easement.
16    Q    But -- but your -- I'm asking if you
17  appraised ACP's acquisition of the rights of ingress and
18  egress to and from the easements?
19    A    Just as set forth in this language.
20    Q    So in item no. 3 of page 15 of your report,
21  is that incorrect in the description?
22    A    No. I'm going to -- I will reference to you
23  where such access is provided. So if you go to page
24  19 --
25    Q    Page 19 of -- or paragraph 19?



98

1    A    Exhibit 2. I'm sorry. Yes.
2    Q    Okay.
3    A    Paragraph 19, page 5.
4    Q    Yes, sir.
5    A    So it's referenced in 19, "authorized entry
6    onto the property including restoration." We already
7    talked about 20, and on 21 it talks about, "ACP project
8    to maintain safe and efficient access to and from the
9    ACP project." So it's my interpretation that I've
10   properly reflected the rights.
11   Q    So your testimony is that ACP -- and you
12   appraised ACP's acquisition of the right of ingress and
13   egress to and from the easements?
14   A    Only for the purposes of restoration. It's
15   through the easement that they would actually maintain
16   the pipeline.
17   Q    All right. So your -- I just want to clarify
18   because I'm a little bit confused here. Your -- your --
19   what you appraised -- one of the items you appraised,
20   the right to appraise that ACP is acquiring -- your
21   testimony is it includes the right of ingress and egress
22   to and from the easements only for the purposes of
23   restoration?
24   A    Correct, and then it would be through the
25   easement of permanent purposes of maintenance.

99

1    Q    Okay. And what is it in the third amended
2    complaint that you're relying upon with regard to that
3    limited to and from for purpose of restoration? Is
4    there a specific paragraph?
5    A    The paragraph on -- the paragraph on the
6    temporary easement is what provides the access to and
7    from for purposes of restoration, and then it's through
8    the easement for everything else.
9    Q    Okay. And that's -- which paragraph is that,
10   in particular?
11   A    19, 20, 21.
12   Q    Okay. You agree with me in that third
13   amended complaint those paragraphs do not include that
14   specific language relating to ingress and egress to and
15   from, correct?
16   A    Can you repeat that, please?
17   Q    Sure. You agree with me that the three
18   paragraphs you just referenced, paragraphs 19, 20, and
19   21 from the third amended complaint, Harvey Deposition
20   Exhibit 2, do not include specific reference to ingress
21   and egress to and from, correct?
22   A    I'll have to -- I'd look back and see if it
23   says "to and from." I thought it does say "to and
24   from." So if you look at page 20 -- I'm sorry --
25   paragraph 20 on page 5, and you look at the end of the

100

1    sentence, "to and from and through the easements"
2    appears. It's -- I've referenced it.
3    Q    Right. My question is about that specific
4    right of ingress and egress to and from the easements.
5    The language in paragraph 20 talks about the right of
6    ingress and egress through the easements, correct?
7    A    Not exclusively. It goes on to say "The
8    right to transport pipe, vehicles, machinery, persons,
9    equipment, or other materials to and from and through
10   the easements."
11   Q    Okay. So is it your testimony now that your
12   -- your appraisal, what you valued, included the right
13   of ingress and egress to and from the easements for any
14   -- for any purposes related to the ACP project?
15   A    For the express purposes set forth in
16   paragraph 20.
17   Q    Okay. And is that different than what you
18   said earlier about the -- for restoration purposes?
19   A    No, I would say restoration would include
20   those transports.
21   Q    Okay. So your testimony is that restoration
22   includes the transportation of pipe, vehicles,
23   machinery, persons, equipment, or other materials?
24   A    That would be a form of restoration, yes,
25   but it's not -- it's not exclusive to restoration. That

101

1    -- that paragraph 20 doesn't limit it to to and from and
2    through the easements. It doesn't -- it's not limited
3    to restoration activity only, just so the record is
4    clear.
5    Q    I understand that.
6    A    Okay. Good.
7    Q    But we're talking about -- I mean, you agree
8    with me there's a difference between ingress and egress
9    and transporting pipe, vehicles, machinery, persons,
10   equipment, or other materials, do you?
11   A    Not if you look at the full context of -- if
12   you try to take them out of context, you could possibly
13   come up with a different understanding. But in the
14   context that I've related it to in these various
15   paragraphs on pages 15, 16, I don't think so.
16   Q    And we've been talking about here -- about
17   Harvey Exhibit 2 which, as we said, is the third amended
18   complaint, indicating there are earlier amended
19   complaints. I take it you've seen the earlier
20   complaints in the first and second amended complaints;
21   is that correct?
22   A    Yes.
23   Q    In your recollection, did the description of
24   what's indicated there in paragraph 20 of the third
25   amended complaint, did that change between the second



---

**102**

1  amended complaint and the third amended complaint?
2      A    I would have to look at those complaints.
3      Q    You don't know sitting here?
4      A    I don't recall sitting here, but given that
5  the access road was part of an earlier complaint and has
6  now been taken out of the third amended complaint, it's
7  likely that the language is different.
8      Q    Okay. And just so we're clear on things, did
9  that right of ingress and egress to and from the
10  easement -- sometimes that's called a secondary
11  easement; is that right?
12      A    Not that I've described it or --
13      Q    You're not familiar with that term?
14      A    No, I'm not.
15      Q    Okay.
16      A    Easement is an easement. Whether it's
17  primary or secondary, it's an easement. That's what I'm
18  really looking at.
19      Q    I appreciate that. Now, thinking about the
20  easement rights that you've described that are set forth
21  on pages 15 and 16 of your report, do the -- the
22  temporary easement rights acquired by ACP or being
23  acquired by ACP, do those include the right to travel
24  through the temporary easement area to get across the
25  Ralston property?

---

**103**

1      A    Can you repeat that, please?
2      Q    Sure. Thinking about the easement rights as
3  you've described them on pages 15 and 16 -- and I
4  understand your reference to the third amended complaint
5  -- do those rights that you've appraised in this case
6  include the right for ACP to use the temporary easements
7  to travel through or across the Ralston property?
8      A    Yeah, I would believe so.
9      Q    Okay. And I know we talked about this
10  earlier, but the top of page 16, item no. 3, references
11  that the temporary easement would be effective and
12  condemned for a period not to exceed five years
13  following ACP's possession of the easements, correct?
14      A    Correct.
15      Q    And, again, I think we agreed this -- ACP has
16  not yet taken possession of the easements, to your
17  knowledge; is that right?
18      A    Correct.
19      Q    And at this time, you don't know -- or do you
20  know when ACP intends to take possession of the
21  easements?
22      A    When the judge signs --
23          MR. MINSON: Objection. Go ahead.
24      A    I think when the judge awards possession,
25  which is most likely occurring in May of 2020 when the

---

**104**

1  trial occurs.
2      Q    All right. And now looking at the top of
3  page 16, you have a couple of numbered items that are in
4  your section, where you call the rights to the subject
5  larger parcel to be retained by the owner. Do you see
6  that?
7      A    Yes, uhm-hmm.
8      Q    Now, no. 2 under that indicates or says,
9  specifically, "The owner shall not, without the prior
10  written consent of ACP" -- and then it has four
11  subparts, A, B, C, and D. Do you see that?
12      A    Uhm-hmm.
13      Q    So the way I understand this -- and you can
14  correct me if I'm just misunderstanding it -- but your
15  reports indicates that among the rights to the subject
16  larger parcel that are retained by the owner are the
17  right to not, without the prior written consent of ACP,
18  change the depth of cover in the permanent easement; is
19  that right?
20      A    Do you have a double negative in that
21  sentence?
22      Q    Well, that's what I'm --
23      A    I'm confused.
24      Q    It's unique -- well, I didn't write this
25  report, Mr. Harvey, but that's what I'm trying to

---

**105**

1  understand --
2      A    I'm confused by your question. So --
3      Q    Well, the paragraph or the section on the
4  page indicates that these are the rights that are
5  retained by the owner, but then item no. 2, and the four
6  subparts talk about what the owner shall not do, which
7  seemed to me to be not actually rights -- description of
8  rights being retained but rights that ACP has obtained
9  to prohibit the owner from doing certain things.
10      A    I don't distinguish between the two. In
11  other words, if it's an understanding of what the owner
12  may or may not do, those are the rights.
13      Q    Okay.
14      A    You have a right to do something. You have
15  a right not to do something. To me, those are
16  cumulative rights.
17      Q    Okay. So again, for example, item no. 2B,
18  "The owner retains the right to not place any temporary
19  or permanent structure within the permanent easement."
20      A    Well, that's not the way it's written. So I
21  think you're taking it out of context, what it says is
22  the owner has the right to place or permit or to be
23  placed any temporary permanent structure or obstruction
24  of any kind including blah, blah, blah, blah. And that
25  right is conditioned upon the fact that they will have



---

106

1  to do so with the prior written consent of Atlantic.

2  **Q    Okay.  That seems like a double negative to**

3  **me.**

4     A    Okay.

5  **Q    But I appreciate your attempt to clarify that**

6  **for me.**

7     A    Okie doke.

8  **Q    I do appreciate that.  Now, page 16 and on to**

9  **17 of your report has a section called highest and best**

10  **use analysis, correct?**

11    A    Well, that's the topic heading.  The actual

12  sections follow, and they would be larger parcel

13  analysis and highest and best use analysis.

14  **Q    All right.  So that section on 16 and 17 is**

15  **more sort of a description of the concept of highest and**

16  **best use?**

17    A    It's the heading for the sections that

18  follow.

19  **Q    I appreciate that.  Now, did you prepare a**

20  **highest and best use analysis of the subject larger**

21  **parcel as if vacant?**

22    A    Yes.  If you go to page 19, and if you read

23  the maximally reductive use conclusion, the maximally

24  reductive use of the subject larger parcel as though

25  vacant and improved.  It's cumulative in that it looks

---

107

1  at both scenarios, both before and after.

2  **Q    All right.**

3     A    The paragraph repeats.

4  **Q    Right.  And -- but, ultimately, is it correct**

5  **to say that the highest and best use that you used to**

6  **value the subject larger parcel before the taking was as**

7  **improved; is that correct?**

8     A    Correct.

9  **Q    If you'll turn with me to page 21 of your**

10  **report, Mr. Harvey.**

11    A    Okie doke.

12  **Q    Probably two-thirds of the way down the page,**

13  **there's a statement, a paragraph, that begins "Due to**

14  **the nominal value."  Do you see that?**

15    A    I do.

16  **Q    And it says, "Due to the nominal value of the**

17  **subject larger parcel's existing improvements, I**

18  **developed the cost approach to value the property as**

19  **improved."  Do you see that?**

20    A    I do.

21  **Q    What do you mean by the nominal value of the**

22  **subject larger parcel's existing improvements?**

23    A    That its contributory value is not the

24  majority valuation.  It's a lesser component.  In this

25  case, nominal.  If you turn to Exhibit 5 of Exhibit 1,

---

108

1  you'll see the cost approach summary, and that would

2  maybe put in a context for you, that the land component

3  is 1,430,000 versus the improved component is, you know,

4  less than a quarter of that.

5  **Q    Okay.**

6     A    To me, that's nominal.

7  **Q    All right.  So you're using nominal in the**

8  **sense that that's -- it's not the dominant component of**

9  **value?**

10    A    Correct.

11  **Q    All right.  The bottom -- turning back to**

12  **page 21 -- well, really the top of page 22, Mr. Harvey,**

13  **it indicates that you applied the before and after**

14  **method; is that right?**

15    A    Yes.

16  **Q    What is the before and after method?**

17    A    It's that which is recognized in the

18  appraisal literature as the federal rule.

19  **Q    And can you explain that for me, please?**

20    A    Well, it values the property before an

21  occurrence and after an occurrence, the differential

22  being attributed to the impact of the occurrence.

23  **Q    And is there a reason that you applied that**

24  **method and not any other?**

25    A    Well, the appraisal literature,

---

109

1  specifically, the real estate valuation litigation

2  second edition, distinguishes between what's known as

3  the state rule and the federal rule.  The state rule

4  being the value of the take plus damages; federal rule

5  being before and after as being the applicable rule for

6  a federal eminent domain under the fifth amendment.

7  **Q    Okay.  So just so I can summarize,**

8  **essentially, the -- the before and after rule**

9  **incorporates both what we might consider as the value of**

10  **the take and any sort of severance damages into one**

11  **number; is that right?**

12    A    It's not explicit.  Yes.

13  **Q    Okay.**

14    A    It's implicit.

15  **Q    Right.  It's all -- it's not broken out**

16  **between take value and damages.  It's just one number,**

17  **just compensation or the difference in value?**

18    A    Correct.

19  **Q    Okay.  And so in your appraisal, then, you**

20  **valued the entire property, the subject larger parcel --**

21  **let's use that term -- before the taking, and you**

22  **disregarded the influence of the ACP project itself; is**

23  **that right?**

24    A    Mostly.  I valued the rights to the

25  property.



110

1    Q   Okay.  What's the difference between that and
2  what I asked you?
3    A   One is real estate.  One is real property.
4  The way you phrased your question sounds most like real
5  estate.  I appraise real property.
6    Q   What's the difference, in your mind, between
7  real estate and real property?
8    A   Real estate is the tangible component but
9  fixed and immovable, but real property is how you hold
10  title to that fixed and immovable -- what is exchanged
11  in the marketplace is title, not the dirt.
12    Q   Okay.  All right.  And, anyway, you came up
13  with a market value of that subject larger parcel before
14  the taking using your definition of market value; is
15  that right?
16    A   Yes.
17    Q   All right.  And then you -- again, as part of
18  your before and after method, you valued the entire
19  residue of the subject larger parcel after the taking,
20  again, as of April 4th, 2018, to get your after value;
21  is that right?
22    A   Correct.
23    Q   And then -- and at that time, it was assuming
24  that the pipeline was in the ground and operational as
25  of that day; is that right?

111

1    A   Yes, project has been completed.
2    Q   Okay.  Did you consider in your after take
3  value in coming up with your after take value the
4  impact, if any, of the temporary easements being
5  acquired on the value of the subject larger parcel's
6  residue after the taking?
7    A   No, the temporary easement would have
8  already been concluded under the hypothetical condition
9  that the project is completed.
10    So, no, it would be outside of that, but it's an
11  -- it's an additional form of compensation that's owed
12  to the landowner, but it doesn't -- it's not part of the
13  calculus of the before and after.
14    Q   Okay.  All right.  Let's talk about a little
15  bit about your evaluation of the subject larger parcel
16  before the taking, and you indicate on page 23 of your
17  report there's three comparable land sales; is that
18  right?
19    A   Yes.
20    Q   And then you -- we've talked about this
21  before, but you actually have another appraisal report
22  that you attached to your expert report that's Exhibit 4
23  that is an appraisal of those -- of the land component
24  of the subject larger parcel before the taking; is that
25  right?

112

1    A   That's correct.
2    Q   If you'll turn with me to those -- or excuse
3  me -- to Exhibit 4, your before take --
4    A   Yes.
5    Q   -- appraisal of the land.  You have a chart
6  on, I guess, the fourth page of that report that shows
7  the three comparable sales and compares them to the
8  subject; is that right?
9    A   That's correct.
10    Q   And we talked a little bit about them -- this
11  before, but did you confirm the information with regard
12  to these three comparable land sales?
13    A   Verified.
14    Q   Verified with whom?
15    A   Documents and sources that I've already
16  testified to.
17    Q   Okay.  So looking at your first comparable
18  sale, which is indicated in your report as 132 Still
19  House Lane in Deerfield, Virginia, who did you verify
20  that with?
21    A   Again, you're using a word that I didn't
22  use.  I used -- I'm sorry.
23    Q   You just --
24    A   I thought you said confirmation.  I used
25  verification.  That was verified with the -- through the

113

1  MLS data and through the deed of conveyance of real
2  property.
3    Q   Okay.  Was it --
4    A   And through the other sources, the GI --
5  everything I've talked about under the scope of work
6  that I used for purposes of collection, verification,
7  analysis.
8    Q   All right.  Was it verified with a party to
9  the transaction?
10    A   I doubt it.  From 2015, normally when you
11  contact realtors, they just don't recall.
12    Q   Okay.
13    A   A lot of times, they're not even at the same
14  brokerage anymore.
15    Q   Do you know who was the broker of record for
16  that sale?
17    A   Only by referencing the data in the file.
18    Q   All right.
19    A   I don't recall off the top of my head.
20    Q   That information is not contained in your
21  report?
22    A   No.
23    Q   Is that correct?  Okay.  The sale no. 2,
24  which is at 1786 Marble Valley Road in Deerfield, with
25  whom or with what did you verify that sale?



114

1   A   Same answer, documents available under the
2   scope of work section that I've -- typically would
3   collect and then verify that the traction was actual.
4   Q   Okay.
5   A   Including potential discussion with the
6   realtor or broker.
7   Q   Did you actually have a discussion with the
8   realtor or broker?
9   A   I just don't recall.  I mean, I -- from 2015
10  -- I know in the Rockbridge, the last one, yes, because
11  it was a more recent sale and I introduced that one
12  between the second and third supplement.  When I found
13  it, I became aware of it.  I thought it would benefit
14  the landowner.  So to be fair and objective, I added it
15  and I substituted an older sale.  So in other words, I
16  wanted to bring the data current --
17  Q   All right.
18  A   -- which raised the value by $100 an acre.
19  Q   Right.  But still talking about sale no. 2,
20  you're not sure whether you verified --
21  A   I don't recall -- I don't recall talking to
22  a realtor.
23  Q   Okay.  And would that have been something
24  that you would do?  Or would it have been somebody else
25  at your firm who would have done that?

115

1   A   It's a collaborative effort that -- it would
2   have been primarily either Mr. O'Donnell or myself or
3   both of us a lot of times.
4   Q   All right.  Now talking about the third sale
5   which you just talked about, that's in Rockbridge
6   County; is that right?
7   A   Yes.
8   Q   East side of Cold Springs, Raphine, Virginia?
9   A   Right.
10  Q   Is that right?
11  A   Right.
12  Q   And that was one that you verified; is that
13  right?
14  A   To the best of my recollection, because it
15  was in Rockbridge and it was vamanet, it wasn't part of
16  the Car MLS (phonetic).  I just recall that finding that
17  sale was difficult, but once it was found, to verify it,
18  I had to take extra steps.  I just don't recall the
19  specifics.
20  Q   Okay.  So you're not aware of any specific
21  person or persons that you may have talked to to verify
22  that?
23  A   I am not.
24  Q   All right.  Is that somewhere in your work
25  file?

116

1   A   It may be.  It's -- I don't recall.
2   Q   When you talk with a broker and are verifying
3   a sale, do you make notes of that?
4   A   Sometimes, but not all -- I mean, if the
5   information on the document that I'm seeking to verify
6   is accurate, no.  If there was some change to that, I
7   would probably amend it.
8   Q   And, in your opinion, these three sales were
9   those the best sales available?
10  A   I think so.
11  Q   Now, if you you'll turn with me to -- there's
12  a series of pages which have photographs on them --
13  A   Yes.
14  Q   -- as part of this land appraisal report?
15  A   Uhm-hmm.
16  Q   And are these paragraphs that you took?
17  A   Yes.
18  Q   And I take it you took them when you made
19  that inspection of the property back in July of 2018?
20  A   Yes.
21  Q   All right.  Did you take any of the photos
22  inside any of the improvements?
23  A   Yes.
24  Q   And is there a reason those aren't included
25  in this report?

117

1   A   I generally don't include interior photos
2   because I think it's reflective of personal taste and so
3   forth, and what I'm really appraising is the real
4   estate, the improvements, not people's lifestyle and
5   furnishings.  So, no I -- and a lot of times, if there's
6   a person in one of those photos, I will not include it.
7   Q   Now, the -- the report, Exhibit 4, is titled
8   a land --
9   A   I will specify that under my understanding
10  of the rules in, for instance, North Carolina, under the
11  26F3 agreement, I do provide all photographs and notes
12  and so forth.  I wasn't under -- aware that that was a
13  requirement.  My judgment.
14  Q   Now, the report that we're looking at,
15  Exhibit 4 to your expert report, is called "appraisal
16  report land," correct?
17  A   Correct.
18  Q   And it is a land valuation, a land appraisal;
19  is that right?
20  A   That's correct.
21  Q   Is there a reason that the photographs
22  include a lot of photographs of improvements?
23  A   Just because of the convenience, that's the
24  best place to put them, is my belief.  I could have
25  added another exhibit, but I think in this particular



118

1 case it's helpful to the reader to orient to what the
2 photographs are of, the land in the area of the
3 improvements, and so forth.
4    Q    Okay.
5    A    So -- helpful.
6    Q    And is there a reason that this is a separate
7 land appraisal report as Exhibit 4 as opposed to you
8 simply sort of including that analysis in the main body
9 of your expert report?
10    A    Stylistic.
11    Q    If you'll turn with me to -- I think it's the
12 fifth page of this report.  It's the page before your
13 signature page -- of this land appraisal report?
14    A    Yes.
15    Q    And the -- the bottom section says "value
16 definition," and then there's a checkmark next to
17 alternate value definition, and in parentheses, it says
18 attached. Do you see that?
19    A    Yes.
20    Q    What is the alternate value definition that
21 you have used?
22    A    The definition that appears in the body of
23 the report.
24    Q    Okay. So it's not attached to this land
25 appraisal report that's contained in the body of the

119

1 expert report itself?
2    A    I consider that an attachment.
3    Q    I just want to make sure I know where it is
4 because --
5    A    I'm going to direct you to where it is.
6    Q    All right. Thank you.
7    A    So if you turn back to page 5, the last
8 italicized, bolded definition is that which is attached,
9 which is controlling on my work.
10    Q    All right. So that definition of fair market
11 value --
12    A    Correct.
13    Q    -- that's your -- that's what you applied in
14 -- in your land appraisal report as your alternate value
15 definition?
16    A    Yes.
17    Q    Okay. And that's just reading from page 5,
18 so the record is clear. Fair market value is defined
19 as, "what a willing buyer would pay in cash to the
20 willing seller at the time of the taking."  Is that
21 right?
22    A    That's correct.
23    Q    Okay.
24    A    It goes alone -- at the top of page 6, it's
25 further qualified in accordance with USPAP.

120

1    Q    All right. So page 6 includes a sentence
2 that says, "The value of opinions expressed herein
3 reflects the subject larger parcel's sale price in terms
4 of cash or financial terms equivalent to cash."
5    A    Correct.
6    Q    So those two sentences together comprise your
7 definition of fair market value?
8    A    And the terms associated with such.
9    Q    Which terms are those?
10    A    Cash equivalency.
11    Q    We talked a little bit about this before, but
12 you -- in valuing the entire subject larger parcel
13 before the taking as improved, you used the cost
14 approach; is that correct?
15    A    Yes.
16    Q    Why did you choose to use the cost approach?
17    A    For the reasons stated. That it's rural
18 property, the land component constitutes the majority of
19 the value, and the supporting appraisal literature and
20 accepted texts, it's recognized that a rural property --
21 that the conservatory value of the improvements is best
22 reflected through the cost approach."
23    Q    Okay. Did you consider the property to be a
24 special use property or a special purpose property?
25    A    No.

121

1    Q    And, again, we talked about this earlier, but
2 you obtained a land value through your comparable land
3 sales for the subject -- excuse me -- the subject larger
4 parcel's land component before the taking, correct?
5    A    Yes.
6    Q    And then you used the -- I believe you called
7 it Marshall Value -- CoreLogic Swift Residential
8 Estimator, formally known as the Marshall Valuation
9 Service --
10    A    Correct.
11    Q    -- to develop your replacement cost estimate
12 for the improvement; is that correct?
13    A    That's correct.
14    Q    And did you use -- were you estimating
15 replacement cost? Or reproduction cost?
16    A    Replacement.
17    Q    What -- what is the difference in your mind
18 between those two costs?
19    A    Reproduction is an actual replica using the
20 same components and materials as the structure under
21 review. Replacement is using modern specification and
22 construction for a similar utility building.
23    Q    Okay. Now, if you'll turn with me to page 24
24 of your report, in the middle of the page is that
25 paragraph where we -- you referenced earlier referencing



122

1  CoreLogic Swift Residential Estimator.
2    A    Yes.
3    Q    And then there's a paragraph underneath that
4  that says "Accrued depreciation is the difference
5  between an improvement's reproduction cost and its
6  market value as of the effective date of appraisal."
7    A    Understood.
8    Q    So there's a reference there to reproduction
9  cost, but you're testifying today that you used
10  replacement cost?
11    A    Yeah.  If you look at the paragraph above --
12  and I understand your confusion.  So just to clarify, it
13  would have been more artful have I said "replacement"
14  consistently, but I used the Marshall Valuation Swift to
15  develop the replacement costs.  The accrued depreciation
16  was applied to replacement costs.
17    Q    Okay.  All right.  I appreciate that
18  clarification.  Thank you.
19    A    Sure.
20    Q    Now, if you you'll look with me at Exhibit 5
21  to your report, Mr. Harvey.
22    A    Okay.
23    Q    This is a summary of your cost approach
24  valuation of the subject larger parcel before the
25  taking, correct?

123

1    A    That's correct.
2    Q    And using CoreLogic Swift Residential
3  Estimator, you came up with the replacement costs of
4  various improvements that are listed at the top of that
5  chart in Exhibit 5; is that correct?
6    A    That's correct.
7    Q    Now, the bottom of that page references a
8  source as Marshall and Swift Commercial and Residential
9  Estimator.  Is that the same thing as the Marshall
10  Valuation Service?
11    A    Yes.
12    Q    Okay.  And it's now called, apparently,
13  CoreLogic Swift Residential Estimator?
14    A    They use all three terminologies in the
15  website and in the materials, yes.
16    Q    All right.
17    A    They're all one and the same.
18    Q    All right.  Thank you.
19    A    And just for clarification, the reason it
20  says "commercial" on Exhibit 5 is because some of the
21  site improvements aren't in the residential component.
22  You have to go to the commercial application to get
23  those site improvements.
24    Q    I appreciate that.  Now, looking back at
25  Exhibit 5, I understand the components of the

124

1  replacement cost that you estimated, and then you added
2  certain estimated indirect costs and entrepreneurial
3  profit; is that correct?
4    A    That's correct.
5    Q    And what was your source for those -- for
6  that information?
7    A    That's primarily experience and judgment.
8  It's an opinion as to what's applicable, other than the
9  taxes.  That's just the carry of the land under the
10  published taxes.
11    Q    I understand that.  So then adding those
12  together, your total replacement costs, new, for the
13  improvement was $411,575; is that right?
14    A    That's correct.
15    Q    And then you determined estimated
16  depreciation, correct?
17    A    That's correct.
18    Q    How did you determine the amount of
19  depreciation to apply?
20    A    So the residential estimator has tables of
21  overall depreciation.  I looked at those and that as
22  guidance.  I believe them to be accurate.
23    Q    Okay.  And is there a specific indication in
24  your report of what you determined the -- the age or the
25  effective age or the effect -- or the life of the

125

1  improvements were?
2    A    No, not specifically.
3    Q    All right.  What was your determination of
4  the age or the effective age of the improvement?
5    A    That they were less than the actual age.  I
6  would say it was 20 over 50 or thereabouts as applied to
7  -- some of the components differed as to some of the
8  conditions of the sheds and barns versus the -- the
9  buildings, the habitable buildings.
10    Q    So -- so the indication on -- in your chart
11  in Exhibit 5 of the sort of total accrued depreciation
12  is a summation of all of the depreciation to all of the
13  different improvements?
14    A    That's correct.
15    Q    And I guess your testimony is that some of
16  those improvements you applied different levels of
17  depreciation to?
18    A    Based upon what I saw, yes.
19    Q    All right.  There's a line item there on
20  Exhibit 5 for the depreciated cost of site improvements
21  of $100,000?
22    A    Yes.
23    Q    Do you see that?
24    A    Uhm-hmm.
25    Q    How did you come up with that estimate?



**126**

1    A    That's why I referenced the commercial
2  estimator because fencing and so forth is only in that
3  component. So I looked at those components and then
4  rounded it. Thought $100,000 was a fair estimate.
5    Q    And which site improvements were you valuing?
6    A    The gravel driveways, the fencing, the
7  paddock fencing, and so forth that exists on the
8  property.
9    Q    Okay. Do you know the -- the linear feed of
10 the fencing, for example?
11   A    Only by virtue of tracing it on Google
12 Earth. I just don't recall what it was.
13   Q    All right. Do you know the linear feed of
14 their -- their gravel driveway that you valued?
15   A    Same answer. I used Google Earth to
16 quantify the site improvements.
17   Q    And is that information contained anywhere in
18 your report?
19   A    The reference to Google Earth is, yes. The
20 information by which I quantified it, no. It's a
21 summary of all of that.
22   Q    Any other site improvements besides the
23 driveway and the fencing?
24   A    Well and septic.
25   Q    And then you ultimately added those numbers

**127**

1  together, your replacement cost, depreciation of the
2  improvements, your depreciated cost of site
3  improvements, and your land value, to come up with your
4  total value of the subject larger parcel before the
5  taking; is that right?
6    A    Yes.
7    Q    And you rounded that to 1,813,000; is that
8  right?
9    A    Yes.
10   Q    Now, looking at page 25 of your report, Mr.
11 Harvey?
12   A    Okay.
13   Q    About -- about a third of the way down
14 page 25, you have a section that says "valuation of the
15 part taken." Do you see that?
16   A    Yes.
17   Q    And the -- the second paragraph of text is
18 information that is referenced to a treatise or a
19 textbook called Real Estate Valuation and Litigation
20 Second Edition; is that right?
21   A    Yes.
22   Q    Is that actually just quoted from that text?
23   A    Yes.
24   Q    And that's the reference to footnote there --
25 page 25, footnote 44, is to the -- again, that same text

**128**

1  at page 356; is that correct?
2    A    Yes.
3         MR. CLARKE: If I could have this
4  marked.
5         (Whereupon Harvey Exhibit No. 3 was
6  marked for identification.)
7  BY MR. CLARKE:
8    Q    Mr. Harvey, I'm going to show you a document
9  that's been marked for identification purposes as Harvey
10 Exhibit 3. I'll represent to you that this includes the
11 disclosure and then an expert report of yours relating
12 to the Ralston property that was dated September 17th,
13 2018?
14   A    Uhm-hmm.
15   Q    Have you seen this expert report before?
16   A    Yes, I have.
17   Q    And is this something you prepared?
18   A    Yes.
19   Q    And this is actually the first report of
20 appraisal report that you prepared with regard to this
21 case; is that right?
22   A    Yes.
23   Q    All right. If you'll turn with me to --
24   A    Page 25, 24.
25   Q    Yeah, page 24, it has the same quote there

**129**

1  that we were looking at, page 25 of Harvey Exhibit 1.
2    A    Correct.
3    Q    And the reference on page 24 of Exhibit 3
4  says "Ibid 356." Do you see that?
5    A    I do, and that's incorrect.
6    Q    Okay. Right.
7    A    The page number is right --
8    Q    When you trace it back --
9    A    The page number is right. The source is
10 wrong.
11   Q    All right. That -- I appreciate that because
12 if you trace it back on page 22, the Ibid is the
13 Appraisal of Real Estate, Fourth Edition.
14   A    There was a deletion along the way.
15   Q    I appreciate that. Okay.
16   A    Like I said, the page is correct. Ibid is
17 wrong.
18   Q    All right. Thank you. All right. So
19 looking again at Harvey Exhibit 1, your -- your third
20 supplemental report, there's a -- a reference at the
21 bottom of page 25 to sources that you considered in
22 analyzing the percentage of fee value attributable to
23 the property rights taken by ACP. Do you see that?
24   A    I do.
25   Q    And two of those are -- I think you referred



**130**

1  to those previously in talking about your treatises or
2  peer-reviewed treatises?
3      A    Yes.
4      Q    Item A is the Donald Sherwood article called
5  Easement Valuation from Right of Way publication, and
6  the David Dominy study, that was published by the INGAA
7  Foundation entitled Pipeline Impact to Property Value
8  and Property Insurability; is that right?
9      A    Correct.
10     Q    And now the -- that paragraph or that
11 subparagraph A references "appraisal literature
12 including but not limited to," and then it references
13 those two treatises.  Is there -- is there other
14 appraisal literature that you're not referencing there
15 that you considered?
16     A    They would be duplicative, but I didn't --
17 those were the primary sources.
18     Q    Okay.  And item B indicated that you also
19 considered reported easement acquisitions by various
20 utility companies such as Colonial Pipeline and
21 Baltimore Gas and Electric Co., correct?
22     A    Correct.
23     Q    Did you consider easement acquisitions by
24 other utility companies, not Colonial Pipeline or
25 Baltimore Gas and Electric?

**131**

1      A    Yes.
2      Q    Which ones were those?
3      A    Any one that is public record.  The problem
4  as an appraiser, excuse me -- my phone rings through my
5  hearing aids.  So -- the problem as an appraiser is most
6  easements are not -- to not indicate the consideration,
7  and they're under confidentiality.
8      So, normally, the input you get is through oral
9  communications with parties, and I've done a number of
10 pipelines, for Transco, NiSource, transit --
11 TransCanada, Colonial, BG & E, and others.  So it's a
12 combination of sources.
13     Q    And how did those reported easement
14 acquisitions that you're referencing here in
15 subparagraph B -- how did those inform your opinion
16 about the percentage of fee value attributable to the
17 property rights taken by ACP?
18     A    With respect to paragraph -- subparagraph B,
19 normally, the inquiring entities will quote lower
20 percentages than those that I opined are applicable
21 here.
22     Q    Were -- were these reported easement
23 acquisitions that you're referencing in subparagraph B,
24 were they the product of the exercise or the potential
25 exercise of the power of eminent domain?

**132**

1      A    No, that's the dissemination
2  characteristics.  These were consensual easements where
3  they had to go acquire them not through eminent domain
4  action but through meeting of the minds, and that's why
5  I thought it was more relevant.
6      Q    Okay.  Did those entities, though, Colonial
7  Pipeline, that you referenced, BG & E, do they have
8  power of eminent domain?
9      A    From time to time, they did.  And the
10 particular instances that I was inquiring about, they
11 were specifically non-eminent domain acquisitions where
12 they did not have the right but sought the easement.
13     Q    Okay.  All right.  If you turn with me to
14 page 26, Mr. Harvey, about two thirds of the way down,
15 there's a paragraph that says, "In order to determine
16 the percentage of the fee value applicable to the
17 partial interest in the subject larger parcel to be
18 taken by ACP, I searched the broader market for property
19 sales encumbered by similar easements and reviewed
20 peer-reviewed appraisal literature on this specialized
21 topic as well as peer actions in similar assignments."
22     A    Yes.
23     Q    Then it says, "Thus, I relied on
24 peer-reviewed appraisal literature" -- excuse me.  It
25 says, "I found a paucity of property sales encumbered by

**133**

1  similar easements.  Thus, I relied on peer-reviewed
2  appraisal literature and peer actions in similar
3  assignments."  Is that right?
4      A    Yeah.
5      Q    Were you unable to find property sales
6  encumbered by similar easements in the area -- areas in
7  which you looked?
8      A    No.  ACP.  If you read the context of the
9  paragraph, I was looking for properties encumbered by
10 this particular project.
11     Q    Okay.  And were you -- were you able to find
12 sales of properties that had been encumbered by the ACP
13 project?
14     A    Only one or two.
15     Q    All right.  And what peer-reviewed appraisal
16 literature did you rely upon?
17     A    Which we've discussed previously, primarily
18 Easement Valuation, which provides a matrix.
19     Q    Okay.
20     A    I went to the upper end of the matrix.
21     Q    So the Easement Valuation is the Sherwood
22 article; is that right?
23     A    That's correct.
24     Q    And there's a chart and a matrix, as you
25 said, I think it's an exhibit to one of your reports; is



134

1  that right?
2    A   Yes.
3    Q   And then there's the Dominy article or study
4  that he published, correct?
5    A   Yes.
6    Q   And did you also rely upon that Thomas
7  Jackson article?
8    A   No, the Thomas Jackson, Dominy articles were
9  relied upon differently.  The primary reliance for
10  purposes of the percentage of fee applied to the
11  permanent easement was the Sherwood article and what
12  other peers had done.
13    Q   Okay.  And when you say "what other peers had
14  done," are you talking about other appraisers that had
15  valued --
16    A   Sure, yes.
17    Q   What -- what appraisers --
18    A   Well, Mr. Grewell, your expert, we differ by
19  5 percent.
20    Q   He's not my expert but -- I mean, I didn't
21  hire him.
22    A   You didn't?
23    Q   No.
24    A   Okay.
25    Q   Okay.  But -- so you rely upon Mr. Grewell's

135

1  determination in valuing --
2    A   No, I said I considered --
3    Q   Okay.  That's all I'm trying to understand --
4    A   I considered Mr. Grewell's action and
5  others, you know.  There's a similar pipeline, Mountain
6  Valley.  I'm sure you're aware.  You're active in it.
7  And those are also peers doing underground pipeline of a
8  similar nature.
9    Q   Okay.  That's all.  I'm just trying to
10  understand it.
11    A   Yeah, understood.
12    Q   And given Mr. Grewell, are there other
13  specific appraisers that you're relying upon as far
14  as --
15    A   Mr. Long, Mr. Woods.  I don't know what
16  happened to Mr. Noble.  He was in the Mountain Valley
17  pipeline, but I guess he got excluded, but I -- you
18  know, those would be peers doing similar assignments,
19  and I believe my percentage is -- is above the three I
20  just noted and slightly below Mr. Grewell.
21    Q   Okay.
22    A   All peers.
23    Q   And is that -- in your -- in your opinion,
24  that's acceptable appraisal methodology, to sort of look
25  to what other appraisers who are appraising similar type

136

1  projects have -- have considered you've or have determined?
2    A   Right.  On page 26, when you're referencing,
3  if you look in the middle of the page, it talks
4  specifically about the scope of work rule and what is an
5  acceptable credible assignment result, and -- and you
6  obtain them, in part, when you do what your peers do.
7    Q   Now, if you look at the top of page 27, end
8  of the first paragraph at top of that page, you state,
9  "In this case, the larger parcel consists of the fee
10  ownership plus the appurtenant easement attached to it,
11  which are viewed as a single entity."  Do you see that?
12    A   Yes.
13    Q   Can you explain your reference to the
14  appurtenant easement attached to the larger parcel?
15    A   Doing the after valuation.  So it's the
16  property as encumbered.
17    Q   Now, in the fourth paragraph on page 27, you
18  make reference to "considering the value of the partial
19  taking, as well as any resulting damages to the subject
20  larger parcel's residue by reason of the taking and the
21  value of the special (particular) benefits to the
22  subject larger parcel's residue that may arise from
23  ACP's future use of the part taking," correct?
24    A   Correct.
25    Q   Did you conclude that the residue of the

137

1  subject larger parcel receives special benefits from
2  ACP's future uses?
3    A   I considered them, but I didn't determine
4  that there were any.
5    Q   Okay.  Now, the next paragraph down, there's
6  a second sentence.  It indicates, "While proximity to a
7  UGTL," which is an underground transmission line; is
8  that correct?
9    A   That's correct.
10    Q   So that goes on.  "While proximity to a UGTL
11  may be objectionable to some segments of the market,
12  there may be other markets in which the locations are
13  considered benign or even desirable because of the
14  additional open space or other perceived amenities."  Is
15  that right?
16    A   That's correct.  That's correct.
17    Q   Did you determine that proximity to an
18  underground transmission line would be objectionable to
19  the market in and around the subject larger parcel?
20    A   I didn't find it objectionable to the market
21  in general.  I found it objectionable to some segments
22  of the market, meaning first generation owners who are
23  having a condition imposed on them.
24    Q   Who is it -- when we talk about the market,
25  in your opinion, who makes up the market for real



138

1  estate?
2      A    The market is the area that would exert
3  potential influence on valuation.
4      Q    Okay. Did you determine whether the market
5  around the subject larger parcel in this case was a
6  market in which proximity to an underground transmission
7  line would be considered desirable?
8      A    I didn't find it a -- a desire to be
9  proximate to such locations in that market.
10     Q    Okay. Did you determine that this is a
11  market in which proximity to a UGTL would be considered
12  benign?
13     A    I consider it benign, yes.
14     Q    And what -- what evidence did you consider in
15  sort of making that conclusion, that it was neither
16  detrimental, objectionable nor desirable, but it was
17  just benign?
18     A    The pair of sales I looked at which are
19  arm's length transactions of property owners who were
20  acquiring property with pipelines --
21     Q    Okay.
22     A    -- as determined and contrasted to the value
23  of like kind properties without pipelines.
24     Q    And those -- those paired sales, were they in
25  and around the market for the subject larger parcel?

139

1      A    No, they were from other markets, as I
2  indicated, because ACP hasn't been constructed. It's --
3  you can't find any such properties because the ACP line
4  doesn't exist today. It didn't exist at the time I
5  developed this appraisal. So you have to go to other
6  competing markets.
7      Q    Okay. Now, the next paragraph references
8  that you were aware of some of the local opposition to
9  the ACP project, and you've studied many of the articles
10  and press releases from those groups; is that right?
11     A    That's correct.
12     Q    All right. And are you aware of whether ACP
13  possesses all of the permits that it needs to actually
14  construct the ACP project --
15          MR. MINSON: Objection.
16     Q    -- in Virginia?
17     A    I don't believe -- based upon my
18  understanding of published articles, I don't believe it
19  does.
20     Q    What permits do you know of which ACP does
21  not have but still needs?
22     A    I think cumulatively that --
23          MR. MINSON: Objection.
24     A    -- there are six permits that -- that were
25  issued and then rescinded or stayed by various courts.

140

1      Q    And from your investigation, do you know the
2  timeline for expected completion of construction on the
3  ACP project?
4          MR. MINSON: Objection.
5      A    I believe it's been a moving target, but the
6  most recent publication I'm aware of is that it would be
7  operational by the end of 2021.
8      Q    The next paragraph on page 27, you indicate
9  that "relying on published articles as a basis for a
10  valued opinion is not a recognized appraisal technique
11  in the absence of independent investigation and
12  verification of the accuracy of the market data and
13  conclusions." Is that correct?
14     A    Yes.
15     Q    And that is a quote from the Appraisal of
16  Real Estate, Fourteenth Edition; is that right?
17     A    Yes.
18     Q    And it's -- you reference -- it's footnote
19  49. It's from page 215 of that book, correct?
20     A    Yes.
21     Q    That quote is actually from a specific
22  portion of the book that's titled "Specialized Methods
23  and Techniques for Determining the Effects of
24  Environmental Contamination on Prices and Values." Is
25  that correct?

141

1      A    Correct.
2      Q    So it -- is it your position that your
3  appraisal in this case is one which is determining the
4  effects of environmental contamination?
5      A    No, but it parallels the investigation that
6  an environmental condition such as an underground
7  pipeline could be perceived by the market.
8      Q    All right. So you're sort of saying the same
9  principle would apply in appraising underground
10  transmission of gas pipelines?
11     A    That's correct. The universe of what would
12  be described as potential detrimental conditions is
13  evidenced by that section of text.
14     Q    And just so I understand, did you undertake
15  an independent investigation in order to verify the
16  accuracy of the market data and conclusions that are
17  contained in the published articles that you've
18  referenced in your report?
19     A    Well, the only article I referenced is
20  Easement Valuation for the this line of questioning.
21  There is no data presented. There's only the matrix.
22  So there's nothing to verify or confirm. Contrast that
23  to an article that may reference a case study from,
24  let's say, Texas where data is put forth in the article,
25  and that's the reference to that -- if you're going to



142

1  rely upon that article, you have to rely upon that data.
2  In order to rely upon that data, you have to verify it
3  yourself.
4     Q    Okay.  So we talked earlier about the Dominy
5  -- the David Dominy study in the INGAA publication,
6  correct?
7     A    Yes.
8     Q    Did you do any independent investigation to
9  verify the accuracy of the market data and conclusions
10 that are presented in that study?
11    A    No, because I have my own primary data and
12 what -- that study just recognized that my results were
13 similar to what Dominy published as his results.
14    Q    All right.  Now, the next paragraph says on
15 page 27, "My -- my research revealed a wide divergence
16 of opinions, both pro and con, regarding the perceived
17 benefits and detriments of the ACP and its impact on
18 property values."  Is that correct?
19    A    That's correct.
20    Q    What -- what opinions did you encounter in
21 your research which indicated a perceived benefit of the
22 ACP on property values?
23    A    If you go to the ACP website, they quote
24 landowners who desire that the project be there
25 primarily for economic benefit in the form of job

143

1  creation and so forth and benefit to the economic base
2  in the form of increased tax revenue.
3     That's one form of an opinion that's pro.  If you
4  go to the websites such as Friends of Nelson County,
5  you'll find the opposite, the contra opinions of people
6  who don't portray that.  I'm just saying that the -- the
7  market is made up of pro and cons, like most issues.
8     Q    Did you choose to disregard some or all of
9  those opinions?
10    A    No, I just recognized that the diversity of
11 a market is such that you have opponents and you have
12 supporters.  I don't really care about those two bodies.
13 I recognize they exist, and to be objective, you have to
14 look at -- at both sides, you know, of the transaction,
15 and, you know, all things being considered, this --
16 eminent domain actions against property owners who are
17 having an imposed condition placed on their property,
18 and I understand their objections to that.
19    But that's not what I'm charged with -- is
20 justifying their objection.  I'm charged with looking at
21 an objective portrayal of properties where market
22 participants are not under any duress or need to acquire
23 property and, when they do and it's equipped with a
24 pipeline, what is the reaction?  That's really what I'm
25 looking for.

144

1     You won't get those reactions if you talk to
2  either of those two groups of opponents or supporters.
3  You will just get their opinions.
4     Q    All right.  So the next paragraph down, the
5  bottom of page 27, you say, "The impact of UGTL on
6  property value is ultimately an empirical question that
7  requires the application of one or more of the three
8  traditional approaches to value."  Is that right?
9     A    That's correct.
10    Q    And, ultimately, you applied the -- what you
11 call the sales comparison approach utilizing the paired
12 sales analysis method; is that right?
13    A    Yes.
14    Q    Now, continuing on to the top of page 28 in
15 your text about the paired sales analysis, you have a
16 sentence that says, "This approach is not always easy to
17 apply because of the difficulty in finding relevant
18 market data, but it is a very strong approach for
19 quantifying value issues in a condemnation assignment."
20 Is that right?
21    A    Yes.
22    Q    So your testimony earlier was that you were
23 -- you searched the broader market for sales of
24 properties with similar easements but found a paucity of
25 such sales, correct?

145

1     A    Of ACP.
2     Q    But then you were able to put together this
3  paired sales analysis study using other pipeline sales?
4     A    Correct.
5     Q    All right.  Now, when you do a paired sales
6  analysis, is there a number of pairs that you're looking
7  for?
8     A    Depends on how you utilize them.  If you're
9  -- if you're utilizing them in a statistical manner,
10 such as a regression analysis, the resulting indices
11 will tell you as to the validity of the statistics, so
12 output.  Appraising is a comparative analysis, and, you
13 know, there's no magic number.  I use more.  Mr. Grewell
14 uses less, you know.  It's -- it's judgmental.
15    Q    Okay.  Now, looking at the top of page 28 of
16 your report, the third paragraph indicates, "I have
17 researched all of the properties along the ACP's route
18 in Augusta, Buckingham, and Nelson Counties, and at
19 present, there is a paucity of arm's length sales
20 involving ACP-eased properties."  Is that right?
21    A    Yes.
22    Q    Did you find any sales?
23    A    No, because the ACP project, by and large,
24 doesn't exist.  So I don't consider an easement without
25 the pipeline as being synonymous with what I'm



146

1 appraising here in the after scenario.
2    Q    And is there a reason why you were looking
3 particularly for, as you call them, ACP-eased -- sales
4 of ACP-eased properties?
5    A    Well, that's the project at issue.  I think
6 that would be most relative to folks to say, "This is
7 like kind.  It's the same project."  Then you have to
8 find a substitute as an arbiter and underground
9 transmission lines by other operators and developers who
10 would serve that purpose.
11    Q    And why was it that you located only the
12 properties in Augusta, Buckingham and Nelson Counties?
13    A    At the time, those were the counties I was
14 active in.
15    Q    Okay.
16    A    I will proffer to you I've looked at the
17 entirety, every property, along the North Carolina and
18 Virginia boundary of the ACP.
19    Q    Okay.  So after you've looked at all of those
20 properties -- and I appreciate that -- and you found a
21 paucity of sales, basically no sales or no sales that
22 you thought were appropriate to apply --
23    A    Right.  I found some sales, but then the
24 second part of a paired sale analysis is you have to
25 find a comparable sale, and that's where the limitation

147

1 got severe.  Of the two or three sales that I found
2 along the route, I couldn't find anything that was a
3 like kind property to compare it to.  So, therefore, you
4 have to look at alternatives.
5    Q    All right.  So then -- and that's when you
6 decided to sort of expand your geographic region?  You
7 looked at what you call case studies involving UGTLs in
8 other communities with seasoned transaction histories;
9 is that right?
10    A    That's correct.
11    Q    All right.  Let's turn to Exhibit 7 of your
12 report.
13    Before you start your next question, what is
14 your timing you anticipate?  Because I would like to get
15 something to eat soon if we're going to be here into the
16 afternoon.  Best estimate?
17    Q    I think an hour.  I'd like to try to push
18 through.
19    A    You only have an hour remaining?  If that's
20 the case, sure.
21    Q    That's my hope.
22    A    But it it's two or three hours --
23    Q    No, I --
24    A    I'm going to hold you to that.  Okay.
25 Exhibit 7.  Let's go.

148

1    Q    Okay.  Thank you, Mr. Harvey.  Just answer
2 really quickly.  All right.  So looking at Exhibit 7 --
3 and just so we're clear, this is a chart reflecting the
4 paired sales analyses that you considered or relied upon
5 with regard to this appraisal; is that correct?
6    A    Yes.
7    Q    And the first segment of the chart includes,
8 looks like, 12 pairs which are from Baltimore and
9 Hartford Counties in Maryland related to Columbia Gas
10 transmissions, line MA and MB; is that right?
11    A    Correct.
12    Q    And of that, the first several pairs are --
13 you have a -- well, let me ask.  You have case sales,
14 which are the -- the sales of properties which have an
15 underground pipeline on them, correct?
16    A    One or two pipelines, yes.
17    Q    Okay.  And then you have a controlled sale
18 which does not; is that right?
19    A    Correct.
20    Q    Okay.  So you have four pairs which include a
21 case sale at 2308 Kings Arm Drive, correct?
22    A    Yes.
23    Q    And then four sales that include a case sale
24 at 7 Joel Court, correct?
25    A    Yes.

149

1    Q    Three that included a case sale at 23
2 Dellwood Court?
3    A    Yes.
4    Q    And then one with a case sale at 3207 Hunting
5 Tweed Drive; is that right?
6    A    Yes.
7    Q    And just for -- for the record, where in
8 Maryland, geographically, are Baltimore and Hartford
9 Counties or these properties located?
10    A    North and east of the city.
11    Q    North and east of Baltimore?
12    A    Yes.
13    Q    All right.  And included in your report is a
14 write-up-- are write-ups about these pairs as
15 Exhibit 10; is that correct?
16    A    Yes.
17    Q    Now, we looked earlier at your first
18 appraisal, which I believe was Harvey Exhibit 3, and
19 that did not include all of these write-ups on these
20 pairs; is that right?
21    A    Correct.
22    Q    Is there a reason that you didn't include it
23 in that first appraisal and that you have included in
24 your most recent report?
25    A    Well, the reason I included in my most



150

1  recent one was my understanding of Judge Dillon's action
2  in the MVP case, which -- where her order was vacated.
3  I think she was critical of Mr. Noble for lack of
4  information that he had relied upon.  So I -- I believed
5  in accordance with the way the courts are looking at
6  these types of reports -- in abundance of caution, I
7  included them.
8      Q    Okay.  Did somebody ask you to do that?
9      A    No, I do that on my own.  Just typical
10  research.
11     Q    Did somebody bring that case to your
12  attention?
13     A    No, I brought it to my own attention through
14  PACER.
15     Q    Okay.  Now, looking -- and it probably is
16  helpful -- would be helpful for us to look mostly at
17  Exhibit 10 --
18     A    Okay.
19     Q    -- because that has a lot of the meat of the
20  information.  So Exhibit 10 to Harvey Deposition
21  Exhibit 1.  Do you -- so thinking about the case sale at
22  2308 Kings Arms Drive, do you know the listing history
23  of that property before it was sold?
24     A    Hold on a second.  I'm trying to get to the
25  beginning.  Okay.  Could you please repeat your

151

1  question?
2      Q    Sure.  We talked about the first, I think,
3  four pairs included a case sale at 2308 Kings Arms Drive
4  in Fallston, Maryland, correct?
5      A    Yes.
6      Q    Do you know the listing history of that
7  property before the sale that you're referencing?
8      A    It's something that I considered.  I did
9  these appraisals in real time.  In other words, these --
10  all of these properties, I appraised.
11     Q    All right.  You were appraising these on
12  behalf of Columbia Gas?
13     A    Correct.  And to answer your question, yes,
14  as part of my appraisal, I did the due diligence, which
15  would have investigated the history.
16     Q    And with regard to that 2308 Kings Arms
17  Drive, do you know what the just compensation that was
18  ultimately paid for that Columbia Gas easement was?
19          MR. MINSON:  Objection.
20     A    No, that wouldn't factor into my analysis.
21     Q    Why not?
22     A    Because it's not part of the analysis.  I'm
23  looking at transactional data, comparing what the
24  property sold for on a resale basis.  What somebody
25  received in the form of a court award or settlement is

152

1  outside of that transactional data.
2      Q    But it -- wouldn't that be important for you
3  to sort of -- be a check on your conclusions?
4          MR. MINSON:  Objection.  I'm going to
5          object that for relevance.  I don't think
6          that has anything to do with this.
7  BY MR. CLARKE:
8      Q    Now, you first compared 2308 Kings Arms Drive
9  to 2304 Kings Arms Drive, which is just down the road;
10  is that correct?
11     A    That's correct.
12     Q    They're, really, kind of both off the same
13  cul de sac; isn't that right?
14     A    Yes.
15     Q    To get to 2304 Kings Arms Drive, your control
16  sale, you have to actually drive right over the pipeline
17  and right past it, don't you?
18     A    I believe so.
19     Q    Okay.  And the -- the sale at 2308 Kings Arms
20  Drive, that's a 2.49-acre parcel in a subdivision with a
21  32 -- 3,257 square-foot house on it; is that right?
22     A    Correct.
23     Q    Now, we can save some time.  The -- the
24  write-ups that you've included for each of these pairs,
25  to your -- to your knowledge, the description of the

153

1  size of each of the properties and the size of the homes
2  on each of those properties, those are as you've set
3  forth in this report; is that correct?
4      A    Correct.
5      Q    And I believe for all of these 12 pairs from
6  this Maryland study, it's -- they're all single-family,
7  residential properties; is that right?
8      A    Yes.
9      Q    If you'll look at the second pair, where you
10  compared 2308 Kings Arms Drive to 3150 Charles Street
11  also in Fallston --
12     A    Yes.
13     Q    -- your conclusion after that comparison is
14  that the -- the property with the gas pipelines or
15  pipelines on it was actually enhanced in value; is that
16  correct?
17     A    I wouldn't call it an enhancement.  It
18  showed no negative.  It was positive.
19     Q    Okay.
20     A    But I wouldn't classify it as enhancement.
21     Q    Well, but it is a positive difference there
22  that you've concluded after making your adjustments
23  between the two sales; is that right?
24     A    Yeah, it's a positive value difference.
25     Q    Right.  Indicating that after -- after you



154

1  account for all of the different variables and
2  differences between the two properties, the buyers would
3  basically value the property with the pipeline on it at
4  a 1.04 percent premium?
5      A    If that's the way you want to portray it,
6  sure.
7      Q    Sir, is that your conclusion?
8      A    My conclusion is you're taking one data out
9  of the context out of all of the data.  My purposes of
10 doing it is twofold.  That, in the broad array, I
11 believe the underground transmission line on the Ralston
12 property as evidenced by this data is a benign
13 condition.
14     The reason I believe it's a benign condition is if
15 you look at the summation, the accumulation, using
16 statistical inference, mean, median, there's no market
17 reaction.  That's observable and measurable, but the
18 market is imperfect, real estate markets.
19     As I testified, I was a stockbroker.  I could go
20 to, you know, Bloomberg and gets thousand of bid-asks at
21 any minute.  The real estate market, the data is much
22 more scarce and it's imperfect, but even with that
23 imperfection, you can draw certain conclusions.  My
24 conclusion is this pipeline is a benign condition.
25     Q    Okay.  And I appreciate that.

155

1      A    Yeah.
2      Q    But, ultimately, you draw those conclusions
3  based on the data itself, correct?
4      A    All of the data.
5      Q    Right.
6      A    Not just --
7      Q    And I'm not trying to single out something --
8      A    Okay.
9      Q    We can go through all of these but --
10     A    No.
11     Q    -- with regard to the 12 pairs that you have
12 from this Maryland study, six of them show an
13 enhancement and six of them show a diminution relative
14 to the pipeline; is that correct?
15     A    Yeah, and it's typical.
16     Q    Okay.  And a lot of that, really, is the
17 function of the adjustments that you're making when
18 you're comparing the two -- two properties; is that
19 right?
20     A    When you say "all of that," I'm not -- what
21 do you mean?
22     Q    I said a lot of that is the function of the
23 adjustments that you're making when you're comparing --
24     A    I don't understand --
25     Q    -- the case sale --

156

1      A    -- what's -- a lot of that is --
2      Q    A lot of that -- the variability between,
3  "Well, this is a 1.04 percent enhancement, or this is a
4  5.28 percent enhancement" --
5      A    Okay.  I understand.  It's a perceived --
6      Q    -- that's a function of --
7      A    -- it's a perceived market reaction as
8  measured through the adjustment.
9      Q    Right.  Right.  And you determined what those
10 adjustments are correct?
11     A    Yes.
12     Q    All right.  And that's -- is that based on
13 your experience, your expertise in the field, having
14 done this over the course of your career?
15     A    Those three in combination with the
16 collaborated effort that I did with my residential
17 associates when I did this project.
18     Q    So you're talking about when you were
19 appraising these properties for Columbia Gas?
20     A    Yes.
21     Q    Okay.
22     A    When I did the equivalent expert report in
23 that matter.
24     Q    I gotcha.  So this study, this 12-pair study,
25 was something you had actually prepared for a different

157

1  pipeline project?
2      A    Correct.
3      Q    And did you revisit any of the analysis or
4  the adjustments that you made in this study when you
5  decided to include it in this project, in this report?
6      A    No, it had been -- the study had been
7  concluded back in August of 2016.  So I just referenced
8  it and included the data here.  Same is true with the
9  next grouping from the WBX line.
10     Q    Right.  Now, if you'll turn with me to -- I
11 think it's the fifth pair.  It's the first one that
12 has --
13     A    Joel Court?
14     Q    7 Joel Court.  Is there a pipeline on that
15 property at 7 Joel Court?
16     A    Yes.
17     Q    Okay.
18     A    If you turn to the third page, you'll see
19 the plat.
20     Q    I see the plat, but I'm not sure from that
21 plat whether the pipe itself is on the property or it's
22 simply just a permanent easement.  Do you know?
23     A    Oh, I see your distinction.  It's a
24 permanent pipeline easement.  Whether the pipe touches
25 in the easement, I don't know.



158

1    Q    Okay.  Now, looking at your ninth pair, I
2  think it is the one that's on 23 Dellwood Court.
3    A    Yes.
4    Q    9, 10, and 11, I believe, include that?
5    A    Uhm-hmm.
6    Q    Again, is there an actual pipeline on that
7  property?
8    A    There's a pipeline easement on the property.
9  Whether the pipe is within the easement, I couldn't -- I
10  don't think so.
11    Q    Okay.
12    A    The disclosure when these properties are
13  sold is that there's an underground transmission line
14  easement.
15    Q    Now, actually, looking back at -- the plats
16  that you've included for that 7 Joel Court property --
17    A    Yes.
18    Q    -- there's a reference there to the size of a
19  proposed easement and then a temporary construction
20  easement at 0 acres, and then a temporary construction
21  license?
22    A    Yes.
23    Q    What is the difference between a -- well,
24  what is a temporary construction license?
25    A    I consider them to be synonymous and in

159

1  those particular instances -- that the way the language
2  read in the complaint -- is it was -- seemed to be as
3  synonymous with an easement, but it was a license to do
4  activity but not necessarily occupy the space.
5    Q    So you agree for that -- for that property at
6  7 Joel Court, there was a permanent pipeline easement
7  and then there was a temporary construction license but
8  not a temporary construction easement?
9    A    That's correct.
10    Q    Okay.  Now, looking at your final pair for
11  this Baltimore study -- or Maryland study.
12    A    23?
13    Q    Yes, sir.  That 3207 Hunting Tweed property
14  in Owings Mills was your case sale, and you compared it
15  to a control sale at 12 Huntersworth Court, also in
16  Owings Mills; is that right?
17    A    Yes.
18    Q    And the 12 Huntersworth Court actually has a
19  high voltage transmission line on it; does it not?
20    A    Correct.
21    Q    So you were comparing one property with a
22  national gas transmission line on it to another property
23  that has a high voltage transmission line on it; is that
24  right?
25    A    Correct.

160

1    Q    And your conclusion, again, or the result of
2  that pair was that the property with the pipeline on it
3  had an enhancement of .57 percent over the property with
4  a power line on it; is that right?
5    A    Had a higher value, yes.
6    Q    Is there a reason that you compared the case
7  sale with a pipeline on it with a property that had a --
8  a transmission line of a different type on it?
9    A    The -- was the only available sale that
10  matched up comparability with regard to physical
11  characteristics.
12    Q    And did you make any adjustments to the
13  control sale at 12 Huntersworth Court with regard to the
14  presence of that high voltage transmission line?
15    A    No.
16    Q    Why not?
17    A    Same reason.  I found it -- I've done other
18  high voltage transmission line cases, and I found those
19  to be largely benign, as well, but I will say that --
20  that's it.
21    Q    Do you consider the impact of a gas pipeline
22  transmission line to be different or similar to the
23  impact to property from an overhead high voltage
24  transmission line?
25    A    I don't determine the impact, per se,

161

1  subjectively.  I look at the market's reaction, and it's
2  implied in the transactional data as to whether there is
3  or is not an impact and, if these is an impact, what's
4  the differential in value?
5       And what you'd find is most of these analyses show
6  a rather nominal difference in value, whether it's plus
7  or minus.  That's more inherent in the imperfection of
8  real estate markets.
9    Q    Now, have you used or have you considered
10  paired sales in which the case sale was a high voltage
11  transmission line versus a property that sold without a
12  transmission line easement?  Have you looked at these
13  types of pairs to inform your conclusions about the
14  impact of underground natural gas pipeline easement?
15    A    No.
16    Q    Is there a reason that you haven't looked at
17  HVTLs pairs?
18    A    It's a dissimilar easement.  It's above
19  grade versus below grade.  It's a different type of a
20  transmission of electricity versus gas.  So I believe
21  that they would not be -- if I couldn't find anything
22  else in the marketplace, I may consider them.  But I
23  generally will go to the ends of the earth to find
24  better data that's like kind in nature than opposed to
25  something that is unlike kind.



162

1    Q    And when you say "like kind," you're talking
2    about the type of utility line; is that right?
3    A    Correct, the corridor at issue.
4    Q    Not necessarily the type of property,
5    correct?
6    A    Well, I think they're both important.  A
7    paired sale is facilitated by the degree of
8    comparability between the two properties being compared.
9    Q    Okay.  What is the -- well, let me back up.
10   For -- for all of these 12 pairs in your first grouping
11   from the counties north and east of Baltimore, they were
12   involving properties that -- you were comparing
13   properties that sold with the Columbia Gas transmission
14   pipeline or pipelines on them; is that right?
15   A    Correct.
16   Q    What is the width of that Columbia Gas
17   permanent pipeline easement?
18   A    I don't recall.
19   Q    Okay.  What is the width of the temporary
20   easement?
21   A    The -- that would be variable.
22   Q    And what is the depth of that pipeline?
23   A    I just don't recall.  It's underground and,
24   again, it would be variable depending upon contours
25   and so forth.

163

1    Q    And what's the diameter of that pipe?
2    A    I don't recall.
3    Q    Okay.  Now, does that pipeline that's in --
4    north of Baltimore, north and east of Baltimore, connect
5    to a pipeline that's owned by same entity, which I think
6    is now TransCanada, that actually runs through Augusta
7    County, Virginia?
8    A    Well, I think all pipelines ultimately
9    connect.
10   Q    Uhm-hmm.
11   A    Including, you know, the main pipeline,
12   Transco, coming from Houston and New York.  So I think
13   there is interconnectivity by PGM's requirements.
14   Q    Right.  My question is do they connect to the
15   -- a pipeline that's owned by the same entity?
16   A    When you say same entity, there may be a
17   parent and a subsidiary, but, you know, NiSource is
18   different than NiSource of Virginia, which is different
19   from Columbia Gas.  So, you know, whether they have
20   consortium and they have some side agreement, I don't
21   know.
22   Q    Okay.  Did you attempt to find paired sales
23   data from Augusta County with regard to any existing gas
24   pipelines in the county there?
25   A    Yes.

164

1    Q    And were you able to find any?
2    A    No.
3    Q    Now, you mentioned earlier the -- that you
4    looked at some appraisals that were done for the
5    Mountain Valley Pipeline project, remember?
6    A    I didn't say I looked at appraisals.  I said
7    I looked at PACER for activity in connection with the
8    Mountain Valley Pipeline.
9    Q    Okay.  I thought you were testifying -- you
10   had testified about Mr. Long and Mr. Woods.  Do you
11   remember that?
12   A    Yeah.
13   Q    And did you look at any of their appraisals?
14   I think you were talking about peer -- peer analysis or
15   -- or peer work done with regard to similar assignments
16   when we were talking about the value of the easement
17   rights as a function of the fee value.
18   A    I did, and the only thing I've seen is that
19   which is publicly available on PACER through the filings
20   that your firm and other firms have done back and forth
21   in connection with those cases where they will reference
22   particular data in the filing as an attachment.
23   Q    Okay.
24   A    For instance, an appraisal and so forth.
25   The most recent one I looked at was Mr. Noble's where

165

1    the judge I think, ultimately -- before her order was
2    vacated, she excluded Mr. Noble, and there was a
3    discussion in the filings as to what the data he relied
4    upon -- what the data that wasn't in his report that he
5    said he relied upon, and what -- the court determined it
6    was inappropriate, but, like I said, it was vacated.
7    Q    Okay.
8    A    That's how I become aware of that
9    information.
10   Q    But did you look at appraisals prepared by
11   Mr. Long or Mr. Woods with regard to the Mountain Valley
12   Pipeline project?
13   A    No.
14   Q    Okay.
15   A    I haven't seen those appraisals other than
16   those which are attached to filings, and I think there
17   have been some valuations, at least sections of
18   valuations, that have been included in filings.
19   Q    So -- so of the ones that have been attached,
20   you may have or you did look at those?
21   A    Yes.
22   Q    Okay.  Now, and have you -- are you familiar
23   with the paired sales study that some of the appraisers
24   appraising on behalf Mountain Valley Pipeline have
25   relied upon?


ZAHN
COURT REPORTING
www.zahncourtreporting.com

**166**

1    A    Generally, yes.

2    **Q    Okay.  Have you seen that study?**

3    A    I've seen excerpts of the study.  I've not

4 seen the whole study.  I believe it's trademarked,

5 copywritten, or trademarked.  I don't know.

6    **Q    You're asking the wrong type of attorney**

7 **about that.**

8    A    Yeah, as far as I know, I have -- I've

9 looked at what was available in PACER as attached to

10 various filings, but that didn't include the cover page

11 and any other things.  So I consider it proprietary

12 work, but I nonetheless looked at it.

13    **Q    Okay.  Was that a study that was prepared by**

14 **Mr. Woods who you referenced before?**

15    A    Yes.

16    **Q    Is that correct?  All right.  Now, looking**

17 **back at your report, the next section of pairs, Mr.**

18 **Harvey, is from a Columbia Gas line called WBX in**

19 **Fairfax County, Virginia; is that correct?**

20    A    Correct.

21    **Q    And just so we're all on the same page,**

22 **Exhibit 7 summarizes and you have 11 pairs relating to**

23 **that study; is that right?**

24    A    Yes.

25    **Q    And for all of those, the case sales were**

**167**

1 along both a natural gas transmission line and a high

2 voltage electric transmission line; is that correct?

3    A    Yes.

4    **Q    Now, does your report isolate what the impact**

5 **is from the pipeline versus the high voltage power line?**

6    A    No, it considers the property and, you know,

7 the case study as equipped on the date of sale.

8    **Q    Is there a reason why you didn't try to**

9 **isolate the specific impact from the natural gas**

10 **pipeline versus any impact from the power lines?**

11    A    Well, they're collated -- co-located.  You

12 can't -- I mean, the property limits are the

13 transactions that appear.  All of those transactions are

14 co-located.

15    A    Okay.

16    A    So there's no ability to do that.

17    **Q    Well, but did the pipeline go in before the**

18 **power lines, or vice versa?**

19    A    After.

20    **Q    So, then, you could have found data from the**

21 **sale of those properties with just the power line on it**

22 **and then the subsequent sale with the pipeline and a**

23 **power line, correct?**

24    A    I guess you could have researched that data,

25 but that doesn't inform one as to the impact of the

**168**

1 power line -- of a gas transmission line, only potential

2 impact of the power line.  Like I said, I've done other

3 studies of power lines.  I already -- I already have

4 that knowledge and experience.

5    **Q    I mean, I'm just trying to understand -- it**

6 **seems to me like it's an important thing when you're**

7 **trying to isolate the impact of a pipeline, which you're**

8 **attempting to do in this appraisal, to -- to be able to**

9 **weed out any other impacts that might be related, not to**

10 **the pipeline, but instead to a power line?**

11    A    If the data existed, that would be fine.

12    **Q    Okay.**

13    A    But the data didn't exist with regard to the

14 gas transmission line data.

15    **Q    So we -- we don't really know whether the**

16 **difference in value that you've determined in your study**

17 **of this WBX line is attributable to the pipeline or to**

18 **the power line or to some combination thereof; is that**

19 **correct?**

20    A    Well, in the second grouping, it would be a

21 combination, but under the theory that -- that the more

22 intensive use of two easements on a property, one being

23 an above-grade power line and the other being a

24 below-grade transmission line, if there was to be a

25 measurable impact, it would have contrasted to the two

**169**

1 groupings of the case studies.

2    Here, the results being issued are within 2

3 percent of another.  So you can say, yeah, when you have

4 a high voltage transmission line, there's 2 percent.

5 You could deduce that from the data.  I don't think that

6 rises to the level of something that's measurable and

7 impactful.

8    2 percent accuracy within appraisal is -- I mean,

9 it's amazing in this case that Mr. Grewell and I -- in

10 the before -- with the 2 percent.  That's a rarity.

11 Most of the time, you just don't find that concurrence.

12    **Q    But let me back up.  Because earlier, you had**

13 **-- your were saying, and in your report you indicate,**

14 **that there may be some markets which would actually view**

15 **a power -- excuse me -- a pipeline easement as a -- as a**

16 **positive because it provides more open space or**

17 **something like that, correct?**

18    A    Sure.

19    **Q    So I guess I'm wondering how did you**

20 **determine whether these -- these power lines that were**

21 **all present in your study of the Fairfax County sales**

22 **were a negative or a positive or neither when you were**

23 **trying to determine what the impact of the pipeline was?**

24    A    Because there's no measurable impact on the

25 combination of the corridor.



ZAHN
COURT REPORTING
www.zahncourtreporting.com

170

1    Q    But, I mean, couldn't -- couldn't it just as
2 well have been that the power lines enhanced the
3 property and the pipelines diminished it and the impact
4 is a wash?
5    A    I don't --
6        MR. MINSON:  Objection.
7    Q    You just -- you just don't know, correct?
8    A    Well, I do know, as I just explained to you.
9 If you look at two groups, they -- the 2 percent
10 differential in the combination of the statistics for
11 both groupings of paired sales don't show a measurable
12 difference.
13    Q    So the reason you know that there's --
14 there's not a -- that the -- that the power lines
15 haven't skewed your data here is because you compared
16 your overall results from the Fairfax County study to
17 the overall results from the Maryland study?
18    A    That, in concert with the individual studies
19 of high voltage transmission lines which I've also done
20 in a very similar fashion.
21    Q    Are those referenced in your report?
22    A    What?
23    Q    Those individual studies of high voltage
24 transmission?
25    A    No, they're not relevant.  As I previously

171

1 testified to, I would not use as an arbiter a study
2 solely of a high voltage transmission line and apply
3 that to an underground transmission line impact.  I
4 don't think it's appropriate.
5    Q    Now, looking again at Exhibit 7 to your
6 report, you do have two pair that come from the ACP or
7 the proposed ACP line; is that right?
8    A    That's correct.
9    Q    And you have a write-up about these sales at
10 the end of Exhibit 10; is that right?
11    A    Correct.
12    Q    Now, you did consider, I take it, these as
13 informative of your opinion of the impact of the ACP
14 easements on the Ralston properties, correct?
15    A    Well, it's part of the data.  I didn't
16 consider them good arbiters because the project hasn't
17 been completed.  It doesn't fit the definition, but,
18 nonetheless, it was the only data along -- which had a
19 recorded ACP easement but without the pipeline on it.
20    Q    Okay.  So if you didn't consider it to be
21 that informative, why did you choose to include it in
22 your report?
23    A    Because it's the only data that I found that
24 touched upon the actual ACP project itself, and I
25 thought, in an abundance of caution -- include it and

172

1 then explain it is what I typically do, and that's what
2 I did here.
3    Q    Okay.  Are you familiar with the sale of
4 property of 4296 Deerfield Valley Road in Deerfield,
5 Virginia?
6    A    Not off the top of my head, no.
7    Q    Okay.  Did you recall ever seeing information
8 on that sale in the course of developing your
9 appraisals?
10    A    Not off the top of my head.
11    Q    If you will, can we go back to page 28 of
12 your report?
13    A    Okay.
14    Q    And at the bottom of page 28, you reference
15 that study prepared by David Dominy that we've talked
16 about earlier, correct?
17    A    Correct.
18    Q    It continues -- your reference continues onto
19 the top of page 29 about that study, correct?
20    A    Yes.
21    Q    And that is, we've talked about it, but it
22 was published by something called the INGAA Foundation,
23 Inc.; is that right?
24    A    Yes.
25    Q    And that is a natural gas trade association;

173

1 is it not?
2    A    Correct, uhm-hmm.
3    Q    And on page 29, you indicate about midway
4 down -- after your numbered paragraph 8, you indicate,
5 "My independent investigation, verification of market
6 data, and conclusions regarding the impact of the UGTL
7 on property value parallel the conclusions expressed in
8 Mr. Dominy's treatise."  Do you see that?
9    A    Yes.
10    Q    And that independent investigation is the
11 paired sales analysis that we just talked about; is that
12 correct?
13    A    Correct.
14    Q    But you -- and I think you said this earlier,
15 but I just want to make sure you -- you did not
16 undertake an independent investigation of Mr. Dominy's
17 market data?
18    A    I did not.
19    Q    All right.  If you'll turn with me to page 34
20 of your report, Mr. Harvey.
21    A    Yes.
22    Q    And this is your certification, and we talked
23 a little bit about whether there was a seal missing from
24 this and --
25    A    Well, if you look at Exhibit 3, you'll see



174

1  the seal on that same certification page.  That's what's
2  missing.
3      Q   Yeah.
4      A   And that may explain the typos.
5      Q   Well, that's fine.
6      A   Yeah.
7      Q   My question, though, is, this is -- this is
8  your certification page for your report here, which is
9  required under USPAP; is that right?
10     A   Yes.
11     Q   In paragraph 14, you indicate that you have
12 an opinion of the fair market value of the fee simple
13 interest in the permanent easement taken on the subject
14 larger parcel; is that right?
15     A   Yes.
16     Q   Can you explain to me what a fee simple
17 interest in a permanent easement is?
18     A   It's an encumbered fee, meaning what's the
19 just -- it would be -- my job isn't to rule on just
20 compensation or opine on just compensation -- that's the
21 province of the court and the jury -- but to provide the
22 court and the jury any type of assistance in the form of
23 market data, I provide valuations.  So my valuation
24 would be, presumably, something that they would look at
25 to award just compensation for the two takings here, one

175

1  being permanent, the other one being temporary.  And in
2  14, I'm saying that the encumbered fee impact of the
3  permanent easement, in my opinion, is worth $13,000.
4      Q   Just so I'm clear, you're saying that $13,000
5  is the -- is the value of the easement rights
6  themselves, not the value of the rights that the Ralston
7  trustees are retaining in that area; is that correct?
8      A   Neither.  I'm saying the difference before
9  and after is $13,000 attributed to the permanent
10 easement.
11     Q   Okay.  All right.
12         THE WITNESS:  If you're going to move on
13     to another line, I would like to just take
14     another quick break.
15         MR. CLARKE:  Sure.
16         (Whereupon there was a brief recess in
17     the proceedings.)
18         MR. CLARKE:  All right, Mr. Harvey.  I
19     could have this marked.
20         (Whereupon Harvey Exhibit No. 4 was
21     marked for identification.)
22 BY MR. CLARKE:
23     Q   Mr. Harvey, I'm going to give you a document
24 that was marked for identification purposes as Harvey
25 Exhibit 4.  I'll represent to you that this is a

176

1  document I received from your client, McGuireWoods, on
2  the 5th of November 2018, and it includes a document
3  that purports to be an expert rebuttal report prepared
4  by you with regard to this case.
5      A   Yes.
6      Q   Have you seen this before?
7      A   Yes.
8      Q   All right.  And this is the -- you talked
9  earlier about an appraisal review.  This is the first of
10 the appraisal review reports that you've prepared with
11 regard to this case; is that correct?
12     A   That's correct.
13     Q   You've since prepared, I think, two other
14 supplements of this review; is that correct?
15     A   Yes.
16     Q   And if you will, turn with me to page no. 1
17 of your report here.
18     A   Yes.
19     Q   And actually, the cover page is dated
20 November 2nd, 2018; is that correct?
21     A   Yes.
22     Q   All right.  And then page no. 1, there's a
23 section at the top of the page entitled "opinions."  Do
24 you see that?
25     A   Part of our Rule 26 disclosures, yes.

177

1      A   Yes, sir.  And the last paragraph under
2  opinions indicates, "Based on my review and subject to
3  the definitions, certifications, assumptions, and
4  limiting conditions and scope of work set forth in this
5  report, my opinion, which I hold to a reasonable degree
6  of professional certainty, is that I disagree with the
7  opinions and conclusions contained in the work under
8  review due to errors of omission or commission that
9  significantly affected the assignment results."  Do you
10 see that?
11     A   I do.
12     Q   And the work under review is an appraisal
13 report prepared by Dennis Grewell with regard to the
14 Ralston property; is that right?
15     A   For clarification, it's the Grewell report
16 dated October 11th, 2018.
17     Q   Okay.
18     A   But you will -- there's various Grewell
19 reports.
20     Q   As -- as with you, every time the plats
21 changed, Mr. Grewell changed his opinions or updated his
22 report, correct?
23     A   I think he issued three reports.  I issued
24 four.  I don't know why there aren't four.  I just don't
25 know why.


ZAHN
COURT REPORTING
www.zahncourtreporting.com

178

1   Q   You were -- you won the contest.  You wrote
2   the most reports.
3   A   I don't really care anymore, but I don't
4   know why.
5   Q   All right.  So right.  I agree.  This is --
6   this is a review of Mr. Grewell's October 11th, 2018,
7   appraisal report for the Ralston trust properties,
8   correct?
9   A   Correct, yes.
10  Q   And, as stated, again, in -- your opinion is
11  -- your opinion was that you disagreed with the opinions
12  and conclusions contained in that October 11th, 2018,
13  Grewell report due to errors of omission or commission
14  that significantly affected the assignment results; is
15  that correct?
16  A   Correct.
17  Q   And in particular, in this report, your first
18  appraisal review -- well, let me back up.  Appraisal
19  review, is that a specific term or type of assignment
20  under USPAP?
21  A   Yes.
22  Q   And how is it different than an appraisal?
23  A   Well, it's a critique of another appraiser's
24  work, but it would be synonymous to an appraisal if the
25  scope of work of the review requested that, by

179

1   extension, the appraiser -- the review appraiser rely
2   upon what he's reviewing that he does agree with and
3   extends that to his own opinion of value.  So an
4   appraisal review can also include an appraisal opinion.
5   Q   Okay.  But this --
6   A   Mine does not.
7   Q   Your appraisal review -- none of your
8   appraisal reviews that you're prepared for this case
9   include an actual opinion of value; is that correct?
10  A   That's correct.
11  Q   And, in particular, this appraisal review
12  that's dated November 2nd, 2018, you criticize and you
13  give opinions with regard to Mr. Grewell's use of paired
14  sales data, in particular relating to a sale of property
15  on Milum Lane or Milum Lane in the City of Suffolk,
16  Virginia; is that correct?
17  A   Yes.
18  Q   And one of your criticisms was that the
19  Grewell report, in your opinion, failed to make
20  appropriate adjustments for the presence of wetlands on
21  that Milum Lane property; is that correct?
22  A   Yes.
23  Q   Are there any other substantive criticisms
24  with regard to the Grewell report that are contained in
25  this review?

180

1   A   No.
2   Q   Okay.
3   A   Other than what's on 11 and 12.
4   Q   Okay.  And I don't -- I don't mean to be over
5   simplistic, but what's contained on 11 and 12, again,
6   really focused on that Milum Lane sale and your
7   criticism of Mr. Grewell's use of it or his failure, in
8   your opinion, to appropriately adjust it in his paired
9   sales analysis?
10  A   Correct.
11  Q   Now, in this appraisal review -- well, let me
12  back up.  At the time that you prepared this appraisal
13  review, had you done any investigation with regard to
14  the circumstances surrounding that Milum Lane sale?
15  A   Yes.
16  Q   What was that investigation?
17  A   Well, I can't segregate -- I had
18  investigated because this information that appears in
19  the exhibits is from my investigation, but I've
20  continued to investigate it as Mr. Grewell has continued
21  to add additional information to his supplemental
22  reports.
23      So I can't tell you what I did then versus what
24  I've done more recently and what the demarcation line
25  is.  I don't recall.

181

1   Q   Okay.
2       MR. CLARKE:  If I could have this
3   marked.
4       (Whereupon Harvey Exhibit No. 5 was
5   marked for identification.)
6   BY MR. CLARKE:
7   Q   Mr. Harvey, I'm going to show you a document
8   that's been marked for identification purposes as Harvey
9   Exhibit 5.
10  A   Yes.
11  Q   All right.  And this -- there's a disclosure,
12  but then attached to it is an expert report.
13  A   Did you intend for this e-mail to be part of
14  this?
15  Q   That's fine.  I'm okay with that.  That was a
16  transmittal e-mail to me.
17  A   It's not part of my work.  I just --
18  Q   I understand.
19  A   Okay.  Gotcha.
20  Q   So aside from that e-mail that's not part of
21  your report itself, but the -- the documents before it
22  are your second supplemental rebuttal report?
23  A   To the best of my knowledge -- to the best
24  of my knowledge, although the stamps are, again, not
25  appearing.  I don't know why.



**182**

1    Q    Okay. So, again, you're looking at your
2  certification signature page --
3    A    Page 21.
4    Q    -- and there's not a stamp on it, but other
5  than that, does this appear to be the rebuttal report
6  appraisal review that you prepared most recently, the
7  second supplement dated January 17th of this year?
8    A    Yes.
9    Q    And if you look with me at page 1 of this
10  document, Harvey Exhibit 5, again, under Rule 26
11  disclosures at the top of the page and the section
12  titled "opinions," the third paragraph states, "Based on
13  my review and subject to the definitions, certifications,
14  certifications, assumptions, and limiting conditions,
15  the scope of work set forth in this report, my opinion,
16  which I hold to a reasonable degree of professional
17  certainty is that I disagree with the opinions and
18  conclusions contained in the work under review due to
19  errors of omission or commission that significantly
20  affected the assignment results." Is that correct?
21    A    Yes.
22    Q    Now, you mentioned this earlier, but you've
23  updated this. This -- again, this is an appraisal
24  review, correct?
25    A    Yes.

**183**

1    Q    And you've updated this or supplemented this
2  appraisal review now twice, I take it, in response to
3  the updated appraisal reports that Mr. Grewell had
4  prepared with regard to this property; is that right?
5    A    Yes.
6    Q    And this is your most recent appraisal
7  review, and you are reviewing an appraisal report
8  prepared by Mr. Grewell that was dated what day?
9    A    December 2nd, 2019.
10    Q    Okay.
11        MR. MINSON:  Just so you know, I was
12  looking for the stamp --
13        MR. CLARKE:  Okay.
14        MR. MINSON:  -- that's he's talking
15  about that's missing from his report. I
16  don't see --
17        MR. CLARKE:  Yeah, I don't -- I don't
18  know what happened. I'm sure -- we'll get it
19  straightened out, and I'm not worried about
20  it.
21        THE WITNESS:  Okay.
22        MR. CLARKE:  And I understand your
23  concern. So --
24        THE WITNESS:  Okay. It's on the record.
25        MR. CLARKE:  I appreciate that.

**184**

1  BY MR. CLARKE:
2    Q    So, Mr. Harvey, looking at this document that
3  we have, Harvey Exhibit 5 in front of you, your
4  criticisms of Mr. Grewell's December 2nd, I think you
5  said 2019 appraisal report, again, revolve around your
6  -- his use or his, you believe, improper use or improper
7  adjustment of that Milum Lane sale in Suffolk; is that
8  correct?
9    A    Not exclusively.
10    Q    All right. What else are you including in
11  this appraisal review?
12    A    Well, the way you frame your question,
13  you're talking about the Milum Lane sale, but the
14  comparators that he used to analyze the Milum Lane sale
15  also are -- I'm discussing, for instance, the Diggs
16  Prospect Road transaction, that there was deficiencies,
17  I believe, in the way Mr. Grewell reported the data and
18  analyzed the data.
19    Q    Okay.
20    A    And then, also, Mr. Grewell's reliance on
21  the published studies along the lines of what we
22  previously discussed, that if you're going to rely upon
23  them, you got to look at the data and analyze the
24  underlying data.
25        I think that he used high voltage transmission

**185**

1  lines and an underground transmission study in Texas,
2  for instance, and, yeah, he says, "Well, it's
3  supporting." I don't think he's met the criteria. And
4  then, lastly, I believe that the application of the
5  before and after methodology is erroneous.
6    Q    So let me ask you specifically about the use
7  of studies or published studies or treatises because
8  you've -- we talked about it. We talked about it with
9  regard to your most recent appraisal. You did look at
10  treatises and you relied upon treatises, and you
11  determined, in particular talking about this Dominy
12  study, that your independent analysis sort of came up to
13  similar conclusion as Mr. Dominy's study; is that
14  correct?
15    A    Well, I said parallels.
16    Q    Okay. Parallel. Is there a difference
17  between that and similar conclusions, in your mind?
18    A    I think parallels is less explicit as to the
19  terminology you used.
20    Q    Okay. But you're -- one of your criticisms
21  of Mr. Grewell is that he has looked at other studies,
22  other published information in appraisal literature, and
23  indicated that parallels his conclusions with
24  regard to the impact of the pipeline?
25    A    He doesn't say parallels.



186

1    Q    Okay.  So that -- that's your critique?  He
2  doesn't use that word "parallels"?
3    A    My critique is the specific language.  Do
4  you have the Grewell report?
5    Q    I do not.
6    A    Okay.  I'll summarize it, that I think he
7  uses much more explicit language as to the reliance he
8  placed on the studies that appear in his addendum.
9    Q    Okay.  Do you recall specifically what that
10  language is that is, in your opinion --
11    A    He said he relied upon those studies in
12  formulating his 40 percent impaired percentage.
13    Q    Okay.  So if we could boil it down -- and I'm
14  not trying to be overly reductive, but you -- you use
15  the terminology that your information paralyzes --
16  parallels the studies, and that your critique is that
17  Mr. Grewell relies upon the studies in reaching his
18  opinions?
19    A    I think that's a fair summation, but I think
20  putting it in context, the pairings I have are the
21  primary data that I -- that I relied upon.  I'm not
22  aware of any errors that have been alleged in my data.
23      The data that Mr. Grewell relies upon, he,
24  himself, has admitted under oath that there are errors
25  in that data.  So I think the justification for the

187

1  attachment of the reports that Mr. Grewell uses is much
2  more robust in support of his opinion than mine.
3    Q    Now, is there a reason that you didn't
4  include that element of your critique in any -- in your
5  first appraisal review that we looked at as Harvey
6  Exhibit 4?
7    A    Because he didn't use the same language in
8  his first report.  His narratives have changed
9  throughout the development of the three reports.  So
10  each time there is a change, I focus on that change and
11  supplement my work accordingly.
12    Q    Okay.  And your -- your narrative has changed
13  with regard to the four appraisal reports you've
14  prepared for this case; isn't that correct?
15    A    Yes.
16    Q    Now, you also talked about the most recent
17  appraisal review that we have.  Harvey Exhibit 5,
18  includes -- I think you talked about a critique or a
19  discussion about the sale on Diggs Prospect Road in
20  Suffolk; is that correct?
21    A    That's correct.
22    Q    And was that -- was that critique included in
23  your first appraisal review?
24    A    No.
25    Q    Harvey 4?  Why not?

188

1    A    Again, the information that Mr. Grewell
2  portrayed in the second and third reports is what
3  brought my attention to the Diggs Prospect analysis that
4  he utilized.
5    Q    Okay.  Now, your most recent -- your second
6  supplemental review, appraisal review, dated
7  January 17th of this year, includes some references to
8  the deposition that Mr. Grewell gave in this case back
9  in May of last year.  Do you recall that?
10    A    Yes.
11    Q    And you've read that transcript, I take it;
12  is that correct?
13    A    I have.
14    Q    And do you know, at the time of that
15  deposition, which report Mr. Grewell was giving his
16  testimony about?
17    A    It would be referenced and identified in
18  the transcript.  I don't recall.
19    Q    Okay.  I mean, I think it's just
20  fundamentally impossible that he wasn't testifying in
21  May of 2019 about the substance of his December 2019
22  report, correct?
23    A    I would agree with you, yeah.
24    Q    Okay.  And your most recent rebuttal --
25  appraisal review, rather, the January 17th report that

189

1  we have as Harvey Exhibit 5, also includes a sheet which
2  appears to be notes that, I guess, you prepared after a
3  conversation with the buyer of that Milum Lane property
4  in Suffolk; is that correct?
5    A    Correct.
6    Q    And why was is that you talked to that
7  individual?
8    A    Based upon the representations that Mr.
9  Grewell made in his two supplemental reports and recent
10  supplemental reports.
11    Q    And you talked to the individual in June of
12  2019; is that correct?
13    A    Correct.
14    Q    At that time, had Mr. Grewell prepared more
15  than one appraisal report?
16    A    I believe so.  I think it was at the time of
17  his second supplement that -- that caused me to focus
18  more on the verification of this Milum Lane sale.
19    Q    And what was -- or what was the purpose of
20  talking with that buyer?  What did -- what were you
21  trying to understand or learn from him?
22    A    Because Mr. Grewell had said -- he had made
23  representations that the buyer of the land -- I can't --
24  without looking at the report -- I didn't author Mr.
25  Grewell's reports, but, basically, Mr. Grewell reported



190

1  about his interview of parties associated with the Milum
2  Lane either land or approved sale. So, you know, that
3  was new data, new information. I took it upon myself to
4  do the due diligence and investigate it.
5      Q    Okay. And in particular, one -- one thing
6  that Mr. Grewell had investigated, and you confirmed it,
7  was that the buyer was unaware of the ACP pipeline when
8  he purchased that Milum Lane property; is that correct?
9      A    I think you misspoke. There's no ACP
10 pipeline.
11     Q    The ACP easement. Excuse me.
12     A    There's no ACP easement. That's not an ACP
13 eased property --
14     Q    Okay.
15     A    -- or Milum Lane. It's Carolina Light or
16 Colonial.
17     Q    Excuse me. Forgive me. Okay.
18     A    Yeah.
19     Q    The underground pipeline or above -- what --
20 I think there was a junction or some sort of above
21 ground --
22     A    I'll identify it for you in a --
23     Q    -- that wound up getting in the -- I don't
24 want to be misleading. I'm sorry.
25     A    Yeah, I just -- I'll identify it for you.

191

1  It's held by Commonwealth.
2      Q    Okay. But you confirmed that the buyer was
3  not aware of that when he purchased the property; is
4  that correct?
5      A    He was not aware of that. He wasn't aware
6  of the extent of wetlands.
7      Q    Right. Okay. Now, as a result of your
8  conclusions in your appraisal review and appraisal
9  reviews of Mr. Grewell's reports, have you reported him
10 to the Appraisal Institute?
11     A    No. As I said previously, I only reported
12 one person in my history, and that history is true
13 today, and that was in my capacity of director of
14 education and experience credits here, and that was
15 mandated. Aside from that, it's not my intent to --
16 it's not my style.
17     Q    All right.
18          MR. CLARKE: I think that's all the
19     questions I have. If you would just give me
20     one minute, I just want to look over
21     everything.
22          THE WITNESS: Time is running.
23          MR. CLARKE: All right. I can't give it
24     up. I have a few more questions.
25 BY MR. CLARKE:

192

1      Q    Mr. Harvey, one of the things that you
2  include in your most recent review appraisal dated
3  January 17th of this year is the criticism of --
4          MR. MINSON: I'm sorry. Which exhibit
5      are we on right now?
6          MR. CLARKE: Exhibit 5.
7  BY MR. CLARKE:
8      Q    It's -- it's a criticism, I believe, of Mr.
9  Grewell using paired sales data that was developed or
10 obtained by a different appraiser, Matt Ray; is that
11 right?
12     A    Well, it links to that.
13     Q    Okay.
14     A    That wasn't my specific criticism.
15     Q    Well, if you look at page 11 of Exhibit 5,
16 item no. 3 at the top of the page, you've indicated that
17 the signed certification in the Grewell report fails to
18 acknowledge the significant appraisal assistance
19 provided by Mr. Ray; is that correct?
20     A    That's the specific criticism, yup.
21     Q    Okay. And that -- and we talked a little bit
22 about this earlier, about what is required under USPAP
23 and reporting requirements as far as crediting another
24 appraiser or other individuals for assisting. So if I
25 just -- if I want -- I want to just kind of understand

193

1  it a little bit better.
2          Your critique or your criticism of this is
3  that, in your opinion, Mr. Ray provided Mr. Grewell
4  significant appraisal assistance but Mr. Grewell did not
5  appropriately credit him in his certification?
6      A    That's one aspect, yes.
7      Q    Okay. And we talked a little bit earlier --
8  I think you kind of indicate stylistically you -- you
9  would give more -- you would err on the side of giving
10 more credit, even when it may not rise to the level of
11 significant appraisal assistance in your reports; is
12 that correct?
13     A    I said that previously, but here, we're
14 talking about the minimum requirements of USPAP Standard
15 Rule 2-3.
16     Q    Right. And your -- and your opinion is that
17 Mr. Ray's assistance to Mr. Grewell rises to the level
18 of significant appraisal assistance such that USPAP
19 would require Mr. Grewell to credit him in his
20 certification; is that correct?
21     A    There and in his scope of work, yes.
22     Q    Okay.
23     A    Those are dual requirements.
24     Q    All right. Now, just so we're clear on the
25 terminology, the review -- appraisal review that we're



194

1  looking at, Harvey Exhibit 5, gives -- defines something
2  called "the Property" with a capital "P" on page 1, and
3  that's defined at the top of the page to include the six
4  PIN numbers that you've elsewhere called the subject
5  larger parcel; is that right?
6      A    I don't think that's correct.
7      Q    Okay.
8      A    And I will distinguish for you.  In my
9  appraisal report, I used the term "property" and
10 "subject larger parcel."  In Mr. Grewell's report, he
11 does not do a larger parcel analysis.  He just refers to
12 it as the "subject property."
13     When he refers to subject properties, I believe
14 he's referring to all six parcel identification numbers.
15 So I used his descriptions as the basis for the
16 identification.  It comes from his report, not my
17 report.
18     Q    Okay.  So at the top of page 1 is your
19 reference to those six PINs and -- and a parenthetical
20 defining them as the "property."  That's intended to
21 incorporate Mr. Grewell's description of those in his
22 report?
23     A    Right.  That -- that comes directly from his
24 -- his report, yes.
25     Q    All right.  So your use of that term in your

195

1  review appraisal shouldn't be taken to mean the same way
2  you use that term in your appraisal reports?
3      A    If -- if one were to use the terminology
4  consistently, when I refer to property in the Grewell
5  Exhibit 5, I'm referring to the subject larger parcel in
6  Harvey 1.
7      Q    Okay.  Thank you.  I appreciate that.
8          MR. CLARKE:  That's all the questions I
9  have, Mr. Harvey.  Thank you.
10         THE WITNESS:  Any questions?
11         MR. MINSON:  I don't have any questions.
12         THE WITNESS:  I'd like to read and sign,
13 please.
14         MR. CLARKE:  Yes, just regular.
15         MR. MINSON:  Same.
16         MR. CLARKE:  Electronic is fine with me.
17         MR. MINSON:  I think electronic is fine.
18
19         (Whereupon the proceedings concluded at
20 2:14 p.m.)
21
22
23
24
25

196

1  STATE OF _____
2                          ss:
3  COUNTY OF _____
4
5              CERTIFICATE OF WITNESS
6
7      I, WILLIAM C. HARVEY, II, hereby certify that I
8  have read the foregoing transcript of my deposition taken
9  January 29, 2020, in Tysons, Virginia, pursuant to the
10 applicable Rules of Civil Procedure, and that the
11 foregoing 195 pages of transcript are in conformity with
12 my testimony given at that time (with the exception of
13 any corrections made by me, in ink, and initialed by me
14 on the attached errata sheet).
15
16         _____
17              WILLIAM C. HARVEY, II
18 STATE OF _____
   COUNTY OF _____
19
       SUBSCRIBED AND SWORN to before me, the undersigned
20 authority on this the _____ day of _____, 20__.
21
22 _____
   Notary Public
23 County of _____, State of _____
24 My Commission Expires _____
25

197

1                     ERRATA SHEET
2  Please make any corrections or changes on this sheet.
   Please do not write in the deposition transcript.
3
   PAGE NO./LINE NO.                        EXPLANATION
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19         _____
               WILLIAM C. HARVEY, II
20 STATE OF _____
   COUNTY OF _____
21
       SUBSCRIBED AND SWORN to before me, the undersigned
22 authority on this the _____ day of _____, 20__.
23 _____
   Notary Public
24 County of _____, State of _____
   My Commission Expires _____
25



198

```
 1
                    REPORTER CERTIFICATE
 2
 3    I, JACQUELINE N. HAGEN, Court Reporter and Notary Public,
 4    certify:
 5    That the foregoing proceedings were taken before me at
 6    the time and place herein set forth, at which time the
 7    witness was put under oath for me;
 8    That the testimony of the witness and all objections made
 9    at the time of the examination were recorded
10    stenographically by me and were thereafter transcribed;
11    That the foregoing is a true and correct transcript of my
12    shorthand notes so taken;
13    I further certify that I am not a relative or employee of
14    any attorney or of any of the parties not financially
15    interested in this action.
16
17
18
19                    _____
20                    JACQUELINE N. HAGEN
21
22    Dated:  February 6, 2020
23
24
25
```

William Harvey - January 29, 2020                                                    199

---

**$**

**$100** 114:18

**$100,000** 125:21 126:4

**$13,000** 175:3,4,9

**$411,575** 124:13

---

**0**

**0** 158:20

**040-11** 53:22

---

**1**

**1** 3:14 24:9,10,14 26:7 29:3 30:12,25 31:6,18 38:14 40:5 50:19 51:21,24 52:5 53:18 54:20 55:6 58:1,5 72:25 73:1 84:20 92:25 93:3 107:25 129:1,19 150:21 176:16,22 182:9

**1,430,000** 108:3

**1,813,000** 127:7

**1-** 29:11

**1.04** 154:4 156:3

**10** 44:12 63:20 64:8 67:1 73:5 75:12 76:14,25 77:6 79:1 149:15 150:17,20 158:4 171:10

**100** 93:16,19

**11** 38:20,21 39:9,18 59:6 60:5 61:12 78:6 84:22 86:1 87:22 88:10 158:4 166:22 180:3,5 192:15

**1166** 8:17

**11th** 177:16 178:6,12

**12** 38:22 39:9,18,19 52:18 59:20 61:12 79:4 89:5,22 148:8

153:5 155:11 159:15, 18 160:13 162:10 180:3,5

**12-pair** 156:24

**128** 3:16

**13** 89:22 91:16 92:4

**132** 112:18

**13th** 31:16 61:22

**14** 92:5,14 94:4 174:11 175:2

**140** 14:11

**15** 39:19 52:18 84:25 95:14,16 96:6,21,22 97:20 101:15 102:21 103:3

**150** 14:11

**16** 95:14 101:15 102:21 103:3,10 104:3 106:8,14

**17** 85:25 106:9,14

**175** 3:17

**1786** 113:24

**17th** 128:12 182:7 188:7,25 192:3

**18** 87:21 97:5

**1800s** 69:5

**181** 3:18

**19** 82:25 83:7 96:16, 17 97:24,25 98:3,5 99:11,18 106:22

**1900s** 68:21 69:5

**1976** 7:10,15

**1986** 7:3

---

**2**

**2** 3:15 27:11 28:7,18, 21 30:14,22,24 49:10 55:22 82:6,7,12,24 92:24 93:4 96:3,14 98:1 99:20 101:17 104:8 105:5 113:23 114:19 169:2,4,8,10 170:9

**2-2A** 29:11,21

**2-3** 87:3

**2.49-acre** 152:20

**20** 20:23 96:18,19,20 97:2,4 98:7 99:11,18, 24,25 100:5,16 101:1,24 125:6

**2000** 17:13

**2009** 31:16

**2010** 39:20 59:18 60:15,21 61:13,19

**2012** 22:20

**2013** 22:20

**2015** 90:2,14 113:10 114:9

**2016** 157:7

**2017** 11:1,18 12:7

**2018** 40:20 42:25 43:16 44:24 60:7 61:15,20 62:11 84:1, 5,10,15 90:2,5 92:8, 15 110:20 116:19 128:13 176:2,20 177:16 178:6,12 179:12

**2019** 31:19 32:12 33:8 41:2 45:11 62:11 73:9,10 183:9 184:5 188:21 189:12

**2020** 103:25

**2021** 18:4 140:7

**21** 14:15 32:12 98:7 99:11,19 107:9 108:12 182:3

**215** 140:19

**21st** 73:9

**22** 17:24 108:12 129:12

**23** 111:16 149:1 158:2 159:12

**2304** 152:9,15

**2308** 148:21 150:22 151:3,16 152:8,19 153:10

**23rd** 44:24

**24** 3:14 78:14 121:23 128:24,25 129:3

**25** 127:10,14,25 128:24 129:1,21

**26** 29:15 132:14 136:2 176:25 182:10

**2682** 29:8

**26F3** 117:11

**26th** 90:1,2,5,6,17

**27** 136:7,17 140:8 142:15 144:5

**27th** 31:19 33:8 41:2

**28** 144:14 145:15 172:11,14

**29** 64:22 172:19 173:3

**2A** 29:9

**2B** 105:17

**2nd** 60:7 61:15,20 73:9 176:20 179:12 183:9 184:4

---

**3**

**3** 3:16 26:18 54:3,7, 18 55:14 58:1,8 62:7 73:14,15 96:6,20,22 97:20 103:10 128:5, 10 129:3 149:18 173:25 192:16

**3,257** 152:21

**30,000** 13:15

**3150** 153:10

**32** 152:21

**3207** 149:4 159:13

**34** 24:23,24 41:18 173:19

**356** 128:1 129:4

---

**4**

**4** 3:8,17 29:2 63:19

---



ZAHN
COURT REPORTING
www.zahncourtreporting.com

75:22 111:22 112:3
117:7,15 118:7
175:20,25 187:6,25

**40** 186:12

**40-11** 32:11 54:14,17
56:23 57:20 58:2,12
71:20 88:17,24

**40-13** 58:12 71:20
88:17,24

**4011** 53:25

**4013** 58:2

**4296** 172:4

**43** 7:10

**44** 127:25

**49** 140:19

**4th** 39:20 40:20
42:23 43:15 60:15,20
61:13,19 84:1,5,10,
15 90:9,14 91:8,10
110:20

---

**5**

**5** 3:18 8:19 64:9
82:24 96:16 98:3
99:25 107:25 119:7,
17 122:20 123:5,20,
25 125:11,20 134:19
181:4,9 182:10 184:3
187:17 189:1 192:6,
15

**5.28** 156:4

**50** 93:1 125:6

**50/50** 10:25

**525** 13:7

**57** 160:3

**5th** 176:2

---

**6**

**6** 19:25 67:2 69:10
70:8 71:1 77:5,9
119:24 120:1

**600-mile** 94:18

---

**605** 8:19

---

**7**

**7** 37:23 38:13 40:5
73:5 74:14 75:11
147:11,25 148:2,24
157:14,15 158:16
159:6 166:22 171:5

**72** 7:16

**73** 7:17

**75** 7:17

**77** 7:16

---

**8**

**8** 29:2 75:12,22 173:4

**82** 3:15

---

**9**

**9** 40:16,25 41:4 42:13
44:15 49:10 62:6
63:20 76:14 158:4

**9-11** 42:7,8,9

**9-9** 42:8

**90** 11:24

**95** 11:24,25 12:6

**9:59** 4:4

---

**A**

**a.m.** 4:5

**ability** 167:16

**above-grade**
168:23

**absence** 140:11

**abundance** 150:6
171:25

**accept** 32:2

**acceptable** 66:8
135:24 136:5

**accepted** 62:8

---

120:20

**access** 50:3 68:8
74:1 97:23 98:8 99:6
102:5

**accompanied** 46:7
86:13

**accordance** 29:7
30:23 119:25 150:5

**account** 84:13 154:1

**accrued** 122:4,15
125:11

**accumulation**
154:15

**accuracy** 74:11
140:12 141:16 142:9
169:8

**accurate** 116:6
124:22

**accurately** 57:12

**acknowledge** 87:5,
9,10,15 91:7 192:18

**ACP** 9:24 10:7 11:2,
13,15,20,23 22:12
47:23,25 54:10 71:8,
12,23 72:2 75:1,5
80:10,16 81:24 82:3
94:17 95:10,19 96:23
98:7,9,11,20 100:14
102:22,23 103:6,15,
20 104:10,17 105:8
109:22 129:23
131:17 132:18 133:8,
12 139:2,3,9,12,14,
20 140:3 142:17,22,
23 145:1,23 146:18
171:6,7,13,19,24
190:7,9,11,12

**ACP's** 73:6 79:18
81:11 94:8 97:12,17
98:12 103:13 136:23
137:2 145:17

**ACP-EASED** 145:20
146:3,4

**ACP-RELATED**
22:14,15

**acquire** 132:3
143:22

---

**acquired** 36:1,5
85:15,21,23 102:22,
23 111:5

**acquiring** 95:11
96:23 98:20 138:20

**acquisition** 79:18
81:12,22 97:13,17
98:12

**acquisitions** 63:9
130:19,23 131:14,23
132:11

**acre** 114:18

**acreage** 59:16

**acres** 158:20

**act** 42:11

**action** 19:10 20:5
132:4 135:4 150:1

**actions** 42:11
132:21 133:2 143:16

**active** 135:6 146:14

**activity** 10:5 41:12,
13 60:23 62:17
80:18,20 101:3 159:4
164:7

**actual** 29:4 50:14
52:9 54:22 80:18
81:13 90:18 92:2
93:22 106:11 114:3
121:19 125:5 158:6
171:24 179:9

**ad** 22:25

**add** 64:23 180:21

**added** 114:14
117:25 124:1 126:25

**addendum** 186:8

**adding** 124:11

**additional** 29:21
30:11 36:19 39:11,17
40:1 89:3 111:11
137:14 180:21

**adjust** 180:8

**adjusted** 43:10

**adjustment** 156:8
184:7



ZAHN
COURT REPORTING
www.zahncourtreporting.com

**adjustments** 153:22 155:17,23 156:10 157:4 160:12 179:20

**administrative** 23:1,4 87:19,20

**admitted** 186:24

**advisory** 41:17

**Aerial** 73:3

**affect** 74:24

**affected** 177:9 178:14 182:20

**affiliations** 7:6

**affixed** 95:2

**afternoon** 147:16

**age** 124:24,25 125:4, 5

**agency** 18:7 20:10 21:10

**agent** 78:4

**agree** 56:11 97:3 99:12,17 101:7 159:5 178:5 179:2 188:23

**agreed** 103:15

**agreement** 31:15 117:11 163:20

**ahead** 24:17 103:23

**aids** 131:5

**align** 55:3

**aligned** 54:24

**alleged** 186:22

**altered** 25:10

**alternate** 118:17,20 119:14

**alternatives** 147:4

**amazing** 169:9

**amend** 116:7

**amended** 3:15 32:12 33:1 40:14 82:13 94:14 96:1,15 97:2 99:1,13,19 101:17, 18,20,25 102:1,6 103:4

**amendment** 35:24 109:6

**amenities** 137:14

**amount** 10:3,14 124:18

**analyses** 148:4 161:5

**analysis** 65:1 75:24 76:10 77:12 78:20 80:5 87:13 92:14 106:10,13,20 113:7 118:8 144:12,15 145:3,6,10,12 146:24 151:20,22 157:3 164:14 173:11 180:9 185:12 188:3

**analytical** 76:12

**analyze** 184:14,23

**analyzed** 76:15 77:1 78:7,13 184:18

**analyzing** 86:4 129:22

**anonymous** 19:9,20

**answers** 5:7

**anticipate** 147:14

**anymore** 113:14 178:3

**apparently** 123:12

**appeals** 23:1

**appeared** 61:25 62:2

**appearing** 181:25

**appears** 25:23 54:13 59:9 100:2 118:22 180:18 189:2

**appliance** 47:13

**applicable** 38:10 109:5 124:8 131:20 132:16

**application** 123:22 144:7 185:4

**applied** 108:13,23 119:13 122:16 125:6, 16 134:10 144:10

**apply** 63:17 124:19 141:9 144:17 146:22 171:2

**appraisal** 6:6,8,10, 14 8:4,13 9:4,19 10:2,11 12:10,15 14:7 17:5,8 19:8,11, 17,23 20:3,11 21:8 27:13 28:10,21 29:4, 5,8,12,17,20,22 30:1, 3 31:2 32:2,21 33:19 36:13,16,19,21 37:4 39:3 40:21 41:5,8,11, 19,24 42:2,4,6,8 45:4,5 62:9,10 63:5,8 64:11 65:3,23 66:6,9, 17,23 74:23 75:22 76:24 79:5,22 83:17 87:16 89:25 100:12 108:18,25 109:19 111:21,23 112:5 116:14 117:15,18 118:7,13,25 119:14 120:19 122:6 128:20 129:13 130:11,14 132:20,24 133:2,15 135:24 139:5 140:10, 15 141:3 148:5 149:18,23 151:14 164:24 168:8 169:8 176:9,10 177:12 178:7,18,22,24 179:4,7,8,11 180:11, 12 182:6,23 183:2,3, 6,7 184:5,11 185:9, 22 187:5,13,17,23 188:6,25 189:15 191:8,10 192:2,18

**appraisals** 11:22 22:8,11 36:14,24 40:8 64:10 151:9 164:4,6,13 165:10,15 172:9

**appraise** 98:20 110:5

**appraised** 21:23 22:5,16 36:9 39:1 49:2 60:6 88:11 97:12,17 98:12,19 103:5 151:10

**appraiser** 6:3,13 7:20 16:21 17:10 18:23 20:10 21:8

41:6 42:19 66:15 80:6 86:9,13 131:4,5 179:1 192:10,24

**appraiser's** 41:19 178:23

**appraisers** 43:8 66:10 134:14,17 135:13,25 165:23

**appraising** 8:13 31:12 35:20,21 38:23 52:6,22 63:3 117:3 135:25 141:9 145:12 146:1 151:11 156:19 165:24

**Appreciated** 46:25

**approach** 85:2,7,8, 16,19 88:7 107:18 108:1 120:14,16,22 122:23 144:11,16,18

**approaches** 85:10 144:8

**appropriately** 180:8

**approved** 190:2

**approximate** 55:8,9 58:9

**approximately** 14:1 94:18

**appurtenances** 94:24 95:1,3,12

**appurtenant** 136:10,14

**April** 11:1,18 12:6 40:20 42:25 43:15 60:7 61:15,20 84:1,5, 10,15 90:1,2,5,6,9, 14,16,17 91:8,10 110:20

**AQB** 17:7

**arbiter** 44:6 146:8 171:1

**arbiters** 171:16

**Arcgis** 71:8 72:5,6,8

**architecture** 55:2,3, 4

**area** 20:14 21:5 58:9



67:5 69:11,19 75:16
76:2 85:16 102:24
118:2 133:6 138:2
175:7

**areas** 47:22 85:23
133:6

**arise** 136:22

**Arm** 148:21

**arm's** 138:19 145:19

**Arms** 150:22 151:3,
16 152:8,9,15,19
153:10

**array** 154:10

**art** 56:9 88:16

**artful** 122:13

**article** 65:25 66:4
130:4 133:22 134:3,
7,11 141:19,23,24
142:1

**articles** 134:8 139:9,
18 140:9 141:17

**asks** 34:2

**assess** 92:23

**assessed** 92:6,10,
15,25 93:3

**assessing** 93:13

**assessment** 23:4,6
49:19,25 68:4 70:13
86:10 92:23 93:25
95:17

**assessments** 93:23

**assessor** 51:13

**assignment** 32:2
35:19 36:22,25 37:15
38:9 45:5 64:12
66:17 136:5 144:19
177:9 178:14,19
182:20

**assignments** 38:11
132:21 133:3 135:18
164:15

**assist** 9:12 86:14

**assistance** 87:6,8,
10 174:22 192:18

**assistants** 87:19

**assisted** 86:3 87:15

**assisting** 192:24

**associate** 20:15,20
48:18

**associates** 6:20 8:6,
12 9:2,3 18:13,14,17
86:2 156:17

**association** 69:11
172:25

**assume** 12:25 26:25
79:19

**assumed** 38:14

**assumes** 79:6

**assuming** 110:23

**assumption** 38:6,7,
8,9 40:4 79:5,11,12,
15 80:1 81:3 83:18

**assumptions** 35:13
38:2,12 40:9 177:3
182:14

**ate** 47:9

**Atlantic** 4:11 5:17
10:8 12:10,13 14:22
22:11 36:1,10 83:13
94:8 106:1

**Atlantic's** 83:10

**attached** 28:10,11,
13,21 30:3,8,17,19
31:5 111:22 118:18,
24 119:8 136:10,14
165:16,19 166:9
181:12

**attachment** 119:2
164:22 187:1

**attempt** 106:5
163:22

**attempting** 168:8

**attendance** 48:20

**attending** 47:8

**attention** 25:12 32:5
55:21 71:5 150:12,13
188:3

**attorney** 18:12,15,
16 166:6

**attorney's** 28:2

**attorneys** 32:19
35:8,12 36:8 45:22

**attributable** 129:22
131:16 168:17

**attributed** 108:22
175:9

**auction** 8:23,25

**auctioneering** 8:21

**Auctions** 8:23

**August** 157:7

**Augusta** 21:19,21,
23 22:6,9,17 23:14
45:19 49:19 50:3
51:12,22 67:23 68:7
69:21 70:15,17 71:9
72:14,22 89:11 93:10
145:18 146:12 163:6,
23

**aunt** 62:3

**author** 189:24

**authored** 26:25

**authoritative** 63:25

**authorities** 10:21

**authority** 11:3

**authorized** 98:5

**automatic** 23:8

**award** 81:13,17
151:25 174:25

**awards** 82:3 103:24

**aware** 16:13,16
18:16 41:19 43:6,21,
22 73:17 74:3 80:8,9
85:22 89:15 91:14
114:13 115:20
117:12 135:6 139:8,
12 140:6 165:8
186:22 191:3,5

**awful** 72:18

---

**B**

**back** 22:20 24:20
30:14 31:18 36:19
40:4 43:10 49:10
53:17 55:13 56:16
57:3,4 59:6 62:6
63:15 68:17,18,19,
20,22 69:2,3,5 70:16
79:1 80:9 84:19 90:8
99:22 108:11 116:19
119:7 123:24 129:8,
12 157:7 158:15
162:9 164:20 166:17
169:12 172:11
178:18 180:12 188:8

**background** 7:12

**backing** 78:2

**Baltimore** 7:13,15
130:21,25 148:8
149:8,11 159:11
162:11 163:4

**barns** 125:8

**base** 23:11 79:4
143:1

**based** 32:14 83:21
92:14 125:18 139:17
155:3 156:12 177:2
182:12 189:8

**basically** 146:21
154:3 189:25

**basis** 5:1 20:21
33:10,23 44:21 76:24
78:17 81:16 140:9
151:24

**began** 4:4 7:19

**begin** 5:3,4 84:5,9

**beginning** 7:12 26:4
79:21 150:25

**begins** 71:6 80:4
107:13

**behalf** 10:21,22
36:10 151:12 165:24

**belief** 117:24

**believed** 150:4



**below-grade** 168:24

**beneficial** 33:5

**benefit** 114:13 142:21,25 143:1

**benefits** 136:21 137:1 142:17

**benign** 137:13 138:12,13,17 154:12, 14,24 160:19

**BG** 131:11 132:7

**bid-asks** 154:20

**big** 91:23

**bill** 13:18,21

**billings** 13:14

**bit** 37:1 79:10 98:18 111:15 112:10 120:11 173:23 192:21

**blah** 105:24

**Blake** 8:1

**block** 26:13 58:21

**Bloomberg** 154:20

**board** 18:23 21:20 22:6,18,21 23:5,11, 14,19 65:22

**board's** 23:8

**bodies** 143:12

**body** 118:8,22,25

**boil** 186:13

**bolded** 119:8

**Bonnie** 4:9 31:14,15 52:16

**book** 63:9,12,14,17 140:19,22

**bottom** 27:11 28:7 30:15,22,24 39:8,17 52:18 63:20 89:21 92:4 94:4 108:11 118:15 123:7 129:21 144:5 172:14

**bought** 18:14

**boundaries** 52:5,7,

8,22 58:2,12

**boundary** 54:17,22 55:11,24 56:2,4,6,12, 22 146:18

**bounds** 58:18,24 59:1,15

**Breach** 10:16

**break** 5:11 53:11 175:14

**briefly** 27:9

**bring** 23:9 71:4 114:16 150:11

**bringing** 25:11

**broad** 67:20 70:19 154:10

**broader** 66:16 68:5 132:18 144:23

**broke** 10:25

**broken** 109:15

**broker** 9:10,11 113:15 114:6,8 116:2

**brokerage** 8:21,24 9:1,5 17:6 113:14

**brokerage's** 9:17

**brought** 32:5 80:16 150:13 188:3

**Buckingham** 145:18 146:12

**budgetary** 68:3

**building** 44:20 121:22

**buildings** 46:16 47:14,15,18 125:9

**bunch** 76:5,6

**business** 26:14

**buyer** 42:16 119:19 189:3,20,23 190:7 191:2

**buyers** 154:2

———————————

**C**

———————————

**calculated** 93:18

**calculation** 84:12

**calculus** 111:13

**calibrate** 55:4

**call** 4:13,23 32:17 33:2 39:13 51:10 53:24 54:9 56:1,2 104:4 144:11 146:3 147:7 153:17

**called** 4:2 8:6 12:16 20:15 31:21 58:18 63:9 102:10 106:9 117:15 121:6 123:12 127:19 130:4 166:18 172:22

**Calvert** 7:13

**candidate** 20:15,20 21:1,14,15

**candidates** 21:4

**cap** 13:10,11

**capacities** 6:4,15 27:7,20

**capacity** 5:25 20:11, 24 22:22 23:13,19 25:2,20 37:11 65:24 87:15 191:13

**capital** 88:12,23 89:2

**capitalization** 78:8

**car** 49:5,7 115:16

**cards** 86:10

**care** 143:12 178:3

**career** 156:14

**Carolina** 12:5 16:22 117:10 146:17 190:15

**carry** 48:7,10 49:25 124:9

**Carson** 31:14

**case** 5:21 6:1,16 11:7,8 13:13 16:1,5, 10 18:18 21:18,24,25 22:10 29:1,18 30:6 31:9 34:10 43:6,7 45:6 65:2 76:10 78:25 85:10 88:6

92:11 94:14 103:5 107:25 118:1 128:21 136:9 138:5 141:3,23 147:7,20 148:13,21, 23 149:1,4 150:2,11, 21 151:3 155:25 159:14 160:6 161:10 166:25 167:7 169:1,9 176:4,11 179:8 187:14 188:8

**cases** 10:13,16,20, 21 14:11 23:18,24 33:2 160:18 164:21

**cash** 119:19 120:4, 10

**category** 67:20

**caused** 189:17

**caution** 150:6 171:25

**CCIM** 3:2,7 17:7 18:5

**center** 48:13 71:14

**certainty** 27:14,18, 22 177:6 182:17

**certificate** 56:17

**certification** 63:18 87:2 173:22 174:1,8 182:2 192:17

**certifications** 17:2 177:3 182:14

**certified** 16:20 17:7, 10 18:3 86:12

**certify** 87:11

**certifying** 56:8

**chain** 52:24 57:3

**challenge** 23:3

**change** 36:23,24 40:13 44:8 74:2,4 101:25 104:18 116:6 187:10

**changed** 36:22 73:18 177:21 187:8, 12

**characteristics** 45:2 49:14 58:15 63:14 132:2 160:11



ZAHN
COURT REPORTING
www.zahnwaterreporting.com

charge 19:25

charged 143:19,20

Charles 4:18 153:10

Charlottesville 69:11,19

chart 89:6 92:5,14 95:17 112:5 123:5 125:10 133:24 148:3,7

check 152:3

checkmark 118:16

Chesapeake 8:23

chiefly 7:22

Chocolate 24:1,5

choose 120:16 143:8 171:21

Circuit 50:3 68:8

circumstances 180:14

city 89:16,19 149:10 179:15

clarification 51:19 122:18 123:19 177:15

clarified 13:3

clarify 5:11 13:1 85:24 98:17 106:5 122:12

Clarke 3:8 4:6,8 24:8 53:9,12,15 82:5,9 128:3,7 152:7 175:15,18,22 181:2,6 183:13,17,22,25 184:1 191:18,23,25 192:6,7

classic 42:7

classify 153:20

clear 25:4 29:23 38:24 45:3 76:3 101:4 102:8 119:18 148:3 175:4

client 18:16 22:23 25:15 90:21 176:1

clients 4:14 12:19

climate 72:7

closed 18:19 19:10 20:4 43:22

closely 94:2

closer 11:25

co-located 167:11,14

COD 94:3

Code 63:4

coefficient 93:16,17,21

Cold 115:8

collaborate 86:16

collaborated 156:16

collaborative 115:1

collated 167:11

colleagues 65:19

collect 76:25 77:10,15,17 114:3

collected 78:6,13

collecting 77:3,14 86:3,15

collection 87:13 113:6

collects 86:9,10

college 7:14,15,18 47:8

Colonial 130:20,24 131:11 132:6 190:16

Columbia 148:9 151:12,18 156:19 162:13,16 163:19 166:18

combination 22:14 59:11 73:25 131:12 156:15 168:18,21 169:25 170:10

commercial 123:8,20,22 126:1

commission 177:8 178:13 182:19

Commissioner 89:12

committee 20:22

common 25:15 37:10

Commonwealth 191:1

communicating 32:13

communications 131:9

communities 147:8

community 68:3

comp 70:21

companies 130:20,24

company 8:25

comparability 160:10 162:8

comparable 77:1,4,18,23 111:17 112:7,12,17 121:2 146:25

comparative 145:12

comparators 184:14

compare 96:20 147:3

compared 152:8 153:10 159:14 160:6 162:8 170:15

compares 112:7

comparing 78:2 151:23 155:18,23 159:21 162:12

comparison 85:2 144:11 153:13

compensation 13:6 109:17 111:11 151:17 174:20,25

competing 139:6

complained 18:15

complaint 3:15 18:6 19:4,9,16,20 20:9 21:7,10 35:11,22 36:7 38:19 39:2,8 40:24 59:7 79:13,14,16 81:10,24 82:14 83:3 94:13,14 96:2,15 97:2,10 99:2,13,19 101:18,25 102:1,5,6 103:4 159:2

complaints 40:14,15 101:19,20 102:2

complete 33:9

completed 19:24 75:14 81:6 111:1,9 171:17

completion 140:2

complicated 41:6 42:5

comply 62:19,22,25 63:2,7,11

component 88:4 107:24 108:2,3,8 110:8 111:23 120:18 121:4 123:21 126:3

components 74:25 88:5 121:20 123:25 125:7 126:3

compound 15:21 23:17

comprehensive 14:14

compressor 95:8

comprise 39:13 54:7 120:6

comprised 39:12

comps 70:15

con 142:16

concept 106:15

concern 16:7,8 25:14 183:23

concert 170:18



William Harvey - January 29, 2020                                                                            205

conclude 136:25

concluded 88:2
111:8 153:22 157:7

conclusion 106:23
138:15 153:13 154:7,
8,24 160:1 185:13

conclusions 140:13
141:16 142:9 152:3
154:23 155:2 161:13
173:6,7 177:7 178:12
182:18 185:17,23
191:8

concurrence
169:11

condemnation 3:15
82:14 144:19

condemned 83:9
103:12

condemning 10:21
11:3

condition 38:6,10
40:4 111:8 137:23
141:6 143:17 154:13,
14,24

conditioned 105:25

conditions 36:22
38:3,13 40:9 125:8
141:12 177:4 182:14

confidentiality
131:7

confirm 31:8 44:3
72:20 74:10 78:1
112:11 141:22

confirmation 42:15
44:1 112:24

confirmed 190:6
191:2

confused 33:13
98:18 104:23 105:2

confusing 51:16

confusion 13:2
122:12

Congress 14:20

connect 163:4,9,14

connection 94:8
95:19 164:7,21

cons 143:7

consensual 132:2

consent 104:10,17
106:1

conservatory
120:21

consideration
131:6

considerations
38:16

considered 34:15,
19 35:10 42:14,16
44:10 92:7 129:21
130:15,19 135:2,4
136:1 137:3,13
138:7,11 143:15
148:4 151:8 161:9

considers 167:6

consist 49:18 75:23

consistent 27:13
53:1

consistently 122:14

consists 88:17 94:6
136:9

consortium 163:20

constitute 30:1
55:18

constitutes 120:18

construct 95:11
139:14

constructed 95:5
139:2

construction 79:17
80:10,13,18,23 81:1,
4,6 94:17 121:22
140:2 158:19,20,24
159:7,8

consulting 17:6

contact 26:14 27:10
113:11

contained 34:7,10,
20 37:21 113:20

118:25 126:17
141:17 177:7 178:12
179:24 180:5 182:18

contamination
140:24 141:4

contents 28:23

contest 178:1

context 41:24 66:16,
22 92:22 93:8
101:11,12,14 105:21
108:2 133:8 154:9
186:20

continual 17:23

continue 24:4

continued 17:19
180:20

continues 39:8
172:18

continuing 17:18
18:2 28:6 89:22 92:4
144:14

continuously 8:8

contours 162:24

contra 143:5

contract 10:16
43:24

Contrast 141:22

contrasted 138:22
168:25

contribute 20:18

contributory 107:23

control 34:1 152:15
159:15 160:13

controlled 148:17

controlling 119:9

controls 43:12
62:16

convenience
117:23

conversation 15:9,
12 46:24 189:3

conveyance 52:24
58:21 60:21 113:1

conveyances 53:3

conveyed 61:3

cooking 47:3

coordinator 20:14

copy 14:16 25:21
39:24 60:10

copywritten 166:5

cordial 46:25

Corelogic 78:15
121:7 122:1 123:2,13

corners 34:3

correct 10:9 11:16,
17 12:7,8 21:19
24:20 27:25 28:19
30:4 31:9,22 32:1
36:17 37:4 38:23
39:14,15,21 40:2,21
41:3 42:23 44:22
45:7,12 47:18 50:24
52:19 54:15,16 55:25
56:13 58:19 66:3
67:23 68:15,16 71:9,
10,25 72:1 73:10,11,
15,19 74:19 75:17
76:17 77:1 78:10
83:11,12,19,20,23,24
84:2 85:17 86:5,6,18,
22 88:25 89:9,10,14
90:15 92:9 93:24
94:9,10,20 95:21,23,
24 96:12,13,24 98:24
99:15,21 100:6
101:21 103:13,14,18
104:14 106:10 107:4,
7,8 108:10 109:18
110:22 112:1,9
113:23 117:16,17,20
119:12,22 120:5,14
121:4,10,12,13
122:25 123:1,5,6
124:3,4,14,16,17
125:14 128:1 129:2,
16 130:9,21,22
133:23 134:4 136:23,
24 137:8,9,16 139:11
140:13,19,25 141:1,
11 142:6,18,19
144:9,25 145:4
147:10 148:5,11,15,
19,21,24 149:15,21
151:4,13 152:10,11,



22 153:3,4,16 155:3, 14 156:10 157:2 159:9,20,25 162:3,5, 15 166:16,19,20 167:2,23 168:19 169:17 170:7 171:8, 11,14 172:16,17,19 173:2,12,13 175:7 176:11,12,14,20 177:22 178:8,9,15,16 179:9,10,16,21 180:10 182:20,24 184:8 185:14 187:14, 20,21 188:12,22 189:4,5,12,13 190:8 191:4 192:19

**correction** 90:19 91:13

**corridor** 162:3 169:25

**cost** 78:7,17,20 85:1, 7,8,10,16,19 107:18 108:1 120:13,16,22 121:11,15 122:5,9, 10,23 124:1 125:20 127:1,2

**costs** 78:24 121:18 122:15,16 123:3 124:2,12

**coterminous** 17:22

**cottage** 46:15 47:2, 7,24

**counties** 93:15 145:18 146:12,13 148:9 149:9 162:11

**county** 21:19,20,21, 24 22:6,9,17 23:14 45:19 49:19,20 50:3 51:1,22 68:4,7 69:21 70:15,16,19 71:9 72:14,22 89:12 93:10,12,19 115:6 143:4 163:7,23,24 166:19 169:21 170:16

**County's** 67:23

**couple** 14:5 46:20 60:6 104:3

**court** 14:6,11 15:19 43:8 50:4 82:3

148:24 149:2 151:25 157:13,14,15 158:2, 16 159:6,15,18 160:13 165:5 174:21, 22

**Court's** 68:8

**court-appointed** 14:19

**courts** 14:13 139:25 150:5

**COV** 94:2

**cover** 30:14 36:15 82:13 104:18 166:10 176:19

**creates** 76:22

**creation** 143:1

**credible** 15:20 136:5

**credited** 89:16

**crediting** 192:23

**credits** 20:20 191:14

**criteria** 20:17 29:9, 16,18,20 185:3

**critical** 150:3

**criticism** 180:7 192:3,8,14,20

**criticisms** 179:18, 23 184:4 185:20

**criticize** 179:12

**critique** 178:23 186:1,3,16 187:4,18, 22

**crossed** 48:5

**cul** 152:13

**culmination** 97:8

**culvert** 78:23

**cumulative** 105:16 106:25

**cumulatively** 139:22

**cup** 53:7

**curiosity** 61:6

**current** 18:3 41:22 114:16

**custodian** 19:3

**cutoff** 42:20,24 43:4, 16

**CV** 14:16,17

---

**D**

**D-O-M-I-N-Y** 64:19

**damages** 16:7 109:4,10,16 136:19

**data** 28:9 30:7,10,11, 16,18,24 31:1 34:15, 18 35:9 42:13,21 43:9,13,16,23 44:3 50:1,2,6 66:14,15 67:3,9,17,25 68:3,4,8 69:14,16 70:16 71:7, 12,14,22 72:2,5,17 77:10 78:2,7,12,19, 20 86:4,9 93:7 113:1, 17 114:16 140:12 141:16,21,24 142:1, 2,9,11 144:18 151:23 152:1 154:8,9,12,21 155:3,4 157:8 161:2, 24 163:23 164:22 165:3,4 167:20,24 168:11,13,14 169:5 170:15 171:15,18,23 173:6,17 174:23 179:14 184:17,18,23, 24 186:21,22,23,25 190:3 192:9

**database** 52:8 72:2

**date** 32:7 36:24 40:20,23,24 41:1,7, 11 42:4,14,16,21,24, 25 43:3,4,5,6,9,10, 11,12,16,17,25 44:6, 8 46:3 79:18,21 80:3, 6 81:21 89:25 122:6 167:7

**dated** 31:15 33:8 42:8 56:7 57:2 60:7 73:9 128:12 176:19 177:16 179:12 182:7 183:8 188:6 192:2

**dates** 31:25 32:9

**David** 64:19 130:6 142:5 172:15

**day** 12:24 42:8 110:25 183:8

**DC** 16:21 20:14

**de** 152:13

**deal** 91:23

**death** 62:3

**December** 183:9 184:4 188:21

**decided** 147:6 157:5

**decides** 23:3

**decreasing** 76:1

**deduce** 169:5

**deed** 39:20,24,25 40:1 50:12 52:15,17 53:1,5 55:10 56:24 57:13 58:14,17,25 59:4 60:7,10,15,21 61:13,15,20 68:12 78:2 113:1

**deeds** 50:4,5 52:9, 12,21,23 60:12,24 61:4,9 68:12,14 77:16

**Deerfield** 112:19 113:24 172:4

**default** 43:5

**defend** 23:6

**deficiencies** 70:6 184:16

**defined** 74:15 76:2 88:2,15 89:1 95:14 119:18

**definition** 110:14 118:16,17,20,22 119:8,10,15 120:7 171:17

**definitions** 177:3 182:13

**degree** 25:25 27:14, 18,21 34:2 52:25 78:22 91:12 162:7



177:5 182:16

**deletion** 73:25 129:14

**Dellwood** 149:2 158:2

**demand** 75:15

**demarcation** 180:24

**demonstrative** 35:3,7

**denial** 20:21

**denied** 20:20

**Denison** 43:7

**Dennis** 177:13

**Department** 18:25 55:17 93:18

**departments** 25:18

**depending** 162:24

**depends** 23:8 62:23 66:11 145:8

**depict** 54:14

**depiction** 76:13

**depictions** 72:25

**Depo** 29:3

**deposition** 3:2 4:11, 20,24 10:1 14:1,21 15:6 31:6 99:19 150:20 188:8,15

**depositions** 14:3

**depreciated** 125:20 127:2

**depreciation** 78:7, 18 122:4,15 124:16, 19,21 125:11,12,17 127:1

**depth** 104:18 162:22

**derelict** 21:12

**describe** 94:16

**describing** 39:23

**description** 3:13 38:15,18,22 39:11, 16,25 40:12 53:2

58:18 59:1 60:4 89:7 95:18 97:21 101:23 105:7 106:15 152:25

**descriptions** 39:6 50:1

**designation** 17:5,7 20:16

**designations** 17:1 18:1

**desirable** 137:13 138:7,16

**desire** 138:8 142:24 143:6

**desk** 72:19

**detail** 80:25

**determination** 39:3 74:24 88:7,18 94:12 125:3 135:1

**determine** 40:23 42:20 43:3 79:11 80:3 85:9 97:9 124:18 132:15 137:3, 17 138:4,10 160:25 169:20,23

**determined** 39:4,12 42:24 43:15 51:10 75:7 83:17 89:8 93:25 124:15,24 136:1 138:22 156:9 165:5 168:16 185:11

**determining** 140:23 141:3

**detrimental** 138:16 141:12

**detriments** 142:17

**develop** 121:11 122:15

**developed** 85:1 107:18 139:5 192:9

**developers** 146:9

**developing** 31:2 42:14 172:8

**development** 47:5 62:15 64:2 75:15 187:9

**deviation** 93:17

**devices** 48:10

**diameter** 163:1

**differ** 134:18

**differed** 125:7

**difference** 38:5 88:21 101:8 109:17 110:1,6 121:17 122:4 153:21,24 158:23 161:6 168:16 170:12 175:8 185:16

**differences** 154:2

**differential** 85:12 108:21 161:4 170:10

**differentiate** 88:18

**differently** 134:9

**differs** 26:1

**difficult** 48:3 115:17

**difficulty** 144:17

**Diggs** 184:15 187:19 188:3

**digital** 25:5

**digitized** 68:20

**diligence** 57:1,18 151:14 190:4

**Dillon's** 150:1

**diminished** 170:3

**diminution** 155:13

**direct** 55:21 78:17 119:5

**directly** 71:25

**director** 20:2 191:13

**dirt** 110:11

**disagree** 177:6 182:17

**disagreed** 178:11

**disclaimers** 70:4

**disclose** 70:5

**disclosed** 87:18

**disclosure** 3:16,18

27:24 128:11 158:12 181:11

**disclosures** 176:25 182:11

**discretion** 23:8

**discussed** 133:17 184:22

**discussing** 184:15

**discussion** 114:5,7 165:3 187:19

**dismissed** 19:6

**disregard** 43:16,18 143:8

**disregarded** 109:22

**dissemination** 132:1

**dissimilar** 161:18

**distances** 73:4

**distant** 42:20

**distinction** 157:23

**distinguish** 29:14 56:3,5 105:10

**distinguishes** 109:2

**distinguishing** 60:16 63:14

**divergence** 142:15

**diversity** 143:10

**divided** 10:24

**document** 24:13 26:7,18 28:1,16 30:15 37:21 50:14 54:19,21 56:16 58:11 69:4 82:10,16,21,24 83:4 116:5 128:8 175:23 176:1,2 181:7 182:10 184:2

**documentation** 15:15

**documents** 25:19 28:9 30:6,16,18,24 51:20,23 52:4 53:17, 21 54:6,12 57:25 70:2 92:2 112:15



114:1 181:21

**doke** 106:7 107:11

**dollar** 10:3,14

**domain** 10:13,20 109:6 131:25 132:3, 8,11 143:16

**dominant** 108:8

**Dominy** 64:19 130:6 134:3,8 142:4,5,13 172:15 185:11

**Dominy's** 173:8,16 185:13

**Donald** 65:6 130:4

**double** 104:20 106:2

**doubt** 113:10

**DPOR** 18:25

**draw** 154:23 155:2

**drive** 148:21 149:5 150:22 151:3,17 152:8,9,15,16,20 153:10

**driven** 45:16

**driveway** 78:22 126:14,23

**driveways** 126:6

**drove** 49:3,4

**due** 57:1,18 107:13, 16 151:14 177:8 178:13 182:18 190:4

**duly** 4:2 9:3

**duplicative** 130:16

**duration** 79:6,16,20 83:18,23

**duress** 143:22

___

**E**

___

**e-mail** 32:17 181:13, 16,20

**earlier** 73:12 79:10 96:2 100:18 101:18, 19 102:5 103:10 121:1,25 142:4

144:22 149:17 164:3 169:12 172:16 173:14 176:9 182:22 192:22

**early** 68:21

**earth** 71:9 73:2 126:12,15,19 161:23

**eased** 190:13

**easement** 64:15 65:6 66:1 79:17,20 81:12,14,22,25 82:3 83:19,23,25 84:4,9, 14 85:7,11,12,13,16, 21,23 94:7 95:19 97:5,6,15 98:15,25 99:6,8 102:10,11,16, 17,20,22,24 103:2,11 104:18 105:19 111:7 130:5,19,23 131:13, 22 132:12 133:18,21 134:11 136:10,14 141:20 145:24 151:18 157:22,24,25 158:8,9,14,19,20 159:3,6,8 161:12,14, 18 162:17,20 164:16 169:15 171:19 174:13,17 175:3,5,10 190:11,12

**easements** 79:6 81:21 83:9,11,14 85:3 96:9,12,24 97:14,18 98:13,22 100:1,4,6,10,13 101:2 103:6,13,16,21 111:4 131:6 132:2,19 133:1,6 144:24 168:22 171:14

**east** 115:8 149:10,11 162:11 163:4

**easy** 144:16

**eat** 147:15

**economic** 142:25 143:1

**edition** 18:4 62:11, 16 109:2 127:20 129:13 140:16

**editorial** 65:22

**education** 17:18

18:2 191:14

**educational** 7:12

**effect** 17:12,13 124:25

**effective** 40:20 41:7, 11 42:4,13,21 43:6,9, 10,11,12,25 44:6,8 46:2 73:4 79:21 80:3, 6 83:9 84:5,9,16 89:25 103:11 122:6 124:25 125:4

**effects** 140:23 141:4

**efficient** 98:8

**effort** 115:1 156:16

**egress** 96:8,23 97:5, 13,18 98:13,21 99:14,21 100:4,6,13 101:8 102:9

**electric** 130:21,25 167:2

**electricity** 161:20

**electronic** 25:2 48:10

**electronically** 24:24 49:22 57:8 67:17

**element** 47:13 81:17 87:18 187:4

**elevate** 25:21

**elevated** 25:14

**eminent** 10:13,20 109:6 131:25 132:3,8 143:16

**empirical** 144:6

**employ** 7:4

**employed** 6:18,19 8:8 29:19

**employees** 7:6

**employment** 8:11

**encounter** 142:20

**encountered** 81:5

**encumbered** 132:19,25 133:6,9,12 136:16 174:18 175:2

**end** 17:24 26:18 70:25 99:25 133:20 136:7 140:7 171:10

**ends** 161:23

**engaged** 11:2

**engagement** 11:12

**engineering** 74:6

**enhanced** 153:15 170:2

**enhancement** 153:17,20 155:13 156:3,4 160:3

**entire** 72:13 109:20 110:18 120:12

**entirety** 46:11 95:7 146:17

**entities** 131:19 132:6

**entitled** 66:1 130:7 176:23

**entity** 136:11 163:5, 15,16

**entrepreneurial** 124:2

**entry** 98:5

**environmental** 65:1 140:24 141:4,6

**equal** 6:25

**equally** 10:24

**equipment** 96:10 100:9,23 101:10

**equipped** 48:11 143:23 167:7

**equivalency** 120:10

**equivalent** 120:4 156:22

**erroneous** 185:5

**errors** 177:8 178:13 182:19 186:22,24

**esoteric** 69:4

**essentially** 109:8

**estate** 5:24 6:3,8,10,



13,14 7:9,19 8:13,21,
24 9:4,9,15 10:15
14:7 16:8 17:10
18:23 39:1 56:9 60:6
62:1 88:11 109:1
110:3,5,7,8 117:4
127:19 129:13 138:1
140:16 154:18,21
161:8

**estimate** 121:11
125:25 126:4 147:16

**estimated** 124:1,2,
15

**estimates** 87:23
88:1

**estimating** 121:14

**estimator** 78:15
121:8 122:1 123:3,9,
13 124:20 126:2

**ethical** 20:22

**ethics** 19:24 63:4

**evaluation** 17:6
86:16 111:15

**event** 42:9

**evidence** 79:24 81:5
138:14

**evidenced** 141:13
154:12

**evident** 59:3 78:5

**exact** 10:14 11:25
32:7

**Examination** 3:8
4:6

**examples** 47:10

**exceed** 83:10 103:12

**excerpts** 166:3

**exchanged** 110:10

**excluded** 15:19,24
135:17 165:2

**exclusive** 100:25

**exclusively** 11:5
12:1 100:7 184:9

**excuse** 5:12 54:13
67:4 75:13 96:22

112:2 121:3 131:4
132:24 169:15
190:11,17

**exercise** 72:14
131:24,25

**exert** 138:2

**exhibit** 24:10,14
26:7,12 28:2,3,15
29:3 30:12,25 31:5,
18 35:3 50:19 51:21,
24 52:5 53:18 54:3,7,
18,20 55:6,14 58:1,5,
6,8 72:25 73:1,13
82:7,12 84:20 96:3,
14 98:1 99:20 101:17
107:25 111:22 112:3
117:7,15,25 118:7
122:20 123:5,20,25
125:11,20 128:5,10
129:1,3,19 133:25
147:11,25 148:2
149:15,18 150:17,20,
21 166:22 171:5,10
173:25 175:20,25
181:4,9 182:10 184:3
187:6,17 189:1
192:4,6,15

**exhibits** 29:2,3,22
34:25 35:2,7 36:19
73:6,18,22 74:4,11,
15,20 75:5,11 82:19
180:19

**exist** 139:4 143:13
145:24 168:13

**existed** 168:11

**existing** 44:20 78:8
107:17,22 163:23

**exists** 126:7

**expand** 147:6

**expect** 5:20,25 6:2,
5,15

**expected** 27:12
140:2

**expects** 4:13

**experience** 20:14,
20 35:3 78:23 124:7
156:13 168:4 191:14

**expert** 3:16,17,18

4:12 5:18,21 6:1,5,16
14:6,10,19 15:18,24
27:5 28:10,11,13,16,
21 29:5,7,12,19 30:1,
8,17,20 31:5 32:3
33:6,7 34:8,23 36:15,
18,20 37:18,24 40:17
62:18 111:22 117:15
118:9 119:1 128:11,
15 134:18,20 156:22
176:3 181:12

**expertise** 156:13

**expire** 8:25

**explain** 50:25 54:25
85:6 108:19 136:13
172:1 174:4,16

**explained** 170:8

**explicit** 109:12
185:18 186:7

**express** 33:10,23
34:10 100:15

**expressed** 120:2
173:7

**extends** 179:3

**extension** 179:1

**extent** 44:10 68:5
191:6

**exterior** 44:19

**extra** 115:18

**extraneous** 31:1

**extraordinary** 38:6,
8 79:5,11,12,15,25
81:2 83:18

---

**F**

**face** 56:12

**facilitated** 162:7

**facilities** 94:19,22
95:4

**fact** 5:20 18:13 41:6
44:12 54:23 81:2
84:13 105:25

**factor** 151:20

**factors** 75:15 78:24

**facts** 28:9 30:7,16,
18,24 34:15,18 35:9

**failed** 179:19

**fails** 192:17

**failure** 180:7

**fair** 10:2 92:16,20
93:13,16 114:14
119:10,18 120:7
126:4 174:12 186:19

**Fairfax** 166:19
169:21 170:16

**fairly** 25:14

**Falls** 8:18

**Fallston** 151:4
153:11

**false** 80:1

**familiar** 4:22 19:25
21:17,21 37:2 45:1
102:13 165:22 172:3

**familiarity** 33:4

**familiarize** 45:1

**family** 15:1 62:4

**fashion** 170:20

**feasible** 76:22

**federal** 16:5 35:23
63:8 108:18 109:3,4,
6

**fee** 129:22 131:16
132:16 134:10 136:9
164:17 174:12,16,18
175:2

**feed** 126:9,13

**fence** 78:22

**fencing** 126:2,6,7,
10,23

**Fenton** 15:1

**field** 6:6,7,9 7:19
8:12 14:7 66:21
156:13

**file** 19:10 20:13 25:6,
16 50:9,13 56:21
57:7 60:25 113:17



ZAHN
COURT REPORTING
www.zahncourtreporting.com

115:25

**filed**  18:6 20:9 21:7, 10

**files**  19:3 71:14 72:2

**filing**  28:3 164:22

**filings**  164:19 165:3, 16,18 166:10

**final**  87:23 159:10

**financial**  120:4

**financially**  76:21

**find**  33:5 57:2,4,15 64:16 133:5,11 137:20 138:8 139:3 143:5 145:22 146:8, 25 147:2 161:5,21,23 163:22 164:1 169:11

**finding**  115:16 144:17

**fine**  24:15 53:12 83:5 91:21 168:11 174:5 181:15

**finger**  54:2

**finish**  5:3,13

**finished**  5:5 64:23

**firm**  6:21,24 7:2,4 8:9,15,21,22,23 9:4 10:2 12:9,14 19:4 32:20 35:9,13 114:25 164:20

**firms**  164:20

**fit**  171:17

**five-year**  81:3,7 83:23 84:3,8

**fixed**  110:9,10

**Flint**  16:1

**flood**  47:22

**flow**  16:7

**focus**  187:10 189:17

**focused**  180:6

**folded**  9:1

**folks**  146:6

**follow**  106:12,18

**Foods**  23:25

**footnote**  39:18 41:17 50:11 52:18 127:24,25 140:18

**foremost**  77:25

**Forgive**  81:19 190:17

**form**  16:4 35:16 37:12 48:8 50:12 75:21 77:12 100:24 111:11 142:25 143:2, 3 151:25 174:22

**formally**  78:16 121:8

**format**  25:2

**formed**  61:22

**forming**  34:16,19 35:10,14 92:11

**forms**  10:15 55:2

**formulating**  186:12

**forward**  88:6

**found**  15:19 31:1 39:24 114:12 115:17 132:25 137:21 144:24 146:20,23 147:1 160:17,18 167:20 171:23

**Foundation**  17:8 64:17,19 130:7 172:22

**founded**  8:5

**Fourteenth**  140:16

**fourth**  36:12,13 48:19 112:6 129:13 136:17

**frame**  184:12

**frequency**  49:3

**Friends**  143:4

**front**  184:3

**frustration**  91:5

**full**  91:25 101:11

**function**  74:6 93:22 94:13 155:17,22

156:6 164:17

**fundamentally**  188:20

**furnishings**  117:5

**future**  81:21 84:17 136:23 137:2

---

**G**

**gas**  130:21,25 141:10 148:9 151:12, 18 153:14 156:19 159:22 160:21 161:14,20 162:13,16 163:19,23 166:18 167:1,9 168:1,14 172:25

**gather**  67:3

**gathered**  67:10

**gave**  18:17 21:16 47:9 188:8

**general**  16:20 17:10 38:2,5,9,12 40:4,9 137:21

**generally**  21:4 40:8 62:8 117:1 161:23 166:1

**generation**  137:22

**generic**  95:7

**geographic**  71:7 147:6

**geographically**  149:8

**GI**  113:4

**gift**  39:20 50:12 52:15,17 55:11 56:24 57:13 58:14,17,25 59:4 60:7,10,12,15 61:13,16,23 68:12,13

**gifted**  52:16

**GIS**  48:12 49:19 50:18 51:1 52:8 53:17 54:19,21 55:2, 4 56:10 57:25 68:3 71:7,12,22 72:2,5,22 77:7,12 89:12

**give**  4:15 5:7 10:14 175:23 179:13 191:19,23

**giving**  42:10 82:10 188:15

**good**  4:7 9:22 44:6 53:10 101:6 171:16

**Google**  71:9 73:2 126:11,15,19

**gotcha**  15:11 18:20 19:5 25:17,22 156:24 181:19

**Governor**  17:13

**grade**  95:9 161:19

**granted**  16:12 95:18

**gravel**  78:22 126:6, 14

**Great**  8:17 64:25

**greater**  77:21

**greatest**  76:22

**Grewell**  134:18 135:12,20 145:13 169:9 177:13,15,18, 21 178:13 179:19,24 180:20 183:3,8 184:17 185:21 186:4, 17,23 187:1 188:1,8, 15 189:9,14,22,25 190:6 192:9,17

**Grewell's**  134:25 135:4 178:6 179:13 180:7 184:4,20 189:25 191:9

**grids**  54:23

**ground**  4:23 95:1,12 110:24 190:21

**Group**  8:24

**grouping**  157:9 162:10 168:20

**groupings**  169:1 170:11

**groups**  139:10 144:2 170:9

**guess**  9:19 10:17 17:21 23:17 93:21



112:6 125:15 135:17
167:24 169:19 189:2

**guidance** 124:22

---

**H**

**habitable** 125:9

**half** 10:16,19

**hall** 7:13 53:11

**Hamilton's** 59:23

**handle** 12:15 22:25

**handwritten** 69:4

**happened** 135:16
183:18

**Hartford** 148:9
149:8

**Harvey** 3:2,7,14 4:7,
18,20 6:19 8:6,11,24
9:1,2 24:9,10,12,14
26:7,11 27:12 28:8
29:3 31:5 37:24
40:17 49:11 53:16
67:2 79:2 82:6,7,10,
11,24 84:20 86:2,3,8
87:22 89:6 96:2,14
99:19 101:17 104:25
107:10 108:12
122:21 127:11 128:5,
8,9 129:1,19 132:14
148:1 149:18 150:20
166:18 173:20
175:18,20,23,24
181:4,7,8 182:10
184:2,3 187:5,17,25
189:1 192:1

**he'll** 86:10

**head** 5:8 20:22
113:19 172:6,10

**heading** 106:11,17

**headquarters** 8:17

**heard** 27:19 81:16

**hearing** 131:5

**held** 16:8 191:1

**helpful** 16:9,10
72:16 81:14 118:1,5
150:16

**helping** 35:5

**Hershey** 24:1,5

**hey** 32:22 42:10

**high** 7:12,14 159:19,
23 160:14,18,23
161:10 167:1,5 169:4
170:19,23 171:2
184:25

**higher** 160:5

**highest** 76:16,18
106:9,13,15,20 107:5

**Highly** 44:13

**hill** 46:12

**hire** 12:14 23:8
134:21

**hired** 11:6,15,19
18:17

**histories** 147:8

**history** 63:15 80:23
150:22 151:6,15
191:12

**hold** 16:20 17:7 18:1
27:21 29:16 54:2
59:18 60:14 72:9
80:12 110:9 147:24
150:24 177:5 182:16

**Holdings** 15:1

**Holt** 15:14 26:24
32:16 45:21

**homes** 153:1

**hope** 147:21

**hour** 13:7 147:17,19

**hourly** 13:8,9

**hours** 13:12 46:20
147:22

**house** 112:19
152:21

**Houston** 163:12

**hundred** 14:5

**Huntersworth**
159:15,18 160:13

**Hunting** 149:4
159:13

**HVTLS** 161:17

**hydrology** 72:8

**hypothetical** 111:8

---

**I**

**Ibid** 129:4,12,16

**ID** 25:5

**idea** 37:7

**identification**
24:11,13 32:11 35:22
38:25 50:13 51:13,17
53:22 55:7,8 58:7
59:7,8 60:5 72:25
82:8,11 88:10 128:6,
9 175:21,24 181:5,8

**identified** 4:11 5:17
50:8,10,16 52:7
67:14 188:17

**identify** 52:3 190:22,
25

**II** 3:2,7 4:2,18

**illustration** 59:23

**immovable** 110:9,
10

**impact** 64:17 108:22
111:4 130:7 142:17
144:5 160:21,23,25
161:3,14 167:4,9,10,
25 168:2,7,25
169:23,24 170:3
171:3,13 173:6 175:2
185:24

**impactful** 169:7

**impacts** 168:9

**impaired** 186:12

**imperfect** 154:18,22

**imperfection**
154:23 161:7

**implicit** 109:14

**implied** 161:2

**important** 50:5
152:2 162:6 168:6

**imposed** 137:23

143:17

**impossible** 188:20

**improper** 184:6

**improved** 77:18
88:7 106:25 107:7,19
108:3 120:13

**improvement** 85:22
121:12 124:13 125:4

**improvement's**
122:5

**improvements**
44:20 78:8 85:9,15,
20 107:17,22 116:22
117:4,22 118:3
120:21 123:4,21,23
125:1,13,16,20
126:5,16,22 127:2,3

**inappropriate** 165:6

**include** 14:18 40:3,9
57:21 71:17 82:19
95:8 99:13,20 100:19
102:23 103:6 117:1,
6,22 148:20,23
149:19,22 157:5
158:4 166:10 171:21,
25 179:4,9 187:4
192:2

**included** 27:24 35:4
50:8 51:20 52:4
61:23 67:14 71:24
75:20 100:12 116:24
149:1,13,23,25 150:7
151:3 152:24 157:8
158:16 165:18
187:22

**includes** 72:14 83:7
89:2 98:21 100:22
120:1 128:10 148:7
176:2 187:18 188:7
189:1

**including** 38:15
77:7 98:6 105:24
114:5 118:8 130:12
163:11 184:10

**incorporates** 109:9

**incorrect** 97:21
129:5

**increased** 143:2



**increasing** 75:25

**independent** 140:11 141:15 142:8 173:5,10,16 185:12

**indicating** 25:5 101:18 153:25

**indication** 83:2 92:5,20 95:6,17 124:23 125:10

**indications** 87:23

**indices** 145:10

**indirect** 124:2

**individual** 170:18, 23 189:7,11

**individuals** 192:24

**industry** 56:9 65:12, 20

**inference** 154:16

**influence** 109:22 138:3

**inform** 131:15 161:13 167:25

**information** 26:14 27:11 49:12 50:6,18 67:9,13,18,25 68:9 69:14,22 70:11,23 71:7 72:11,22 76:9 77:7 78:4 86:15 95:25 112:11 113:20 116:5 124:6 126:17, 20 127:18 150:4,20 165:9 172:7 180:18, 21 185:22 186:15 188:1 190:3

**informative** 171:13, 21

**INGAA** 64:17,18 65:11 130:6 142:5 172:22

**ingress** 96:8,23 97:4,13,17 98:12,21 99:14,20 100:4,6,13 101:8 102:9

**inherent** 161:7

**inheritance** 62:2

**initial** 30:14

**input** 69:17 131:8

**inquiring** 131:19 132:10

**inside** 116:22

**inspecting** 45:18

**inspection** 44:18, 19,23 45:4 46:5,8,17, 19 48:17,20 86:14 116:19

**instance** 44:2 50:10 63:13 70:14 72:24 117:10 164:24 184:15 185:2

**instances** 132:10 159:1

**Institute** 19:8,18 20:3,11 21:8 63:6 191:10

**instructor** 17:8

**instrument** 50:11

**instruments** 68:10, 14

**Insurability** 64:18 130:8

**intend** 4:15 33:24,25 34:12 35:2 181:13

**intended** 25:16 41:18,23 47:6 51:25 58:7 88:20

**intends** 80:6 103:20

**intensive** 168:22

**intent** 191:15

**interaction** 46:25

**interconnectivity** 163:13

**interest** 132:17 174:13,17

**interior** 44:20 117:1

**interpretation** 81:23 98:9

**interpreted** 74:22

**interview** 78:3 190:1

**introduce** 4:8

**introduced** 114:11

**inverse** 80:16

**investigate** 43:21 74:8 180:20 190:4

**investigated** 151:15 180:18 190:6

**investigation** 140:1,11 141:5,15 142:8 173:5,10,16 180:13,16,19

**investment** 78:9

**investments** 78:9

**involved** 11:19 18:12 23:6,15 44:19

**involvement** 22:10

**involves** 9:21

**involving** 22:10 89:19 94:17 145:20 147:7 162:12

**ipad** 48:11

**isolate** 167:4,9 168:7

**issuance** 19:8

**issue** 39:5 40:10 52:2 55:12 74:7 146:5 162:3

**issued** 139:25 169:2 177:23

**issues** 55:11 143:7 144:19

**italicized** 119:8

**italics** 24:25

**item** 38:14 40:5 44:17 49:10 62:7 63:19 64:8 67:2,16, 22 68:7 69:11 70:8 72:4,21 73:5 74:14 75:12 76:14,25 78:6 79:4 84:25 85:25 87:21 96:5,20,21,22 97:20 103:10 105:5, 17 125:19 130:4,18

192:16

**items** 98:19 104:3

---

**J**

**Jackson** 65:2 134:7, 8

**James** 15:14 26:24 32:16 45:21

**January** 13:18 182:7 188:7,25 192:3

**job** 142:25 174:19

**Joel** 148:24 157:13, 14,15 158:16 159:6

**John** 11:13,14 12:16

**Joseph** 86:1,8

**Journal** 65:3,23 66:6

**judge** 16:6 34:4 103:22,24 150:1 165:1

**judgment** 81:13 117:13 124:7

**judgmental** 145:14

**July** 44:24 116:19

**junction** 190:20

**June** 31:16 61:22 189:11

**Junior** 7:15

**jurisdiction** 18:8,20 19:14

**jurisdictions** 12:2,3 21:4 70:20

**jury** 16:10 35:5 80:5 81:14 174:21,22

**justification** 186:25

**justifying** 143:20

---

**K**

**kind** 4:23 24:19 67:8 105:24 138:23 146:7 147:3 152:12 161:24, 25 162:1 192:25



ZAHN
COURT REPORTING
www.zahncourtreporting.com

**Kings** 148:21 150:22
151:3,16 152:8,9,15,
19 153:10

**kitchen** 47:3

**knits** 90:25

**knowledge** 55:15
81:12 83:13,15
103:17 152:25 168:4
181:23,24

---

**L**

---

**lack** 150:3

**land** 43:20 44:19
49:18 50:4 52:10
55:17 57:1,9 58:14
63:8 68:11,15 77:1,4,
23 85:9 88:4 92:23
108:2 111:17,23
112:5,12 116:14
117:8,16,18 118:2,7,
13,24 119:14 120:18
121:2,4 124:9 127:3
189:23 190:2

**land-to-building**
77:21

**landowner** 74:6
111:12 114:14

**landowners** 10:22
142:24

**Lane** 112:19 179:15,
21 180:6,14 184:7,
13,14 189:3,18
190:2,8,15

**language** 27:19 28:5
30:21,23 41:16,23
44:11 59:2,18 61:12,
19 81:23 83:8 97:1,
19 99:14 100:5 102:7
159:1 186:3,7,10
187:7

**large** 145:23

**largely** 160:19

**larger** 39:4,13 44:18
49:13 51:11 67:4
71:8,13,24 72:11,23
73:7 74:16,21,23,25
75:1,8 76:15 78:8

**79:7** 85:4 86:5 87:24
88:2,19 89:2,9,24
92:8,16 94:6 95:20
104:5,16 106:12,20,
24 107:6,17,22
109:20 110:13,19
111:5,15,24 120:3,12
121:3 122:24 127:4
132:17 136:9,14,20,
22 137:1,19 138:5,25
174:14

**largest** 23:11

**lastly** 185:4

**latest** 76:22

**launcher** 94:25

**launches** 94:25

**law** 16:6 35:8,12 43:6
93:15

**layers** 72:7,15

**laying** 94:17

**layman's** 55:1

**learn** 72:18 189:21

**learned** 49:23 72:20

**leasing** 9:13

**legal** 25:19 27:19
38:15,16,18,22 39:6,
10,16,25 40:12 49:13
53:1 58:15

**legally** 76:21

**length** 138:19
145:19

**lesser** 107:24

**letter** 19:20 20:3

**letters** 27:6

**level** 20:22 25:14
55:19 87:8,20 169:6

**levels** 125:16

**license** 9:15,17
16:18,21,23 17:17,20
50:3 56:7 57:9 68:25
72:6,8 158:21,24
159:3,7

**licensed** 9:3 17:10,
15 18:8 55:17 86:8,

**12**

**licenses** 16:17,19
17:22

**licensing** 17:12 18:7
20:10

**life** 124:25

**lifestyle** 117:4

**light** 82:22 190:15

**limit** 101:1

**limitation** 146:25

**limited** 99:3 101:2
130:12

**limiting** 38:2,6,10,13
40:4,9 177:4 182:14

**limits** 167:12

**linear** 126:9,13

**lines** 54:17,22 146:9
167:10,18 168:3
169:20 170:2,14,19
184:21 185:1

**links** 192:12

**list** 44:8

**listed** 35:22 36:15
43:24 68:7 69:11
70:9 123:4

**listen** 5:2

**listing** 44:1 69:12,
18,19,24 70:3,13
150:22 151:6

**listings** 69:16

**lists** 14:17 67:5

**literature** 66:18
108:18,25 120:19
130:11,14 132:20,24
133:2,16 185:22

**litigation** 9:21 10:4,
6,10,12,15,19 23:15,
18 80:3 109:1 127:19

**live** 27:20

**lived** 46:16 47:8

**LLC** 4:12 5:17 8:23,
24 15:2

**loan** 7:25

**local** 139:8

**located** 21:19
146:11 149:9

**location** 8:16 55:8
58:10

**locations** 8:4 137:12
138:9

**lock** 25:16

**locked** 25:6

**lodged** 19:21

**logical** 42:20

**long** 7:1,8 17:9 21:2
46:18 76:23 135:15
164:10 165:11

**looked** 10:24 57:13
73:12 82:21 88:10
124:21 126:3 133:7
138:18 146:16,19
147:7 149:17 161:12,
16 164:4,6,7,25
166:9,12 185:21
187:5

**Lord** 15:25

**loss** 80:22

**lot** 47:15 57:2 58:21
72:18 82:20 113:13
115:3 117:5,22
150:19 155:16,22
156:1,2

**lots** 25:18 30:10

**lower** 131:19

---

**M**

---

**MA** 148:10

**machinery** 96:10
100:8,23 101:9

**made** 19:17 38:9
41:14,19 44:18 45:3,
14 46:5,19 47:11
74:24 83:17 91:14
116:18 143:7 157:4
189:9,22

**magic** 145:13



MAI 3:2,7 17:5 19:8

main 118:8 163:11

maintain 17:17 98:8, 15

maintenance 98:25

majority 10:4 107:24 120:18

make 4:14,24 5:14 44:23 45:11,14 48:3 74:21 79:12 85:14 89:18 91:9,24 116:3 119:3 136:18 160:12 173:15 179:19

makes 137:25

making 138:15 153:22 155:17,23

Mall 16:1

management 9:13

mandated 191:15

manipulation 84:13

manner 145:9

map 59:22

mapped 72:13

mapping 72:14 73:3

maps 50:22 72:7

Marble 113:24

March 39:20 60:15, 20 61:13,19

marked 3:13 24:8, 10,13 47:25 82:5,8, 11 128:4,6,9 175:19, 21,24 181:3,5,8

market 41:7,10,13 42:3,22 43:17 44:13 66:14 67:4 75:14,25 76:2 92:16,20 93:13, 16 110:13,14 119:10, 18 120:7 122:6 132:18 137:11,19,20, 22,24,25 138:2,4,6,9, 11,25 140:12 141:7, 16 142:9 143:7,11,21 144:18,23 154:16,18, 21 156:7 173:5,17 174:12,23

market's 161:1

marketability 76:1

marketing 69:18

marketplace 110:11 161:22

markets 137:12 139:1,6 154:18 161:8 169:14

markings 48:2

Marshall 78:16,17 121:7,8 122:14 123:8,9

Maryland 7:15,16,17 8:20 16:2,5,21 19:15 21:2 148:9 149:8 151:4 153:6 155:12 159:11 170:17

Mason 8:1

match 55:5

matched 160:10

materials 96:11 100:9,23 101:10 121:20 123:15

matrix 133:18,20,24 141:21

Matt 192:10

matter 4:10,13 5:18 6:3 12:14,21,22 13:13 14:22 15:25 16:6 18:12 19:7 20:4 21:11 22:2,4 33:11, 24 40:7 75:16 81:15 89:16 156:23

matters 38:15

maximally 76:20 106:23

MB 148:10

Mcguire 25:9

Mcguirewoods 11:14 13:23 32:19 35:9,13 36:7 45:22 176:1

Mckey 23:25

meaning 29:19

137:22 174:18

meaningful 92:15, 19,22 93:5,7

measurable 154:17 168:25 169:6,24 170:11

measure 59:15

measured 156:8

measurements 73:3 86:15

meat 150:19

median 154:16

meet 15:8 20:16 29:8

meet all 29:20

meeting 15:10 44:5, 7 132:4

mega 9:23

member 19:24 20:15 21:14,16

membership 20:16 21:16

mentioned 10:7 30:15 46:4 50:12 65:5 68:13 164:3 182:22

met 4:7 185:3

metes 58:18,24,25 59:14

method 85:2 108:14, 16,24 110:18 144:12

methodology 66:9 83:17 135:24 185:5

Methods 140:22

Metro 20:14

Michael's 8:19

middle 78:14 89:6 121:24 136:3

midway 28:16 173:3

million 92:25 93:3,4

Mills 159:14,16

Milum 179:15,21 180:6,14 184:7,13,14

189:3,18 190:1,8,15

mind 16:14 110:6 121:17 185:17

minds 44:5,7 132:4

mine 179:6 187:2

MINSON 16:3 24:2 35:16 46:1 48:8 75:9 81:9 103:23 139:15, 23 140:4 151:19 152:4 170:6 183:11, 14 192:4

minus 161:7

minute 91:17 154:21 191:20

misleading 190:24

missing 173:23 174:2 183:15

misspoke 190:9

misunderstanding 29:25 104:14

misunderstood 81:19

MLS 69:20,25 70:18 77:16,25 113:1 115:16

model 41:16,22

modern 121:21

monthly 13:18

morning 4:7

mother 62:3

motion 16:12

Mountain 135:5,16 164:5,8 165:11,24

move 175:12

moving 140:5

multi-family 47:5

multiple 21:4 23:21 32:18 45:16 58:6 60:24 61:25 69:12, 17,19 72:6 88:1

MVP 150:2


ZAHN
COURT REPORTING
www.zahncourtreporting.com

## N

narrative 187:12

narratives 187:8

national 20:12 64:10 159:22

natural 161:14 167:1,9 172:25

nature 62:23 77:20 135:8 161:24

necessarily 48:23 159:4 162:4

negative 104:20 106:2 153:18 169:22

Nelson 143:4 145:18 146:12

niece 46:16 47:7

ninth 158:1

Nisource 131:10 163:17,18

Noble 135:16 150:3 165:2

Noble's 164:25

nodding 5:8

nomenclature 37:10

nominal 107:14,16, 21,25 108:6,7 161:6

non-eminent 132:11

non-litigation 10:3

non-take 75:6

nonetheless 166:12 171:18

nonverbal 5:7

north 12:5 16:22 47:23 117:10 146:17 149:10,11 162:11 163:4

nos 32:11

note 25:25 55:22

noted 135:20

notes 116:3 117:11 189:2

notice 42:10 49:6

noting 75:14

November 31:19 33:8 41:2 45:11 176:2,20 179:12

nuances 63:16

number 11:25 50:11,22 55:8 65:14, 23 66:6 67:5 69:25 70:1,19 109:11,16 129:7,9 131:9 145:6, 13

numbered 95:22 97:9 104:3 173:4

numbers 35:22 51:7 126:25

numeric 52:1

## O

O'DONNELL 48:18 86:2,12 115:2

oath 186:24

object 16:4 34:4 152:5

objection 24:2 34:5 35:16 46:1 48:8 75:9 81:9 103:23 139:15, 23 140:4 143:20 151:19 152:4 170:6

objectionable 137:11,18,20,21 138:16

objections 143:18

objective 114:14 143:13,21

observable 154:17

observations 47:11

obstruction 105:23

obtain 49:21 51:20 67:25 69:14 71:12 72:23 136:6

obtained 39:6,24 50:5 68:6,15 69:23 71:8 72:10 105:8 121:2 192:10

occasion 92:16

occupation 5:23 55:18

occupy 159:4

occurred 33:4 41:7, 10 42:3,9 43:13 44:5, 7 47:12 60:18 80:13

occurrence 33:4 108:21,22

occurring 103:25

occurs 81:22 104:1

October 32:12 45:10 73:9 177:16 178:6,12

offering 70:1

office 8:3,18

Oftentimes 78:3

Okie 106:7 107:11

older 114:15

omission 177:8 178:13 182:19

one's 62:16

open 137:14 169:16

opened 8:2

operational 110:24 140:7

operators 146:9

opine 174:20

opined 131:20

opinion 15:18,24 41:18 45:24 66:8 92:19 97:11 116:8 124:8 131:15 135:23 137:25 140:10 143:3 171:13 174:12 175:3 177:5 178:10,11 179:3,4,9,19 180:8 182:15 186:10 187:2

opinions 4:15 5:1,2 27:21 28:8 30:5

obtained 32:24 33:9,22 34:9, 16,19 35:1,10,14 65:21 92:11 120:2 142:16,20 143:5,9 144:3 176:23 177:2, 7,21 178:11 179:13 182:12,17 186:18

opponents 143:11 144:2

opposed 61:15 118:7 161:24

opposing 12:19

opposite 143:5

opposition 139:8

oral 131:8

order 132:15 141:15 142:2 150:2 165:1

ordinarily 57:21

organizations 64:11

orient 41:23 55:7 58:7 59:4 72:17 118:1

orientation 52:1

original 40:24 57:17

outhouse 47:15

outlined 50:23

output 145:12

overhead 160:23

overly 186:14

overrule 34:5

owed 111:11

Owings 159:14,16

owned 8:20 163:5, 15

owner 6:24 23:3 104:5,9,16 105:5,6,9, 11,18,22

owners 6:25 10:22 14:25 31:12 137:22 138:19 143:16

ownership 136:10



**P**

**PACER** 150:14 164:7,19 166:9

**pack** 67:1

**paddock** 126:7

**pages** 61:12 64:3,5 95:14 101:15 102:21 103:3 116:12

**paid** 12:20 13:20,23 151:18

**pair** 138:18 153:9 157:11 158:1 159:10 160:2 171:6

**paired** 138:24 144:11,15 145:3,5 146:24 148:4 161:10 162:7 163:22 165:23 170:11 173:11 179:13 180:8 192:9

**pairings** 186:20

**pairs** 145:6 148:8,12, 20 149:14,20 151:3 152:24 153:5 155:11 161:13,17 162:10 166:17,22

**par** 69:9

**paragraph** 24:25 27:10 28:7 38:25 42:12 59:7,8 60:5 69:10 70:8 71:1 75:11 77:5,9 82:25 83:7 94:5,16 96:16, 17,19,20 97:2,4,5,25 98:3 99:4,5,9,25 100:5,16 101:1,24 105:3 107:3,13 121:25 122:3,11 127:17 130:10 131:18 132:15 133:9 136:8,17 137:5 139:7 140:8 142:14 144:4 145:16 173:4 174:11 177:1 182:12

**paragraphs** 26:19 27:2 60:14 95:22 96:1 97:10 99:13,18 101:15 116:16

**parallel** 94:2 173:7 185:16

**parallels** 141:5 185:15,18,23,25 186:2,16

**paralyzes** 186:15

**paraphrasing** 97:7, 8

**parcel** 39:4,13 44:18 51:11 58:2,12 67:4 71:8,13,20,24 72:12, 23 73:7 74:9,16,21, 23,25 75:1,8 79:7 85:4 86:5 87:24 88:3, 19 89:2,9,24 92:8 94:6 95:20 104:5,16 106:12,21,24 107:6 109:20 110:13,19 111:15,24 120:12 122:24 127:4 132:17 136:9,14 137:1,19 138:5,25 152:20 174:14

**parcel's** 76:15 78:8 92:16 107:17,22 111:5 120:3 121:4 136:20,22

**parcels** 40:1 50:22 51:9,13,14,17 52:2, 22 71:17,23 74:20,21 75:7 89:8 92:7

**parcels'** 49:13

**parent** 163:17

**parentheses** 90:1 118:17

**part** 11:12 15:22 36:3 39:7 51:10 53:18 54:19 55:14 70:3 71:24,25 75:7 79:5 89:8 92:7 102:5 110:17 111:12 115:15 116:14 127:15 136:6,23 146:24 151:14,22 171:15 176:25 181:13,17,20

**partial** 94:5 132:17 136:18

**participants** 143:22

**parties** 20:1 48:19 131:9 190:1

**party** 56:8 113:8

**passage** 41:12 42:2

**past** 9:20 10:12 12:19 33:2 73:18 89:24 152:17

**paucity** 132:25 144:24 145:19 146:21

**pay** 119:19

**peer** 64:9 65:9,24 66:6 132:21 133:2 164:14,15

**peer-reviewed** 65:15,17,18 66:4 130:2 132:20,24 133:1,15

**peers** 65:19 66:17 134:12,13 135:7,18, 22 136:6

**pending** 5:13

**Pennsylvania** 16:22

**people** 42:10 56:9 76:5,6 143:5

**people's** 117:4

**perceived** 137:14 141:7 142:16,21 156:5,7

**percent** 93:1,16,19 134:19 154:4 156:3,4 160:3 169:3,4,8,10 170:9 186:12

**percentage** 10:15 129:22 131:16 132:16 134:10 135:19 186:12

**percentages** 131:20

**performed** 85:10

**performing** 8:4

**period** 81:4,7 83:10 84:3,8 103:12

**periodical** 66:2

**permanent** 85:3,7,

13,16,21 94:7 95:19 98:25 104:18 105:19, 23 134:11 157:22,24 159:6 162:17 174:13, 17 175:1,3,9

**permissible** 76:21

**permission** 18:17

**permit** 105:22

**permits** 139:13,20, 24

**person** 10:5 115:21 117:6 191:12

**personal** 15:10 44:18,23 46:5 57:23 117:2

**personally** 10:11 12:11 60:22

**persons** 96:10 100:8,23 101:9 115:21

**perspective** 41:20

**perspectives** 41:21

**pertain** 74:20

**pertains** 16:25

**PGM's** 163:13

**phone** 15:10 48:11 91:18 131:4

**phonetic** 8:2 115:16

**photographs** 116:12 117:11,21,22 118:2

**photos** 116:21 117:1,6

**phrase** 27:17,23 76:18

**phrased** 110:4

**physical** 45:2 49:13 160:10

**physically** 76:21

**pieces** 59:12

**PIG** 94:24,25

**PIN** 32:11 51:7,17



**PINS** 39:2 51:2 88:17,19 89:3

**pipe** 48:14 95:1,2 96:10 100:8,22 101:9 157:21,24 158:9 163:1

**pipeline** 4:12 5:17 10:8 12:10,13 14:22 22:11 36:1,11 48:4 49:2 64:17 71:15,17 94:8,18,21 95:7,11 98:16 110:24 130:7, 20,24 132:7 135:5,7, 17 141:7 143:24 145:3,25 148:15 152:16 154:3,24 155:14 157:1,14,24 158:6,8 159:6 160:2, 7,21 161:14 162:14, 17,22 163:3,5,11,15 164:5,8 165:12,24 167:5,10,17,22 168:7,10,17 169:15, 23 171:19 185:24 190:7,10,19

**pipelines** 131:10 138:20,23 141:10 148:16 153:14,15 162:14 163:8,24 170:3

**place** 105:18,22 117:24

**plain** 47:22

**planning** 62:1

**plat** 32:9,11,14 54:18,22 56:4 57:15, 16 70:4 157:19,20,21

**plats** 32:4,23 33:1 35:11 36:23 45:23 50:4 54:10 55:4,7,11, 13,14,18,22 56:1,10, 12 58:1,8 59:10,11 70:7 74:24 158:15 177:20

**point** 7:23 8:20 42:20 46:6 55:10 57:10 79:24 81:15

**poles** 59:16

**population** 68:3 75:24

**portion** 59:22 140:22

**portray** 154:5

**portrayal** 143:21

**portrayed** 188:2

**posed** 56:19

**position** 141:2

**positive** 153:18,21, 24 169:16,22

**possesses** 139:13

**possession** 83:11, 14 103:13,16,20,24

**possibility** 25:20

**possibly** 101:12

**post-valuation** 43:14,23

**potential** 9:21 114:5 131:24 138:3 141:12 168:1

**potentially** 93:4

**power** 131:25 132:8 160:4 167:5,10,18, 21,23 168:1,2,3,10, 18,23 169:15,20 170:2,14

**practice** 7:19 9:9,19 10:19 37:4 62:11 63:5

**practices** 62:9

**practitioner** 5:24

**pre-** 43:13

**predominant** 69:20, 21

**premium** 154:4

**preparation** 42:5 87:16

**Preparatory** 7:14

**prepare** 12:11 15:5 31:17 32:3,21 45:9 106:19

**prepared** 11:22 12:9 19:12 22:9,12 31:18 40:6 45:6 66:9 86:17

128:17,20 156:25 165:10 166:13 172:15 176:3,10,13 177:13 179:8 180:12 182:6 183:4,8 187:14 189:2,14

**presence** 160:14 179:20

**present** 145:19 169:21

**presented** 74:13 141:21 142:10

**president** 19:4

**press** 139:10

**pretty** 68:19

**previous** 5:5 40:5 48:22 73:21

**previously** 12:17 50:11 52:14 58:13 86:14 130:1 133:17 170:25 184:22 191:11

**price** 44:8,9 92:23 120:3

**Prices** 140:24

**primarily** 58:8 73:3 77:16 115:2 124:7 133:17 142:25

**primary** 66:15 78:21 102:17 130:17 134:9 142:11 186:21

**principle** 141:9

**printed** 67:17

**prior** 21:24 22:9 31:25 36:14,20 37:20 38:24 43:24 52:23,25 53:3 56:25 57:14 58:21 59:10,11 61:23 65:5 78:23 80:15 81:19 89:15 104:9,17 106:1

**pro** 142:16 143:3,7

**problem** 39:4 131:3, 5

**procedures** 62:9

**proceedings** 4:4 53:14 175:17

**process** 17:23 81:1

**product** 131:24

**productive** 76:20

**profession** 7:23 17:2

**professional** 16:19 19:1 27:14,18,21 37:3 55:18 62:10 63:4 64:10 87:5 177:6 182:16

**professionally** 7:9 18:8

**proffer** 146:16

**profit** 124:3

**prohibit** 105:9

**project** 9:23 10:7,8 11:2,13,15,20,23 22:1,13 32:19 80:10 94:9,17 98:7,9 100:14 109:22 111:1, 9 133:10,13 139:9,14 140:3 142:24 145:23 146:5,7 156:17 157:1,5 164:5 165:12 171:16,24

**projects** 136:1

**prompted** 74:3

**properly** 98:10

**properties** 14:24 22:5,9 23:12 36:2,10 38:22 40:6 42:4 49:1 52:5 61:24 72:3 93:3 133:9,12 138:23 139:3 143:21 144:24 145:17,20 146:4,12, 20 148:14 149:9 151:10 153:1,2,7 154:2 155:18 156:19 158:12 162:8,12,13 167:21 171:14 178:7

**property** 9:13 10:22 14:25 16:21 18:14 21:18,22,23 22:17,25 31:12 32:11 35:21 36:10 45:2,6,12,13, 15,16,24 46:11,18



47:18 48:1,2,5,22,23, 24 49:3,5,6,9 50:1 51:12,17 52:3,15 53:21,25 54:14,18 55:6,8 57:11 58:10, 15 59:23,24 63:15 64:18 70:1,3,5,6 72:16,18,24 76:1,13, 23 77:20 80:10,14 83:14 85:9 88:5,12, 17,23 89:7 92:24 93:13,22 95:13 97:6 98:6 102:25 103:7 107:18 108:20 109:20,25 110:3,5,7, 9 113:2 116:19 120:18,20,23,24 126:8 128:12 129:23 130:7,8 131:17 132:18,25 133:5 136:16 138:19,20 142:18,22 143:16,17, 23 144:6 146:17 147:3 150:23 151:7, 24 153:14 154:3,12 157:15,21 158:7,8,16 159:5,13,21,22 160:2,3,7,23 161:11 162:4 167:6,12 168:22 170:3 172:4 173:7 177:14 179:14, 21 183:4 189:3 190:8,13 191:3

**proposed** 47:24,25 95:4 158:19 171:7

**proprietary** 166:11

**Prospect** 184:16 187:19 188:3

**prospective** 41:22

**provide** 32:22 35:9, 13 51:25 56:15,16 68:2 117:11 174:21, 23

**provided** 14:11 38:15,18 40:12 51:1 97:23 192:19

**province** 174:21

**provision** 37:6

**provisions** 37:8

**proximate** 138:9

**proximity** 137:6,10, 17 138:6,11

**public** 49:12,16,24 50:7,15 70:14 131:3

**publication** 65:18 130:5 140:6 142:5

**publications** 65:15

**publicly** 164:19

**published** 64:10 65:2,19 124:10 130:6 134:4 139:18 140:9 141:17 142:13 172:22 184:21 185:7, 22

**pull** 86:10

**pulled** 39:25 61:19 72:10

**purchased** 190:8 191:3

**purports** 176:3

**purpose** 44:25 45:18 49:8 52:11 55:6 56:10 90:4 99:3 120:24 146:10 189:19

**purposes** 24:13 31:2 35:4,23 58:7 63:18 80:4 82:11,18 98:14,22,25 99:7 100:14,15,18 113:6 128:9 134:10 154:9 175:24 181:8

**push** 147:17

**put** 92:22 108:2 117:24 141:24 145:2

**putting** 186:20

**Q**

**qualified** 6:2,5,16 14:10,17 119:25

**qualify** 62:24

**qualitative** 75:24

**quality** 93:24

**quantified** 126:20

**quantify** 126:16

**quantifying** 144:19

**quantitative** 59:15 76:12

**quarter** 108:4

**question** 5:3,4,5,10, 12,14 9:7,22 15:21 16:4 23:17 30:9 33:14 34:2 38:25 45:17,20 48:9,22 53:8 55:16 56:19 61:17 67:12 75:2,3,4, 9 77:13 81:1 97:11 100:3 105:2 110:4 144:6 147:13 151:1, 13 163:14 174:7 184:12

**questioning** 24:3 141:20

**questions** 5:1 24:16 34:1,6 47:2,10,12 76:6 191:19,24

**quick** 53:11 175:14

**quickly** 67:8 148:2

**quote** 128:25 131:19 140:15,21 142:23

**quoted** 59:18 127:22

**quoting** 97:8

---

**R**

**raised** 114:18

**Ralston** 4:9 11:10, 11 12:22,25 13:13 22:1,3 31:14,15 46:7, 10,21 48:16,19 52:16 60:17,21 80:10 83:14 95:5,13 102:25 103:7 128:12 154:11 171:14 175:6 177:14 178:7

**Ralston's** 62:3

**Ralstons** 80:16

**Raphine** 115:8

**rarity** 169:10

**rates** 78:9

**ratio** 77:21 92:24,25 93:9,21

**ratios** 93:4

**Ray** 192:10,19

**reach** 55:19

**reaching** 28:8 30:5 186:17

**reaction** 143:24 154:17 156:7 161:1

**reactions** 144:1

**read** 24:25 26:8 27:8 50:11 59:2 83:4 106:22 133:8 159:2 188:11

**reader** 55:7 118:1

**reading** 119:17

**reads** 97:4

**real** 5:24 6:3,8,10,13, 14 7:9,19 8:12,13,21, 24 9:3,4,9,14 10:15 14:7 16:8 17:10 18:23 39:1 47:9 48:12 56:9 60:5 88:11 109:1 110:3,4, 5,7,8,9 113:1 117:3 127:19 129:13 137:25 140:16 151:9 154:18,21 161:8

**realtor** 70:1 114:6,8, 22

**realtors** 69:12,17 113:11

**reason** 5:11 61:11, 18 86:23 108:23 116:24 117:21 118:6 123:19 136:20 146:2 149:22,25 154:14 160:6,17 161:16 167:8 170:13 187:3

**reasonable** 27:14, 17 80:5 81:16 177:5 182:16

**reasons** 33:10,23 120:17


ZAHN
COURT REPORTING
www.zahncourtreporting.com

**rebuttal** 3:17 33:20, 21 34:3,8,14,21,24 176:3 181:22 182:5 188:24

**recall** 14:13,24 15:25 18:11 26:1 32:16 57:4 61:24 62:4 69:8 78:24 102:4 113:11, 19 114:9,21 115:16, 18 116:1 126:12 162:18,23 163:2 172:7 180:25 186:9 188:9,18

**receive** 70:11,22 71:22 75:5

**received** 19:4 20:3 25:8 32:18 68:9 75:10 90:21 151:25 176:1

**receives** 137:1

**recent** 114:11 140:6 149:24 150:1 164:25 183:6 185:9 187:16 188:5,24 189:9 192:2

**recently** 180:24 182:6

**recertification** 37:11

**recess** 53:13 175:16

**recognize** 88:16 143:13

**recognized** 108:17 120:20 140:10 142:12 143:10

**recollection** 61:21 101:23 115:14

**recommended** 41:18

**reconcile** 87:22

**reconciliation** 88:6

**reconfigured** 60:1

**record** 4:8,17 9:11 16:3 58:14 64:20 82:19 101:3 113:15 119:18 131:3 149:7 183:24

**recordations** 60:19

**recorded** 39:20 48:25 49:18 60:15 68:10 171:19

**recording** 57:17

**records** 49:12,16, 18,20,21,24,25 50:4, 7,15 52:10 57:2,9 68:11,15,19 69:17,24 70:14

**reductive** 106:23,24 186:14

**reenacted** 17:15

**refer** 64:3

**reference** 28:20 30:13 32:9 52:2,23 56:25 58:6 59:10 60:6,14 61:12 63:21 64:16,22 68:11,21 75:22 82:12,23 86:24 87:12 88:12,23 90:4 91:17 97:22 99:20 103:4 122:8 126:19 127:24 129:3,20 136:13,18 140:18 141:23,25 158:18 164:21 172:14,18

**referenced** 28:17 30:11,25 31:24 33:1 38:20 39:1 50:14 51:2,14 52:10,14 53:4,5,6 57:14 58:13 61:18 63:25 67:14 68:14 69:24 70:22 71:1,3 75:11 77:5 78:13 88:20 98:5 99:18 100:2 121:25 126:1 127:18 132:7 141:18,19 157:7 166:14 170:21 188:17

**references** 50:2 52:15 58:21 71:1 74:14 78:15 90:17 94:5 103:10 123:7 130:11,12 139:7 188:7

**referencing** 57:12 59:11 60:23 77:24 94:23 113:17 121:25

130:14 131:14,23 136:2 151:7

**referred** 19:7 62:8 64:9 129:25

**referring** 22:1 29:2 49:17 62:13 67:20

**refers** 29:4 51:12

**reflect** 42:22

**reflected** 98:10 120:22

**reflecting** 148:3

**reflective** 117:2

**reflects** 120:3

**regard** 11:20,23 12:13 14:22 19:11 21:1 30:6 31:9 41:17 45:4 50:1 57:20 58:1, 12 69:6,23 71:13,23 72:11 76:13 78:20 99:2 112:11 128:20 148:5 151:16 155:11 160:10,13 163:23 164:15 165:11 168:13 176:4,11 177:13 179:13,24 180:13 183:4 185:9, 24 187:13

**region** 19:25 147:6

**regional** 19:24

**regression** 145:10

**reinstated** 17:21

**relate** 75:5 80:5

**related** 94:19,22 95:3 100:14 101:14 148:9 168:9

**relates** 37:6 81:2

**relating** 13:13 99:14 128:11 166:22 179:14

**relations** 62:5

**relative** 50:6 146:6 155:13

**releases** 139:10

**relevance** 152:5

**relevant** 24:3 42:22 64:11 81:11 132:5 144:17 170:25

**reliance** 66:11 86:24 134:9 184:20 186:7

**relied** 35:14 49:12, 24 50:7,16 51:23 66:19,23 86:1 132:23 133:1 134:9 148:4 150:4 165:3,5,25 185:10 186:11,21

**relies** 186:17,23

**rely** 30:10 52:2,9 55:9,10 66:9,15 70:22 77:19 92:10,20 133:16 134:6,25 142:1,2 179:1 184:22

**relying** 52:21 57:24 58:5,8,11 83:3,8 99:2 135:13 140:9

**remaining** 147:19

**remains** 46:3

**remember** 21:3 32:7 164:5,11

**remote** 50:3 68:8

**renewal** 17:23

**renewed** 17:24 18:4

**renovation** 47:12

**repeat** 99:16 103:1 150:25

**repeats** 107:3

**replacement** 121:11,15,16,21 122:10,13,15,16 123:3 124:1,12 127:1

**replica** 121:19

**report** 3:14,16,17,18 20:24 24:20 26:6 27:5,13 28:10,11,14, 17,21,22 29:5,7,12, 15,17,19,21 30:1,8, 17,20 31:5,9,13,17 32:3 33:6,7,13,18,21 34:3,8,13,14,20,21, 23,24 35:20 36:16, 20,21 37:12,18,19,24


ZAHN
COURT REPORTING
www.zahncourtreporting.com

38:13,20 40:17 41:1, 19 42:1 44:16 45:5, 10 50:8,14,16,20 51:21 53:4,6,18 54:4 57:22 62:7,18,19,22, 23,25 63:2,7,11 64:2, 6,17,19,21 65:11,12 67:2,14 69:7,23 71:2, 4 72:12 73:15 74:16 75:13,20 84:23 86:18,20 87:16 88:15,20 89:5,15 90:18,21 96:6,21,22 97:20 102:21 104:25 106:9 107:10 111:17, 21,22 112:6,18 113:21 116:14,25 117:7,14,15,16 118:7,9,12,13,23,25 119:1,14 121:24 122:21 124:24 126:18 127:10 128:11,15,19,20 129:20 141:18 145:16 147:12 149:13,24 153:3 156:22 157:5 165:4 166:17 167:4 169:13 170:21 171:6,22 172:12 173:20 174:8 176:3,17 177:5,13, 15,22 178:7,13,17 179:19,24 181:12,21, 22 182:5,15 183:7,15 184:5 186:4 187:8 188:15,22,25 189:15, 24 192:17

**reported** 130:19 131:13,22 184:17 189:25 191:9,11

**reporting** 63:3 192:23

**reports** 14:16 15:7, 16 24:21,22,23 29:4, 5,8,22 30:3 31:10,24 36:15,16,18,19 37:7, 20 40:6,13 46:3 75:21,22 104:15 133:25 150:6 176:10 177:19,23 178:2 180:22 183:3 187:1, 9,13 188:2 189:9,10, 25 191:9

**represent** 4:9 21:20 22:6,21 23:11 25:8 56:24 128:10 175:25

**representation** 22:18

**representations** 189:8,23

**representative** 65:21

**represented** 23:10

**representing** 12:19 23:13,19

**represents** 44:13

**reproduction** 121:15,19 122:5,8

**republished** 65:14 66:5

**request** 74:6

**requested** 178:25

**require** 18:2 87:14

**required** 20:12,23 25:15 174:9 192:22

**requirement** 17:20 86:25 87:4 117:13

**requirements** 29:16 55:20 163:13 192:23

**requires** 144:7

**resale** 151:24

**rescinded** 139:25

**research** 61:7 142:15,21 150:10

**researched** 145:17 167:24

**residential** 78:15 86:12 121:7 122:1 123:2,8,13,21 124:20 153:7 156:16

**residue** 110:19 111:6 136:20,22,25

**resigned** 21:15

**resources** 39:7

**respect** 131:18

**respects** 59:14 77:11

**response** 48:21 65:7 183:2

**responsibilities** 21:12

**responsibility** 38:14

**rest** 12:24

**restate** 84:7 85:18

**restoration** 98:6,14, 23 99:3,7 100:18,19, 21,24,25 101:3

**result** 37:16 136:5 160:1 191:7

**resulted** 80:18

**resulting** 136:19 145:10

**results** 36:25 37:15 142:12,13 169:2 170:16,17 177:9 178:14 182:20

**retained** 104:5,16 105:5,8

**retaining** 175:7

**retains** 105:18

**retrospective** 41:5, 22 42:14

**revealed** 142:15

**revenue** 10:4 89:12 143:2

**review** 6:6,14 8:14 15:15 23:2,5 24:15 30:6,25 33:19 57:20 65:22 75:4 76:9 121:21 176:9,10,14 177:2,8,12 178:6,18, 19,25 179:1,4,7,11, 25 180:11,13 182:6, 13,18,24 183:2,7 184:11 187:5,17,23 188:6,25 191:8 192:2

**reviewed** 15:7 20:2 28:9 30:10,15,18 56:22 60:25 64:9 65:10,20 73:6,21

132:19

**reviewer** 65:24

**reviewing** 179:2 183:7

**reviews** 66:6 179:8 191:9

**revised** 32:4,14

**revisit** 157:3

**revolve** 184:5

**rid** 91:2

**right-of-way** 73:6, 18,22 74:4,11,15,19 75:5,10

**rights** 35:25 36:4,6 82:3 94:12 95:14,18 97:6,9,17 98:10 102:20,22 103:2,5 104:4,15 105:4,7,8, 12,16 109:24 129:23 131:17 164:17 175:5, 6

**rings** 131:4

**rise** 87:8,20

**rises** 20:21 93:18 169:6

**road** 8:17 102:5 113:24 152:9 172:4 184:16 187:19

**robust** 18:2 46:17 187:2

**Rockbridge** 70:15 114:10 115:5,15

**rods** 59:16

**roles** 20:12

**rounded** 126:4 127:7

**route** 47:25 48:4 49:1,2 71:17 72:3,14 74:1 145:17 147:2

**routine** 33:3

**rule** 20:22 29:8,15 35:23 87:2,3 108:18 109:3,4,5,8 136:4 174:19 176:25



182:10

**ruled** 16:6

**rules** 4:23 27:5 33:5
62:9 117:10

**running** 191:22

**runs** 163:6

**rural** 120:17,20

---

**S**

**sac** 152:13

**safe** 98:8

**sale** 70:2 112:18
113:16,23,25 114:11,
15,19 115:4,17 116:3
120:3 146:24,25
148:17,21,23 149:1,4
150:21 151:3,7
152:16,19 155:25
159:14,15 160:7,9,13
161:10 162:7 167:7,
21,22 172:3,8 179:14
180:6,14 184:7,13,14
187:19 189:18 190:2

**sales** 9:12 69:17
77:1,4,15,18,22,24
85:1 92:23 93:22
111:17 112:7,12
116:8,9 121:3
132:19,25 133:5,12
138:18,24 144:11,12,
15,23,25 145:3,5,19,
22 146:3,21,23 147:1
148:4,13,14,23
153:23 161:10
163:22 165:23
166:25 169:21
170:11 171:9 173:11
179:14 180:9 192:9

**salesman's** 9:15
16:18

**satellite** 8:18

**satisfaction** 57:23

**satisfied** 57:10 61:6

**save** 25:1,19 152:23

**savings** 7:25

**scarce** 154:22

**scenario** 146:1

**scenarios** 107:1

**school** 7:12,14

**scope** 44:16 49:11
62:7 67:2 87:2 113:5
114:2 136:4 177:4
178:25 182:15

**screened** 18:18
19:10

**screening** 19:23
20:2

**seal** 173:23 174:1

**searched** 132:18
144:23

**seasoned** 147:8

**secondary** 102:10,
17

**secretarial** 87:19

**section** 38:1 44:16
88:9 89:7 104:4
105:3 106:9,14 114:2
118:15 127:14
141:13 166:17
176:23 182:11

**sections** 106:12,17
165:17

**seeking** 116:5

**seeks** 20:16

**segment** 148:7

**segments** 137:11,
21

**segregate** 180:17

**self-contained** 33:6

**self-evident** 47:20

**sell** 93:4

**seller** 42:16 119:20

**sells** 92:24

**sense** 5:14 108:8

**sensitivity** 74:7

**sentence** 27:12
70:25 71:6 72:4,21

77:8 88:11 91:16
100:1 104:21 120:1
137:6 144:16

**sentences** 120:6

**separate** 8:21 22:12
118:6

**separated** 28:1

**separation** 28:15

**September** 128:12

**septic** 126:24

**series** 4:25 116:12

**serve** 146:10

**served** 47:14 65:22

**service** 69:12,19,23
78:16 121:9 123:10

**services** 67:17

**serving** 14:18

**set** 32:22 36:6 38:19
62:9 89:8 97:19
100:15 102:20 153:2
177:4 182:15

**settle** 44:9

**settled** 44:2,4

**settlement** 151:25

**severance** 109:10

**severe** 147:1

**shaking** 5:8

**shape** 55:9 71:14
72:1

**shapefiles** 48:13
51:2 54:21

**sheds** 47:16,20
125:8

**sheet** 189:1

**Sherwood** 65:7,25
130:4 133:21 134:11

**short** 78:9

**shorter** 82:20

**shortly** 7:18 19:6
32:10

**show** 52:5,7 128:8
155:12,13 161:5
170:11 181:7

**showed** 153:18

**shown** 54:18,19

**shows** 54:21,22
112:6

**side** 115:8 163:20

**sidelines** 7:24

**sides** 47:21 143:14

**sign** 12:11 86:20

**signature** 26:24
118:13 182:2

**signed** 24:23 90:18
192:17

**significance** 91:4

**significant** 87:17
192:18

**significantly** 177:9
178:14 182:19

**signs** 103:22

**similar** 27:6 66:17
70:18 121:22 132:19,
21 133:1,2,6 135:5,8,
18,25 142:13 144:24
160:22 164:15
170:20 185:13,17

**simple** 174:12,16

**simplistic** 180:5

**simply** 118:8 157:22

**single** 136:11 155:7

**single-family** 153:6

**sir** 12:23 14:4 28:25
59:21 90:7 98:4
154:7 159:13 177:1

**site** 123:21,23
125:20 126:5,16,22
127:2

**sits** 58:10

**sitting** 57:5 102:3,4

**size** 55:9 73:25 74:2,
3 153:1 158:18



**skewed** 170:15

**slightly** 135:20

**small** 47:20

**SMJB** 15:1

**soils** 72:8

**sold** 59:12 150:23 151:24 158:13 161:11 162:13

**sole** 6:24

**solely** 171:2

**solution** 39:3

**son** 86:8

**sort** 9:14 26:12 27:11 40:19 70:7 76:8 80:25 84:12 94:25 106:15 109:10 118:8 125:11 135:24 138:15 141:8 147:6 152:3 185:12 190:20

**sought** 132:12

**sounds** 110:4

**source** 58:15 68:1,9, 21 69:15 70:12 72:5 77:25 78:20,21 89:11 123:8 124:5 129:9

**sources** 67:5,10,13, 19 71:1,12 72:20 77:3,14 78:12 112:15 113:4 129:21 130:17 131:12

**south** 8:19 47:22

**space** 137:14 159:4 169:16

**speak** 80:22

**speaking** 44:11

**speaks** 44:1

**special** 120:24 136:21 137:1

**specialized** 64:11 132:20 140:22

**specialty** 6:7,10 8:3

**specific** 32:17 38:9 41:13 50:1 55:11

56:10 59:17 64:3,21 67:3 69:22 71:16 78:4 80:25 87:7 88:23 99:4,14,20 100:3 115:20 124:23 135:13 140:21 167:9 178:19 186:3 192:14, 20

**specifically** 42:1 61:2,19 67:13 69:6 74:8 75:6 86:24 104:9 109:1 125:2 132:11 136:4 185:6 186:9

**specification** 121:21

**specifics** 115:19

**spent** 13:12

**spoke** 79:10

**Springs** 115:8

**square-foot** 152:21

**SRA** 57:9

**St** 8:19

**stable** 75:25

**staked** 47:25

**stamp** 24:24 25:5,21 56:7 91:4 182:4 183:12

**stamped** 91:6,12,17

**stamps** 181:24

**stand** 29:20

**standard** 29:9 87:3

**standards** 30:2 37:3 62:9,10 63:3,5,8

**standpoint** 56:14

**start** 22:3 85:11 147:13

**started** 9:23

**starts** 28:1,14 81:20, 24 88:12

**state** 4:16 21:5,10 93:15 109:3 136:8

**stated** 120:17

178:10

**statement** 33:9 41:5,15 92:13 95:7 107:13

**statements** 33:22

**states** 38:14 82:12 182:12

**stations** 95:8

**statistical** 145:9 154:16

**statistics** 145:11 170:10

**status** 80:9

**stayed** 139:25

**staying** 24:23

**stems** 94:24

**steps** 115:18

**Steve** 4:8

**stockbroker** 8:1 154:19

**stop** 49:5,7

**straight** 13:8,9 88:6

**straightened** 183:19

**stream** 10:4

**street** 8:19 47:21 72:7 153:10

**strike** 16:12

**strong** 144:18

**structure** 105:19,23 121:20

**studied** 139:9

**studies** 65:2 147:7 168:3 169:1 170:18, 23 184:21 185:7,21 186:8,11,16,17

**study** 130:6 134:3 141:23 142:5,10,12 145:3 153:6 155:12 156:24 157:4,6 159:11 165:23 166:2, 3,4,13,23 167:7 168:16 169:21

170:16,17 171:1 172:15,19 185:1,12, 13

**stuff** 9:13

**style** 191:16

**Stylistic** 118:10

**subdivision** 152:20

**subject** 21:18,22 39:2,12,13 44:18 49:13 51:11 67:3,4 71:8,13,24 72:11,22 73:7 74:16,21,23,24, 25 75:7,14,15 76:15 77:20 78:7 79:7 85:3 86:5 87:24 88:2,19 89:2,9,24 92:7,16 94:6 95:20 104:4,15 106:20,24 107:6,17, 22 109:20 110:13,19 111:5,15,24 112:8 120:3,12 121:3 122:24 127:4 132:17 136:19,22 137:1,19 138:5,25 174:13 177:2 182:13

**subjectively** 161:1

**submit** 19:21 20:23 25:2,15 33:6

**submitted** 19:9 20:1,24 21:7 25:4

**submitting** 35:4

**subparagraph** 130:11 131:15,18,23

**subparts** 104:11 105:6

**subscriber** 68:25

**subsequent** 41:12 42:11,13,21 45:11,14 57:17 167:22

**subsequently** 21:15 44:3

**Subset** 6:12

**subsidiary** 163:17

**substance** 15:11 19:16 26:5 46:24 188:21


ZAHN
COURT REPORTING
www.zahncourtreporting.com

William Harvey - January 29, 2020                    223

**substantive** 179:23

**substantively** 90:23

**substitute** 66:14,21 146:8

**substituted** 114:15

**Suffolk** 89:16,19 179:15 184:7 187:20 189:4

**suggest** 25:10

**suit** 80:16

**sum** 10:3

**summarize** 35:1 109:7 186:6

**summarized** 75:21

**summarizes** 166:22

**summary** 81:13 108:1 122:23 126:21

**summation** 83:21 85:8 125:12 154:15 186:19

**supervisors** 21:21 22:7,19,22 23:5,14, 19

**supplement** 31:21 32:3,6,14 33:8 34:8, 13,20,24 36:12 37:7, 9,11,18 41:1 45:23 114:12 182:7 187:11 189:17

**supplemental** 45:10 62:18 63:5 129:20 180:21 181:22 188:6 189:9, 10

**supplemented** 28:10 30:7,17,19 183:1

**supplements** 176:14

**supply** 75:14

**support** 35:1 187:2

**supporters** 143:12 144:2

**supporting** 66:18

120:19 185:3

**Supreme** 43:8

**surprised** 4:16

**surrounding** 180:14

**survey** 55:24 56:2,4, 6,8,16 57:19 75:14, 20,23 76:4,8,12

**surveying** 80:19

**surveyor** 55:17 74:12

**surveyor's** 56:7,17

**surveys** 55:15,19 56:10,12,14,22 57:3 59:12 70:7

**suspended** 17:14

**Swift** 78:15,17 121:7 122:1,14 123:2,8,13

**sworn** 4:3

**Sylvia** 59:22

**synonymous** 51:18 54:23 145:25 158:25 159:3 178:24

**synonymously** 29:19

**system** 68:8 69:18 71:7

---

**T**

**table** 28:23

**tables** 124:20

**takes** 10:15 77:11

**taking** 35:24 36:23 71:25 74:9,12 81:17 94:5 105:21 107:6 109:21 110:14,19 111:6,16,24 119:20 120:13 121:4 122:25 127:5 136:19,20,23 154:8

**takings** 174:25

**Talbot** 8:19

**talk** 46:22 56:22 76:5 83:22 105:6 111:14

116:2 137:24 144:1

**talked** 16:17 34:14, 24 37:1,2 40:25 68:12 94:11 98:7 103:9 111:20 112:10 113:5 115:5,21 120:11 121:1 142:4 151:2 172:15,21 173:11,22 176:8 185:8 187:16,18 189:6,11 192:21

**talking** 5:6 52:13 74:2 76:4,8 77:8 101:7,16 114:19,21 115:4 130:1 134:14 156:18 162:1 164:14, 16 183:14 184:13 185:11 189:20

**talks** 83:8 87:19 98:7 100:5 136:3

**tangible** 110:8

**target** 140:5

**taste** 117:2

**tax** 22:25 23:4,11 51:9,14,16 95:17 143:2

**Taxation** 93:18

**taxes** 92:6 124:9,10

**Taylor** 16:1

**teach** 18:3

**team** 9:12

**technique** 140:10

**techniques** 65:21 140:23

**telephone** 15:9 32:17

**temporary** 79:6,17, 20 83:9,19,22,25 84:4,9,14 94:7 99:6 102:22,24 103:6,11 105:18,23 111:4,7 158:19,20,24 159:7,8 162:19 175:1

**ten** 63:15

**term** 19:24 65:17 74:15 76:4,23 78:9

82:2 88:2,15,16,22 89:1 102:13 109:21 178:19

**terminologies** 123:14

**terminology** 81:8, 10 185:19 186:15

**terms** 54:23 55:1 56:8 120:3,4,8,9

**testified** 4:3 14:6,18, 21 23:15,18 66:24 81:3 86:14 112:16 154:19 164:10 171:1

**testify** 4:13 5:20 6:1 27:13 33:24 80:25

**testifying** 122:9 164:9 188:20

**testimony** 4:15 14:11,19 27:20 35:6 60:20 65:9 81:19 84:6,10 98:11,21 100:11,21 125:15 144:22 188:16

**Texas** 141:24 185:1

**text** 26:19,21 27:1 127:17,22,25 141:13 144:15

**textbook** 127:19

**textbooks** 63:21

**texts** 63:24 64:3 120:20

**theory** 168:21

**thereabouts** 125:6

**thereof** 168:18

**thing** 47:1 123:9 164:18 168:6 190:5

**things** 8:14 66:7 68:3 70:7 97:12 102:8 105:9 143:15 166:11 192:1

**thinking** 9:20 10:11, 18 37:17 41:14 42:1 102:19 103:2 150:21

**thirds** 132:14

ZAHN
COURT REPORTING
www.zahncourtreporting.com



William Harvey - January 29, 2020                                                224

**Thomas** 65:2 134:6, 8

**thought** 99:23 112:24 114:13 126:4 132:5 146:22 164:9 171:25

**thousand** 154:20

**time** 10:25 13:7,17, 20 15:25 16:13 20:13 22:16,19 32:5 33:3 41:12 42:3 47:1 48:12 49:8 53:10 60:1 62:15 69:3 81:15 84:3,8,15,16 91:2 103:19 110:23 119:20 132:9 139:4 146:13 151:9 152:23 169:11 177:20 180:12 187:10 188:14 189:14,16 191:22

**timeline** 140:2

**times** 14:2,9 23:22 25:18 36:9 45:16 48:24,25 49:4 51:18 57:2 60:7 70:2 113:13 115:3 117:5

**timing** 147:14

**title** 31:19 38:16 52:24 57:20 110:10, 11

**titled** 10:1 44:16 117:7 140:22 182:12

**today** 4:10 14:22 16:25 21:18 27:3 57:5 61:9 80:11 81:5 122:9 139:4 191:13

**today's** 15:5

**told** 32:22

**tool** 69:18 73:4

**top** 26:18 38:1,21 39:9,18 40:19 41:4 42:12 51:3 53:21 59:9,20 63:20 64:8 84:25 85:25 86:1 89:22 92:5 103:10 104:2 108:12 113:19 119:24 123:4 136:7,8 144:14 145:15 172:6,

10,19 176:23 182:11 192:16

**topic** 106:11 132:21

**topics** 64:11

**topography** 72:7

**total** 88:4 92:15 124:12 125:11 127:4

**touched** 171:24

**touches** 157:24

**trace** 129:8,12

**tracing** 126:11

**tract** 56:23 57:20 95:5

**traction** 114:3

**tracts** 39:11,17 59:10

**trade** 172:25

**trademarked** 166:4, 5

**traditional** 144:8

**trainee** 86:9

**transaction** 56:25 57:14 113:9 143:14 147:8 184:16

**transactional** 50:2, 6 69:16 70:5 78:2 151:23 152:1 161:2

**transactions** 43:20 61:25 138:19 167:13

**Transcanada** 131:11 163:6

**Transco** 131:10 163:12

**transcript** 188:11,18

**transfers** 89:23

**transit** 131:10

**transmission** 137:7,18 138:6 141:10 146:9 154:11 158:13 159:19,22,23 160:8,14,18,22,24 161:11,12,20 162:13 167:1,2 168:1,14,24

169:4 170:19,24 171:2,3 184:25 185:1

**transmissions** 148:10

**transmittal** 27:5,6 28:3 32:17 181:16

**transmitted** 32:10 36:7 67:17

**transmitting** 25:19

**transport** 96:10 100:8

**transportation** 100:22

**transporting** 101:9

**transports** 100:20

**travel** 102:23 103:7

**travels** 45:19

**treatise** 127:18 173:8

**treatises** 63:21,24 64:3,10,14 65:7,10 66:9,12,23 130:1,2, 13 185:7,10

**tree** 47:24

**trees** 80:23

**trends** 42:15 75:15, 25

**trespass** 80:17,18

**trial** 4:13 5:22 33:11, 12,24 104:1

**trigger** 87:12

**triggered** 62:3

**true** 18:1 157:8 191:12

**trust** 4:10 31:15 50:5 60:18 61:21,23,24 178:7

**trustees** 4:9 31:15 175:7

**turn** 28:23 31:4 37:23 40:16 50:19 53:16,20 54:3 78:14 82:23 84:22 107:9,25

112:2 116:11 118:11 119:7 121:23 128:23 132:13 147:11 157:10,18 173:19 176:16

**turning** 108:11

**Tweed** 149:5 159:13

**two-thirds** 107:12

**twofold** 154:10

**type** 33:3 42:9 47:1 59:15 66:11 70:6 72:17 74:7 76:6,24 87:12 135:25 160:8 161:19 162:2,4 166:6 174:22 178:19

**types** 150:6 161:13

**typical** 27:4 47:4 150:9 155:15

**typically** 57:18,21 74:5 114:2 172:1

**typo** 89:17 90:11,12 91:7

**typos** 174:4

**Tysons** 7:25 8:3

---

**U**

**U.S.** 14:20

**UGTL** 137:7,10 138:11 144:5 173:6

**UGTLS** 147:7

**uh-uh** 5:8

**uhm-hmm** 5:8 75:19 104:7,12 116:15 125:24 128:14 158:5 163:10 173:2

**ultimately** 47:23 86:17 107:4 126:25 144:6,10 151:18 155:2 163:8 165:1

**umbrella** 70:20

**unable** 133:5

**unaware** 190:7

**unbilled** 13:17,19



ZAHN
COURT REPORTING
www.zahncourtreporting.com

**Uncannily** 10:24

**uncertain** 84:16

**underground** 94:18 95:12 135:7 137:7,18 138:6 141:6,9 146:8 148:15 154:11 158:13 161:14 162:23 171:3 185:1 190:19

**underlying** 5:1 32:4 70:4 184:24

**underneath** 26:17 27:10 92:13 122:3

**understand** 4:14 5:10,16 21:13 28:13 30:9 31:11 35:5 37:20 45:20 48:4 55:16 56:3 57:24 65:16 67:9 75:3 77:13 80:8 81:15 88:21 90:22 91:5 94:21 95:15 101:5 103:4 104:13 105:1 122:12 123:25 124:11 135:3,10 141:14 143:18 155:24 156:5 168:5 181:18 183:22 189:21 192:25

**understanding** 83:16 84:11 91:25 95:10 101:13 105:11 117:9 139:18 150:1

**understood** 122:7 135:11

**undertake** 141:14 173:16

**undertook** 60:24

**Uniform** 37:3 62:10 63:8

**unique** 104:24

**Unit** 8:19

**universe** 141:11

**University** 7:16

**unlike** 161:25

**unlock** 25:1

**unreliable** 15:19

**update** 32:23 37:10 45:23

**updated** 32:23 37:12 45:23 177:21 182:23 183:1,3

**upper** 133:20

**user** 41:23 58:7

**users** 25:16 41:18 51:25 88:21

**USPAP** 17:8 18:4 29:9,13,17 30:2 37:2, 3,6,8 41:16 62:14,16, 20,22,25 63:16 87:14,17,18 119:25 174:9 178:20 192:22

**USPAP-COMPLIANT** 30:3

**utility** 121:22 130:20,24 162:2

**utilize** 145:8

**utilized** 188:4

**utilizing** 144:11 145:9

---

**V**

**vacant** 106:21,25

**vacated** 150:2 165:2,6

**valid** 31:2 65:21

**validity** 145:11

**Valley** 113:24 135:6, 16 164:5,8 165:11,24 172:4

**valorem** 22:25

**valuation** 41:21 42:25 43:13 64:15 65:6 66:1 78:16 84:13 85:9 107:24 109:1 117:18 121:8 122:14,24 123:10 127:14,19 130:5 133:18,21 136:15 138:3 141:20 174:23

**valuations** 165:17, 18 174:23

**valued** 83:22,25 85:6 100:12 109:20, 24 110:18 126:14 134:15 140:10

**values** 75:25 92:6,10 108:20 140:24 142:18,22

**valuing** 84:14 86:4 120:12 126:5 135:1

**valve** 94:24

**valves** 95:9

**vamanet** 70:16,18, 23 115:15

**vamanet.com** 70:9, 13

**Vanfossen** 11:8 12:22 13:13 22:1,4

**variability** 156:2

**variable** 10:2 93:11, 21 162:21,24

**variables** 154:1

**variation** 93:17

**vehicles** 96:10 100:8,22 101:9

**venues** 14:15,17

**verbatim** 97:8

**verification** 77:11 87:13 112:25 113:6 140:12 173:5 189:18

**verified** 76:25 112:13,14,25 113:8 114:20 115:12

**verify** 77:11,23 112:19 113:25 114:3 115:17,21 116:5 141:15,22 142:2,9

**verifying** 86:4 116:2

**versa** 167:18

**version** 18:4 91:6, 13,14,18

**versions** 73:21

**valuations** 165:17, 18 174:23

**versus** 16:1 44:9 60:17 63:16 88:8 93:22 108:3 125:8 161:11,19,20 167:5, 10 180:23

**vested** 81:24 82:1

**vice** 167:18

**view** 169:14

**viewed** 136:11

**Virginia** 8:18 12:1,5 15:3 16:21,22,23 17:11,24 18:22,24 21:1,24 22:17 24:6 43:7,8 55:20 56:20 86:9,13 112:19 115:8 139:16 146:18 163:7, 18 166:19 172:5 179:16

**virtually** 38:10

**virtue** 126:11

**vis-à-vis** 36:23

**visible** 52:1

**visit** 45:11,15 48:1

**voltage** 159:19,23 160:14,18,23 161:10 167:2,5 169:4 170:19,23 171:2 184:25

---

**W**

**walk** 7:11 46:11

**walk-through** 44:21

**walked** 46:12,15,16 47:21

**Walker** 8:17

**wanted** 85:24 89:18 114:16

**warranted** 77:22

**wash** 170:4

**Washington** 21:5

**ways** 74:23

**WBX** 157:9 166:18 168:17



ZAHN
COURT REPORTING
www.zahncourtreporting.com

**website** 49:20 51:22 67:23 68:2,6,24,25 70:19 123:15 142:23

**websites** 143:4

**weed** 168:9

**week** 32:13

**Wesley** 7:15,17

**West** 12:5 16:22

**wetlands** 179:20 191:6

**White** 16:1

**Wholesalesman** 16:23

**wide** 142:15

**width** 162:16,19

**wife** 6:25 9:11

**Wilburn** 11:13,14 12:16

**Wilder** 17:13

**William** 3:2,7,14 4:18 6:19 8:5,6,11 9:1,2 48:18 86:2,3

**wind** 52:6 69:1

**won** 178:1

**wondering** 30:18 60:13 81:4 169:19

**Woods** 25:9 135:15 164:10 165:11 166:14

**word** 37:9 40:10 87:17 112:21 186:2

**words** 43:19 92:24 95:1 105:11 114:15 151:9

**work** 8:4 10:3,10,11 11:6,15 12:15,20 13:12 16:9 19:9 20:1, 17,19 21:5,16,24 22:14,15,24 25:23 32:6 43:20 44:17 49:11 50:9,13 56:21 57:7 62:7,16 66:21 67:2 87:2,20 113:5 114:2 115:24 119:9

136:4 164:15 166:12 177:4,7,12 178:24,25 181:17 182:15,18 187:11

**worked** 7:25 12:17, 18

**working** 32:19

**works** 20:8

**world** 47:9 72:7

**worried** 183:19

**worth** 175:3

**wound** 190:23

**write** 26:21 104:24

**write-up** 171:9

**write-up--** 149:14

**write-ups** 149:14,19 152:24

**written** 29:17 40:8 104:10,17 105:20 106:1

**wrong** 129:10,17 166:6

**wrote** 26:23 178:1

---

**Y**

---

**year** 73:18 80:4 182:7 188:7,9 192:3

**years** 7:10 8:1,2,25 9:20,23 10:5,13,23 17:14 20:23 40:10 44:12 63:15,16 65:23 79:7,17,20,21 80:2 81:11,20,24 83:10,19 89:24 103:12

**Yellow** 63:9,12,14, 17

**York** 163:12

**yup** 192:20

---

**Z**

---

**zoned** 47:4

**zoning** 68:4


ZAHN
COURT REPORTING
www.zahncourtreporting.com