**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Harrisonburg Division**

| | |
|---|---|
| ATLANTIC COAST PIPELINE, LLC, | |
| *Plaintiff*, | |
| v. | Case No. 5:18-cv-00060-NKM-JCH |
| 11.18 ACRES, MORE OR LESS, IN AUGUSTA COUNTY, VIRGINIA, *et al.*, | |
| *Defendants*. | |

## PLAINTIFF'S BRIEF IN SUPPORT OF ITS MOTION
## TO EXCLUDE/LIMIT THE OPINIONS AND TESTIMONY OF DENNIS GRUELLE

Plaintiff Atlantic Coast Pipeline, LLC ("Atlantic") files this brief in support of its Motion to Exclude/Limit the Opinions and Testimony of Dennis Gruelle. Dennis Gruelle ("Gruelle") is the Defendant landowners' ("Landowners") expert appraiser.

### INTRODUCTION

In an eminent domain proceeding, a landowner is entitled to just compensation, which could include severance damages.[1] The law prescribes limits on what may be considered in calculating severance damages. Gruelle's methodology exceeds those limits.

For severance damages, Gruelle considered irrelevant and speculative concerns, such as soil compaction caused by construction, additional easements in the future from third-party utility companies, and government mortgage issues. Gruelle does not provide facts or data to show that these generalized concerns impact market value. Indeed, Gruelle fails to establish a nexus between

---

[1] Severance damages is defined as "the difference in market value of the residue before and after taking." *Columbia Gas Transmission, LLC v. 76 Acres*, 701 F. App'x 221, 228 (4th Cir. 2017).

the market concerns and perceptions identified in his analysis on severance damages and the marketplace for the subject parcels. To make matters worse, Gruelle "double dips" by damaging the area of the permanent easement twice—a practice that has been deemed wrong and unreliable by other federal courts.

Gruelle's flawed methodology results in a tainted, and thus unreliable, opinion on severance damages. As such, the Court should exclude Gruelle's opinion that the subject parcels will incur a 40% loss in market value, his calculation of severance damages, and any testimony about the alleged market concerns and perceptions addressed herein.

## RELEVANT BACKGROUND

Atlantic seeks to condemn a pipeline easement across two parcels owned by Landowners in Augusta County, Virginia. These two parcels are identified in the county tax records as PIN 40-11 and 40-13. ECF No. 40, ¶ 5. Pursuant to the larger parcel doctrine,[2] the parties' appraisers have considered the easement's impact, if any, on four additional parcels. These additional parcels are identified as PIN 40-10B, 40-10C, 40-21, and 40-24. *See* Gruelle's Expert Disclosure dated December 4, 2019 at 11 (attached hereto as **Exhibit 1**).[3]

Combined, the six parcels ("Ralston Parcels") total 408.60 acres. *Id.* Of the 408.60 acres, Atlantic seeks a total of 4.13 acres for a permanent easement and 7.05 acres for a temporary five-year easement. ECF No. 41 at 3. The easements will be located on PIN 40-11 and 40-13 only. A public highway known as "Deerfield Valley Road" bisects the two encumbered parcels from the

---

[2] The larger parcel doctrine allows the factfinder to consider severance damages, if any, for other parcels not physically affected by the taking, so long as these parcels share unity of ownership, unity of use, and physical unity with the parcels subject to the taking. *Atl. Coast Pipeline, LLC v. 0.07 Acre*, 396 F. Supp. 3d 628, 647 (W.D. Va. 2019).

[3] Any pin cites to **Exhibit 1** refer to the page number at the top-left corner of the exhibit, as opposed to the page numbers at the bottom.

four unencumbered parcels.  **Ex. 2** (aerial of the Ralston Parcels with PIN labels).  Even though the public highway acts as a natural barrier between the easement and four of the parcels, Gruelle damages the residue of all six parcels equally by 40%.  **Ex. 1** at 36, 38.

On October 15, 2018, Landowners issued Gruelle's first expert disclosure based on the First Amended Complaint.[4]  In his first disclosure, Gruelle opined that "the remaining portion property is negatively impacted by a loss in marketability and value of 35%."  *See* Gruelle's Expert Disclosure dated October 15, 2018 at 28 (cited portions attached as **Exhibit 3**).  After Atlantic filed its Second Amended Complaint,[5] Landowners issued Gruelle's second expert disclosure on August 30, 2019.  In his second disclosure, Gruelle changed the 35% value to 40%, without any explanation for the increase.  *See* Gruelle's Expert Disclosure dated August 30, 2019 at 28 (cited portions attached as **Exhibit 4**).  After Atlantic filed its Third Amended Complaint,[6] Landowners served Gruelle's third expert disclosure (the "Report") on December 4, 2019.  **Ex. 1.**

The Report contains a two-page analysis and one-page calculation on severance damages. *Id.* at 35-36, 38.  In analyzing severance damages, Gruelle cites to numerous "[m]arket perceptions and issues related to natural gas pipelines."  *Id.* at 35.  Gruelle claims he learned about the market perceptions "from talking to property owners and brokers, people involved with the pipelines in some related fashion."  *See* Gruelle Dep. at 58:7-14 (attached as **Exhibit 5**).  Gruelle, however, does not identify the property owners with whom he spoke.  Gruelle does identify the brokers by

---

[4] Atlantic filed its First Amended Complaint to reflect the change in ownership of the subject parcels.  ECF No. 6.
[5] Atlantic filed its Second Amended Complaint to provide new plats that reflect updated boundary lines for the subject parcels.  ECF No. 31 at 2.
[6] Atlantic filed its Third Amended Complaint to remove its request for an access road easement due to a partial settlement.  ECF No. 41 at 2.

name, but provides no other information to determine whether the brokers are tied to the marketplace for the Ralston Parcels. **Ex. 1** at 36.

Gruelle also relies upon the range of severance damages that three other appraisers have applied to other parcels in other counties. *Id.* Collectively, the three other appraisers have a range of 0% to 31% for severance damages. *Id.* Nonetheless, Gruelle opines that the residue of the Ralston Parcels is damaged by 40%, without any explanation for deviating above the cited range. *Id.* Further, Gruelle concedes that the data provided by one of the appraisers applied specifically to above-ground power lines—not underground natural gas pipelines. **Ex. 5** at 95:5-21. Gruelle does not explain how severance damages for above-ground power lines are relevant to severance damages for underground natural gas pipelines. Moreover, Gruelle makes no attempt to compare the properties appraised by the three other appraisers with the Ralston Parcels.

Gruelle also considered three paired sales.[7] **Ex. 1** at 48-53. According to Gruelle, "[o]ther damage comparables were found and considered, but those included best reflect the impact to the [Ralston Parcels]." *Id.* at 36. Gruelle, however, does not explain how the three paired sales "best reflect the impact" to the Ralston Parcels. Indeed, the three paired sales pertain to (i) real property in Suffolk County, which is on the other side of Virginia from Augusta County, (ii) parcels ranging in size from 1.07 acres to 4.99 acres, whereas the Ralston Parcels total 408.60 acres, and (iii) a pipeline easement that covers 18% of a parcel, as opposed to the 1% area[8] of encumbrance here. *Id.* at 49, 51, 53.

_____

[7] "In a paired sales analysis, the appraiser identifies two properties that are as similar as possible except for one factor" in an attempt to determine the difference in value caused by that one factor. *0.07 Acre*, 396 F. Supp. 3d at 648.

[8] 4.13 acres of permanent easement divided by 408.60 acres equals 1.01%. The area of the temporary easement is not included in this calculation as it will expire after five years. Further, partial temporary takings do not result in severance damages. *See 0.07 Acre*, 396 F. Supp. 3d at 644 (noting that just compensation for temporary takings is measured by rental value).

In addition, Gruelle admits that he misclassified a material feature of the impact sale[9] used for all three paired sales. In the Report, Gruelle identifies the impact sale as uplands, instead of wetlands. *Id.* at 49, 51, 53. At deposition, however, Gruelle conceded that the impact sale is majority wetlands, specifically 60%. **Ex. 5** at 76:6-9 ("It's about maybe – probably 40 percent uplands maybe, roughly, and the rest is wetlands.").

The distinction between uplands and wetlands is important for valuation purposes. Wetlands generally limit the amount of developable area on the property. *See* Don M. Emerson, Jr., MAI, SRA, Subdivision Valuation at 12, 28, 88 (Chicago: Appraisal Institute, 2008) (noting detrimental impact of wetlands on development) (relevant portions attached hereto as **Exhibit 6**). Thus, uplands are generally more valuable than wetlands. Even though Gruelle testified that the impact sale should not be characterized as uplands, he made no changes to the paired sales data in the Report. **Ex. 5** at 82:11-21 ("I'm referring to the impact sale where it says uplands and wetlands, and I think it just says uplands when I just explained to you that it had wetlands.").

When asked whether correcting the impact sale from uplands to wetlands would change the percentage difference attributable to the pipeline, Gruelle answered, "I didn't think it was appropriate to make an adjustment, so I wouldn't do that. … ***I didn't even look at that since I didn't consider it relevant to what I was doing***." *Id.* at 88:13-89:4 (emphasis added). But, even Gruelle has admitted that the idea of a paired sales analysis is "to try to isolate that [one] component" that is different in the impact sale versus the non-impact sale. *Id.* at 78:1-6.

---

[9] The impact sale is the parcel encumbered by a pipeline easement. The non-impact sale is the parcel without a pipeline easement. Gruelle uses the same impact sale for all three paired sales. **Ex. 1** at 49, 51, 53.

In addition to the flaws with the paired sales, Gruelle also damaged the area of the permanent easement twice. As shown in the table below, for purposes of calculating severance damages, Gruelle included the area of the permanent easement as part of the residue.

**VALUATION OF REMAINDER AFTER**

| | Acres | | Land | | | | |
|---|---|---|---|---|---|---|---|
| PE | 4.13 | x | $2,275/Acre | x | 5% | = | $470 |
| TCE | 7.05 | x | $2,275/Acre | x | 50% | = | $8,019 |
| | 397.42 | x | $2,275/Acre | | | = | $904,131 |
| | 408.60 | | | | | | $912,620 |
| Contributory Value of Improvements Rd. | | | | | | | $213,305 |

**TOTAL VALUE OF REMAINDER**      **$1,125,925**

**Ex. 1** at 38.

Further, Gruelle damaged both the underlying land and the improvements by 40%. *Id.* Gruelle, however, does not explain how the improvements, as fixtures, have incurred a loss in market value or why the improvements allegedly suffer the same 40% loss as the underlying land.

## STANDARD OF REVIEW

"Federal Rule of Evidence 702 serves as [a] guidepost" for district courts when determining the admissibility of an expert opinion. *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007). Expert testimony is only admissible if (1) the testimony "will help the trier of fact to understand the evidence or to determine a fact in issue," (2) "the testimony is based upon sufficient facts or data," (3) "the testimony is the product of reliable principles and methods," and (4) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

This Court's obligation under *Daubert* is to "act as a gatekeeper and ensure that any [expert] testimony … offered in support of a party's claim is 'not only relevant, but reliable.'" *Mountain Valley Pipeline, LLC v. 1.30 Acres of Land*, Civil Action No. 7:18-cv-00607, 2019 U.S. Dist. LEXIS 155035, at *9 (W.D. Va. Sep. 11, 2019) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). "The proponent of the testimony must establish its admissibility by a preponderance of proof." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001).

"The court's role in limiting expert testimony is important: 'due to the difficulty of evaluating their testimony, expert witnesses have the potential to be both powerful and quite misleading.'" *1.30 Acres of Land*, 2019 U.S. Dist. LEXIS 155035, at *10 (quoting *Cooper*, 259 F.3d at 199). "Indeed, 'given the potential persuasiveness of expert testimony, proffered evidence that has a greater potential to mislead than to enlighten should be excluded.'" *Id.* (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999)).

## ANALYSIS

The Fifth Amendment prohibits the taking of private property without the payment of just compensation to the landowner. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536 (2005). If only a partial portion of the property is taken, the measure of just compensation is the "fair market value of the parcel actually taken plus the severance damages." *Columbia Gas Transmission, LLC v. 76 Acres*, 701 F. App'x 221, 228 (4th Cir. 2017). Severance damages are defined as "the difference in market value of the residue before and after taking." *Id.* In condemnations, the landowner has the burden of proving just compensation. *United States v. 69.1 Acres of Land*, 942 F.2d 290, 292 (4th Cir. 1991) (citing *United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 274 (1943)).

**I.    Gruelle's Opinion on Severance Damages is Unreliable Because It Is Based on Irrelevant and Speculative Concerns That Have No Nexus to Market Value.**

Gruelle's opinion that the residue will suffer a 40% loss in market value is unreliable because he considered multiple irrelevant and speculative concerns that have no causal link to a depreciation in market value.  Because these concerns are not compensable in this lawsuit, Gruelle should not be allowed to present his 40% opinion to the jury.

A.    Any concerns relied upon in calculating severance damages must be reasonably probable and have a causal link to a loss in market value.

To obtain severance damages, the landowner must prove "a causal link between the taking and a direct loss reflected in the marketplace."  *Mountain Valley Pipeline, LLC v. 1.23 Acres of Land Owned by Eagle's Nest Ministries, Inc.*, Civil Action No. 7:18-cv-00610 (W.D. Va.) (7/12/19 Mem. Op. and Order, ECF No. 55 at 13) (herein referred to as "*MVP v. Eagle's Nest*") (citing *United States v. 760.807 Acres of Land*, 731 F.2d 1443, 1448 (9th Cir. 1984)).[10]  In *MVP v. Eagle's Nest*, the court conducted a thorough analysis on the "compensability in eminent domain proceedings of diminution in value of property due to the fears entertained by prospective buyers about the presence of … pipelines."  7:18-cv-00610, ECF No. 55 at 8.  Citing to precedent from

---

[10] The Supreme Court and several appellate courts have required the landowner to prove causation between the taking and severance damages.  *See United States v. Welch*, 217 U.S. 333, 338 (1910) ("Damages to the residue of a tract caused by taking a part are allowable in fixing just compensation."); *76 Acres*, 701 F. App'x at 232 ("[T]he measure of damages caused by a partial taking is the diminution in value of the property."); *AMTRAK v. Certain Temp. Easements Above the R.R. Right of Way in Providence, R.I.*, 357 F.3d 36, 41 (1st Cir. 2004) (allowing "severance damages for any damage … caused by a taking"); *United States v. 38.60 Acres of Land*, 625 F.2d 196, 198-99 (8th Cir. 1980) (permitting "severance damages for the diminution in value of the remainder directly caused by the taking itself and by the use of the land taken"); *United States v. 101.88 Acres of Land, etc.*, 616 F.2d 762, 769 (5th Cir. 1980) ("The measure of damages is the diminution in market value of the remainder caused by the taking or the use to which the land taken is put.").

the United States Supreme Court and the Fourth Circuit, the court held that two things are required to admit an appraiser's opinion about market perceptions. *Id.* at 8-13.

First, "an expert's opinions with regard to some hazard incident to the use of the property taken must be supported by some evidence that the hazards are reasonably probable and more than just speculative." *Mountain Valley Pipeline, LLC v. 1.81 Acres of Land*, Civil Action No. 7:19-cv-00151, 2019 U.S. Dist. LEXIS 141711, at *6 (W.D. Va. Aug. 21, 2019).

Second, "there must be a nexus between those hazards and/or the public perception in the marketplace—specifically, the marketplace for that property—and a diminution in value of the property." *Id.* "In other words, there must be a causal link between the hazard inherent in the taking and a direct loss in the marketplace." *Id.*

The court's two-part test in *MVP v. Eagle's Nest* is supported by Supreme Court precedent. In *Olson v. United States*, the Supreme Court held that "[e]lements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable should be excluded from consideration for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value." 292 U.S. 246, 257 (1934). Indeed, in eminent domain cases, courts are to "assum[e] 'that buyers and sellers of ordinary prudence are knowledgeable and … are ***not motivated by speculation or conjecture***.'" *MVP v. Eagle's Nest*, 7:18-cv-00610, ECF No. 55 at 12 (quoting *United States v. 6.24 Acres of Land*, No. 95-3183, 1996 U.S. App. LEXIS 27761, at *16 (6th Cir. Oct. 22, 1996)) (emphasis added).

B.    <u>Gruelle impermissibly relied upon the uncertainty of damage to springs, wells, drainage, and soil.</u>

As part of his analysis on severance damages, Gruelle considers that "[u]ncertainty is created on the property with the impact to existing springs, wells, drainage and soil compaction."

**Ex. 1** at 35.  This concern, however, pertains to damages that would occur, if at all, during construction, which is irrelevant to just compensation.  *See 0.07 Acre*, 396 F. Supp. 3d at 644 (citing *Ryan v. Davis*, 201 Va. 79, 83 (1959)).  Additionally, Gruelle's reliance on this "uncertainty" is impermissible in this lawsuit for the same reasons that bar testimony about the fear of pipeline explosions.  *See id.* at 642.

        i.     *Gruelle fails to establish that damage to springs, wells, drainage, and soil is reasonably probable.*

Gruelle fails to establish that damage to existing springs, wells, drainage, and soil is reasonably probable.  Standing alone, Gruelle's use of the phrase "uncertainty" demonstrates the speculative nature of this alleged concern.  *Id.* at 35.

With respect to soil damage, Gruelle relied upon conversations with Harold Mathews,[11] as well as two soil-related articles.  **Ex. 5** at 60:9-20 (discussing Harold Mathews); 103:20-104:8 (discussing the soil-related articles).  Harold Mathews is supposedly a "soil scientist."  *Id.* at 60:19.

But, Landowners have not designated Harold Mathews as an expert in this case.  Further, Gruelle cannot himself testify about the effects of pipeline construction on soil.  Gruelle is not an expert on pipeline construction, soil, or hydrology.  *Id.* at 56:19-57:7 ("Q:  Are you a pipeline expert?  A: Not a pipeline expert, no.  Q: Have you ever received any formal education about pipelines or pipeline safety?  A:  Not formal education.  Q: Do you have any training in the field of natural gas pipelines?  A:  No training, no.  Q:  Do you have any licensing in the field of natural gas pipelines?  A:  No.").  Gruelle is merely a real estate appraiser.  *Id.* at 7:1-8:17 (describing his career as an appraiser); **Ex. 1** at 42 (Gruelle's CV, which makes no mention of any expertise

---

[11] According to Gruelle, Harold Mathews believes that "when the pipeline is put in, it disturbs the soils; and that causes a change in the quality of the soil. … [A]nd in some cases if there's blasting that goes on, then there's some rock mixed in as well."  **Ex. 5** at 60:12-18.

outside of real estate appraisals).  He did not test or survey the springs, wells, drainage, or soil on the Ralston Parcels.  Thus, Gruelle's testimony about Harold Mathews's opinions are inadmissible. *See 1.81 Acres of Land*, 2019 U.S. Dist. LEXIS 141711, at *11 ("[A] party cannot turn an expert in another field into an expert in an area where he has no experience by propping him up entirely on the works of others.").

Additionally, Harold Mathews's opinions do not pertain specifically to either the ACP Project or the soil on the Ralston Parcels.  There is no evidence that Harold Mathews is familiar with Atlantic's pipeline construction metholodogy.  *See 0.07 Acre*, 396 F. Supp. 3d at 646 ("Nor had [the proposed expert] performed a noise analysis of pipeline construction previously.").  Harold Mathews mentions that "blasting" will result in "some rock mixed in as well," but Gruelle admits he is not certain whether blasting will even occur on the Ralston Parcels.[12] **Ex. 5** at 61:10-14 ("Q:  And do you know if there's going to be blasting on the subject parcel?  A:  I think based on – I'm not certain, but there's a lot of rock that's on that property.").  Further, there is also no evidence that Harold Mathews tested the soil on the Ralston Parcels.  *See 0.07 Acre*, 396 F. Supp. 3d at 642 (finding hazard probability irrelevant where it was not tied to the taking occurring on the subject property).

Moreover, the two soil-related articles that Gruelle relies upon and attaches to the Report do not support Harold Mathews's opinions.[13]  The article titled "Restoration of Drastically

---

[12] Blasting during pipeline construction is irrelevant in this lawsuit.  *See 0.07 Acre*, 396 F. Supp. 3d at 644 (citing *Ryan*, 201 Va. at 83).

[13] Harold Mathews has no connection to the two soil-related articles attached to the Report.  **Ex. 5** at 97:6-17 ("Q:  … [W]as [Harold Mathews] a contributor to the soybean article that's attached to your report?  A: I don't think he was. I don't see his name in here.  Q: Okay. And do you know if [he] was involved in the Virginia Cooperative Extension of Virginia Tech, Virginia State University presentation that you attached to your report?  A: I don't believe I saw his name on that either.").

Disturbed Lands" discusses a general procedure for soil reclamation.  **Ex. 1** at 59-69.  This article does not analyze the impact of pipeline construction on soil, let alone Atlantic's pipeline methodology or the soil on the Ralston Parcels.

The article titled "Who Killed the Finest Soybean Soil?" helps demonstrate that soil compaction is irrelevant and speculative.[14]  *Id.* at 57-58.  The landowner in this article claimed that the soil damage was caused by the pipeline company's negligent construction activities.  *Id.* at 57 ("Who is to blame? … [The landowner] says the topsoil disaster was a direct result of [the pipeline company's] negligence.").  Atlantic's construction activities are irrelevant to just compensation.  *See 0.07 Acre*, 396 F. Supp. 3d at 644-45 ("To the extent that potential damages might arise after the taking due to construction, under *Ryan* the noise and vibration effects resulting from construction would be irrelevant to … just compensation.").  And, Gruelle may not assume that Atlantic will be negligent during construction.  *See id.* at 644 ("[A]ny damage the property may have sustained by reason of any wrongful act or negligent acts committed during the course of construction … was not compensable in the condemnation proceeding but could form the basis of a separate suit.").[15]  Consequently, generalized concerns about soil damage are irrelevant and speculative.

With respect to springs, wells, and drainage, Gruelle described the sources he relied upon as follows:

> I've learned that from talking to owners of property that pipelines go through their property, Dr. [Harold] Mathews, who was mentioned in here, where springs have been I guess redirected or there have been issues regarding springs drying up; wells,

---

[14] The article is also irrelevant because it pertains to a different pipeline that was owned by a different company in a different state.  **Ex. 1** at 57-58; *see 0.07 Acre*, 396 F. Supp. 3d at 642 (finding hazard probability irrelevant where it was not tied to the taking occurring on the subject property).

[15] Landowners may seek compensation for any damages that may occur, if at all, as a result of negligent construction in a separate lawsuit.  *See 0.07 Acre*, 396 F. Supp. 3d at 644.

obviously, a concern for multiple reasons: One, again, that it might change the water flow from the well; secondly, I've learned that well drillers oftentimes don't want to drill a well, especially if it's in rock near a high-pressure gas pipeline.

**Ex. 5** at 68:4-14.

Gruelle presents no evidence that a pipeline easement causes springs to dry or be redirected. *See 760.807 Acres of Land*, 731 F.2d at 1448 (requiring "causation" between the taking and the diminution in value). The well on the Ralston Parcels is not in the path of the pipeline easement. **Ex. 5** at 68:15-18 ("Q: Is there a well on the property? A: Yes. Q: Is it in the path of the easement? A: It's not in the path of the easement, no."). Gruelle does not even know the distance between the pipeline easement and the well or the springs. *Id.* at 68:19-69:4 ("Q: Do you know how far away the well is from the path of the easement or the centerline? A: I don't know the exact distance. … Q: Do you have any idea the distance [between the springs] from the centerline of the easement? A: I don't know the exact distance, no."). Thus, generalized concerns about springs, wells, and drainage are irrelevant and speculative.

Moreover, Gruelle ignores mitigation and restoration measures employed before, during, and after pipeline construction. In *Rover Pipeline, LLC v. 10.055 Acres of Land*, the landowner's expert "found 'serious compaction' of the soil in the [construction] areas and [opined] that [his] recommendations for soil compaction minimization had not been followed." No. 5:17-CV-239, 2018 U.S. Dist. LEXIS 217574, at *25 (N.D. Ohio Dec. 28, 2018). The court excluded the soil opinion, which "will not aid the jury in their determination of just compensation" because "the FEIS envisions [the pipeline company's] post-construction mitigation measures to include decompaction of the soil, and there is no way to know at this time if those measures will be ineffective." *Id* at 26. "Until such time that the results of these measures can be evaluated, there

is no way to determine whether compaction of the soil will adversely affect the market value of the property." *Id.*

Similarly here, FERC requires Atlantic to restore the Ralston Parcels to pre-construction conditions within a few years after construction.[16] Specifically, FERC made the following findings and imposed the following conditions in Atlantic's Certificate of Public Convenience and Necessity ("Certificate"):

- "Impacts on agricultural lands will be short-term, lasting during the period of construction and restoration and returning to pre-construction conditions within a few years."[17] ECF No. 40-3, ¶ 247.

- "[Atlantic] ha[s] committed to compensate farmers for the loss of agricultural production during the construction and restoration period." *Id.*

- "Following pipeline installation, the right-of-way will be restored to near pre-construction conditions and use, and agricultural practices could resume." *Id.*

- "Mitigation measures typically implemented in agricultural lands … include topsoil segregation, rock removal, soil decompaction, and repair/replacement of irrigation and drainage structures damaged by construction." *Id.*

- "To minimize impacts on wells, springs, and karst-related groundwater from construction-associated sedimentation and runoff, Atlantic and DETI have committed to implement the erosion control measures outlined in their *Karst Mitigation Plan* as well as the measures in the *Commission's Upland Erosion Control, Revegetation, and Maintenance Plan* (FERC Plan)." ECF No. 40-3, ¶ 214.

- "Further, to minimize the potential for hazardous materials to contaminate groundwater, Atlantic and DETI will implement the measures outlined in their *Stormwater Pollution Prevention Plan*; *Spill Prevention, Control, and Countermeasures Plan*; *Contaminated Media Plan*; and *Blasting Plan*." *Id.*

- "Atlantic and DETI must receive written authorization from the Director of OEP before placing their respective projects into service. Such authorization would only be granted following a determination that rehabilitation and restoration of the right-of-way and other

---

[16] To restore the property as required by FERC, Atlantic seeks a five-year temporary easement in this case to "engage in restoration or clean-up activities." ECF No. 40 ¶ 19.
[17] Gruelle notes that the Ralston Parcels are zoned agricultural and are used for agricultural purposes. **Ex. 1** at 18.

areas affected by the ACP and Supply Header projects are proceeding satisfactorily." ECF No. 40-3 at 138[18] (Environmental Condition No. 11).

- "Prior to construction, Atlantic and DETI shall complete the remaining field surveys for wells and springs within 150 feet of the construction workspace, and within 500 feet of the construction workspace in karst terrain, and file the results, including type and location, with the Secretary." ECF No. 40-3 at 147 (Environmental Condition No. 52).

- "Atlantic and DETI shall offer to conduct, with the landowner's permission, post-construction water quality tests, using the same parameters used in the preconstruction tests, for all water supply wells and springs within 150 feet of the construction workspace and within 500 feet of the construction workspace in karst terrain." ECF No. 40-3 at 151 (Environmental Condition No. 68).

The FERC requirements above alleviate the alleged "uncertainty" about springs, wells, drainage, and soil compaction. Atlantic must comply with the FERC requirements. Consequently, Gruelle may not consider this "uncertainty" in assessing severance damages. *See MVP v. Eagle's Nest*, 7:18-cv-00610, ECF No. 55 at 12 ("[A]ssum[e] 'that buyers and sellers of ordinary prudence are knowledgeable and … are not motivated by speculation or conjecture.'").

   ii. *Gruelle fails to establish a causal link between the alleged concerns and market value.*

"[T]here must be a causal link between the taking and a direct loss in the marketplace." *Id.* at 13. Gruelle fails to meet this burden.

Critically, Gruelle does not explain how generalized concerns about the "uncertainty" of the "impact to existing springs, wells, drainage and soil compaction" reduce the market value of the Ralston Parcels—let alone any real property in Augusta County, Virginia. He fails to cite to any source that supports the conclusory leap he made by diminishing the value of the residue because of the "uncertainty." *See 760.807 Acres of Land*, 731 F.2d at 1448-49 (holding that the appraiser failed to explain why knowledgeable buyers would become fearful of explosive hazards

---

[18] The page numbers cited for ECF No. 40-3 refer to the "Pacer-stamped" page number.

and inquire about the adequacy of a blast zone).  Accordingly, Gruelle's reliance on such concerns taints his opinion that the Ralston Parcels will suffer a 40% loss in market value.

      C.      <u>Gruelle impermissibly relied upon the irrelevant and speculative concern that third parties will utilize the easement area in the future.</u>

As part of his analysis on severance damages, Gruelle also considered that "[t]he property is more likely to have additional easements since the state encourages locating easements together." **Ex. 1** at 35.  At deposition, Gruelle said, "once you get an easement like a pipeline easement or power line, transmission line easement, you tend to invite other utilities to follow that corridor.  That's – the state encourages that." **Ex. 5** at 102:4-8.  This alleged concern is irrelevant because just compensation in this lawsuit must be based on Atlantic's easement, not potential easements by third party utilities.  If third parties condemn easements on the Ralston Parcels in the future, the Landowners will be entitled to just compensation.  *See* U.S. CONST., amend. V (requiring just compensation).  The Landowners have no right to seek just compensation for those speculative future easements from Atlantic.

In addition, the alleged concern is based on future events that may never occur, especially for this specific property.  *See 0.07 Acre*, 396 F. Supp. 3d at 641 ("[A]ny opinion or testimony regarding the probability of an incident occurring outside the property is irrelevant and must be excluded on that basis.").  For a 600-mile pipeline spanning across three states, Gruelle has no evidence to suggest that another utility company has requested or otherwise intends to seek an easement in the small portion of the ACP Project that crosses the Ralston Parcels.

Indeed, Gruelle concedes that "[e]very situation [involving the impact of subsequent easements] is different" and that "[y]ou've got to look at each one." *Id.* at 102:18-103:1.  Gruelle, however, failed to look at this specific situation.  *Id.* at 102:2-17 (providing examples involving East Tennessee Natural Gas and Virginia Natural Gas, but no facts about the ACP Project).

Therefore, generalized concerns about additional easements from third-party utilities are speculative. *See 1.30 Acres of Land*, 2019 U.S. Dist. LEXIS 155035, at *17 (granting MVP's motion to exclude testimony about utility corridors based on landowner counsel's concession about the speculative nature of such testimony).

Also, Gruelle has failed to prove a causal link between the alleged concern and market value. Instead of doing the work to confirm whether market data exists, Gruelle merely assumes that the concern impacts market value, without providing any supporting facts or data. *See Rockies Express Pipeline LLC v. Hopkins*, No. 1:08-cv-00751, 2012 U.S. Dist. LEXIS 65122, at *5 (S.D. Ind. May 9, 2012) (expert testimony precluded where expert's report revealed no market data to evidence a loss in market value due to stigma damages).

      D.      <u>Gruelle impermissibly relied upon baseless and speculative concerns regarding government mortgages.</u>

In analyzing severance damages, Gruelle notes that the U.S. Department of Housing and Urban Development ("HUD") "has limitations and approval requirements with respect to mortgages on properties within 660 feet of the center line of high pressure gas pipeline easements." **Ex. 1** at 35. At deposition, however, Gruelle conceded that HUD mortgages are not a legitimate concern. According to Gruelle, having a pipeline on the property "just [creates] another little step in the approval process." **Ex. 5** at 66:3-4. An applicant for a HUD mortgage "just need[s] to certify from the pipeline developer that they met all the … FERC requirements when they put the pipeline in." *Id.* at 65:20-66:1. So long as the applicant "provide[s] that certification," Gruelle notes, "You would still get your mortgage, yes." *Id.* at 66:5-8.

The HUD concern is also speculative because it assumes that a future buyer of the Ralston Parcels will apply for a HUD mortgage. That may not be the case. Further, Gruelle fails to establish a nexus between HUD mortgages and market value. *See Hopkins*, 2012 U.S. Dist. LEXIS

65122, at *5 (expert testimony precluded where expert's report revealed no market data to evidence a loss in market value due to stigma damages).

Because Gruelle considered speculative, baseless, and irrelevant concerns in assessing a 40% diminution in value, his opinion on severance damages is unreliable. To avoid misleading the jury on what is compensable, Gruelle's 40% opinion should be excluded. *See 1.30 Acres of Land*, 2019 U.S. Dist. LEXIS 155035, at *10 ("Indeed, 'given the potential persuasiveness of expert testimony, proffered evidence that has a greater potential to mislead than to enlighten should be excluded.'").

## II. Gruelle's Generalized Opinions about Market Perception Should Be Excluded.

Gruelle's generalized opinions about the market perception of pipelines should be excluded because he fails to demonstrate a nexus between those perceptions and the marketplace for the Ralston Parcels. In addition to the irrelevant and speculative concerns noted above, Gruelle also relied upon the following "[m]arket perceptions and issues related to natural gas pipelines" in determining severance damages:

- "Public perceptions of natural gas pipelines on agricultural and residential properties are negative."

- "The market reacts negatively to a gas transmission line."

- "Many buyers will not purchase properties encumbered by gas pipelines."

- "Knowledgeable buyers who purchase encumbered land expect to pay a discounted price."

- "There are recognized safety concerns in the market."

**Ex. 1** at 35.

In *MVP v. Eagle's Nest*, the landowner's appraiser, Kurt Kielisch ("Kielisch"), similarly found "[d]amages resulting from perceived market negative influence[,] sometimes known as

'stigma' or 'severance' damages." 7:18-cv-00610, ECF No. 55 at 4. To determine the extent of the negative influence on market value, Kielisch "survey[ed] … real estate agents and landowners to analyze the beliefs 'of the potential buyer of a residential property.'" *Id.* at 5. As part of that survey, Kielisch "interviewed four local Giles County real estate brokers on their opinions about the effect of the Mountain Valley Pipeline on property value."[19] *Id.* Kielisch's interviews with these brokers were summarized by the court, as follows: [20]

- "One broker said his clients have expressed concern over the pipeline and opined that the value would be decreased by 25-50%."

- "Another broker said that the local community has an 'extremely negative' view of the pipeline."

- "The third broker opined that the impact was a decrease in value of 10%."

- "The last broker said that clients do not want to see properties within five to ten miles of a natural gas pipeline, but he declined to opine on a percentage of negative impact."

*Id.* at 5-6.

In holding that Kielisch failed to prove a causal link between "the public perception in the marketplace [for the subject parcels taken] and a diminution in value of the properties," the court exposed these flaws with his broker interviews:[21]

> Kielisch has failed to provide any detailed information about the Giles County real estate brokers who provided their opinions about the potential impact that a natural gas pipeline would have on property value. There is no information about the brokers themselves and their experience, the number of clients with whom the brokers have discussed the issue, or if their opinion of the diminution in value percentage is based upon anything other than rank speculation. By only providing

---

[19] The parcels at issue in Kielisch's condemnation case were located in Giles County, Virginia.

[20] A full copy of the Kielisch report can be found at ECF No. 28-2 in 7:18-cv-610-EKD-RSB (W.D. Va.). The section of the Kielisch report that pertains to his interviews with Virginia brokers is attached hereto as **Exhibit 7**.

[21] The court also flawed Kielisch for relying upon sources that dealt with pipelines in other states. *MVP v. Eagle's Nest*, 7:18-cv-00610, ECF No. 55 at 13. Gruelle similarly does the same, attaching to his Report an article about pipelines in Texas. **Ex. 1** at 88-99.

limited information in this regard, Kielisch has not adequately established a causal link. Further, … Kielisch has not provided any evidence that the clients referenced by the Giles County real estate brokers are potential purchasers of the Sizemore or Eagle's Nest properties. Rather, they only generally reference their clientele and those clients' general beliefs about natural gas pipelines.

*Id.* at 14.

Similarly here, Gruelle obtained his "market perceptions" by "talking to property owners and brokers, people involved with the pipelines in some related fashion." **Ex. 5** at 58:7-14; *see also id.* at 66:9-12 ("Q:  When you say the recognized safety concerns in the market, what do you base that on?  A:  The – again, what I've learned from buyers, sellers, brokers.").  Like Kielisch, Gruelle does not establish a nexus between the property owners and brokers he interviewed and the marketplace for the Ralston Parcels.

Gruelle fails to identify the property owners he interviewed.  When asked about the property owners during deposition, Gruelle noted, "I didn't think it was necessary to list another 20 or 30 people by name." **Ex. 5** at 39:21-22.  Without more detailed information about the property owners he interviewed, there is no way to tell if these property owners were even in the market to purchase a new home, let alone if they were potential purchasers of the Ralston Parcels.

Gruelle also fails to provide any detailed information about the brokers he interviewed. The Report contains no information about the brokers themselves, other than their names. **Ex. 1** at 36.  At least Kielisch noted that his brokers were from Giles County.  Gruelle does not even identify where his brokers are from or the marketplace they serve.

Further, Gruelle has not provided any evidence that the "buyers" referenced by the brokers are potential purchasers of the Ralston Parcels.  *See MVP v. Eagle's Nest*, 7:18-cv-00610, ECF No. 55 at 14 ("Kielisch has not provided any evidence that the clients referenced by the Giles County real estate brokers are potential purchasers of the Sizemore or Eagle's Nest properties.").

Each broker references "buyers" with negative perceptions about gas pipelines. **Ex. 1** at 36. But, Gruelle provides no information about these "buyers." One broker, Gayle Harvey, noted that she "[h]ad one listing with a gas pipeline and it never sold." **Ex. 1** at 36. However, no details are provided about that listing. The brokers interviewed by Gruelle "only generally reference their clientele and those clients' general beliefs about natural gas pipelines." *Id.*; *see also Mountain Valley Pipeline, LLC v. 10.67 Acres of Land*, Civil Action No. 7:18-cv-00609, 2019 U.S. Dist. LEXIS 195443, at *16 (W.D. Va. Nov. 12, 2019) (finding that the appraiser "failed to provide a causal link between [his] … interviews with market participants and his conclusion about damages").

Gruelle does not link the information from the brokers to the real estate market for the Ralston Parcels. As a result, Gruelle cannot establish the requisite nexus. *See MVP v. Eagle's Nest*, 7:18-cv-00610, ECF No. 55 at 14 ("[T]he opinions of Giles County real estate brokers … are altogether insufficient to establish a causal link between any evidence of the public's fear or hesitation about natural gas pipelines and a negative impact in value of the [subject] properties."). Therefore, Gruelle's generalized opinions about market perceptions should be excluded.

In addition, Gruelle relied upon these market perceptions in assessing severance damages. **Ex. 1** at 35-36. Consequently, Gruelle's 40% opinion is unreliable and should also be excluded.

## III. Gruelle Impermissibly "Double Dips" By Damaging The Same Area Twice.

Gruelle's calculation of severance damages is also unreliable because he impermissibly "double dips" by damaging the permanent easement area twice. First, Gruelle reduced the per-acre value of the permanent easement area by 40% to account for the residual impact of the pipeline. **Ex. 1** at 38 (multiplying 4.13 acres for the permanent easement by $2,275/acre, instead of

$3,500/acre). Then, he reduced the value of the permanent easement area again by 95% because the area is utilized for the pipeline easement. *Id.* (further multiplying the value by 5%).

Gruelle's "double dip" is the exact type of methodology deemed unreliable by other federal courts. *See Sabal Trail Transmission, LLC v. 3.921 Acres of Land In Lake Cty. Fla.*, No. 5:16-cv-178-Oc-30PRL, 2017 U.S. Dist. LEXIS 221692, at *26-27 (M.D. Fla. Oct. 6, 2017) ("[The appraiser] reduced the value of the 1.535 acres because it was used as the Pipeline easement, and then reduced it a second time to account for the impact of the Pipeline."). Gruelle offers no explanation or support for including the permanent easement area as part of the residue or damaging it twice. *See 76 Acres*, 701 F. App'x at 228 (defining severance damages as the difference in market value of the "residue," which is the portion of the property not taken). Accordingly, his calculation of severance damages is unreliable and should be excluded. *See 69.1 Acres of Land*, 942 F.2d at 292 ("Overcompensation is as unjust to the public as undercompensation is to the property owner.").

## CONCLUSION

For the reasons above, the Court should grant this motion and exclude Gruelle's opinion that the residue will incur a 40% loss in market value, his calculation of severance damages, and any testimony about the alleged market concerns and market perceptions addressed herein.

Dated:  February 20, 2020

**ATLANTIC COAST PIPELINE, LLC**
By Counsel

/s/ Kang He_____
Richard D. Holzheimer, Jr. (VSB No. 40803)
James J. Holt (VSB No. 78601)
Kang He (VSB No. 89237)
**MCGUIREWOODS LLP**
1750 Tysons Boulevard, Suite 1800
Tysons, Virginia 22102
Phone: (703) 712-5000
Fax: (703) 712-5050
rholzheimer@mcguirewoods.com
jholt@mcguirewoods.com
khe@mcguirewoods.com

*Counsel for Atlantic Coast Pipeline, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on February 20, 2020, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will cause a copy to be served on the

following:

> Stephen J. Clarke
> WALDO & LYLE, P.C.
> 301 West Freemason Street
> Norfolk, Virginia 23510
> Telephone: (757) 622-5812
> Facsimile: (757) 622-5815
> sjc@waldoandlyle.com

/s/ Kang He
Kang He